**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LINDA MIGLIORI, et al.,** | : | |
| | : | No. ___**5:22-CV-00397**___ |
| **Plaintiffs,** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **LEHIGH COUNTY BOARD OF ELECTIONS,** | : | |
| | : | |
| | : | |
| **Defendant.** | : | |

## <u>ORDER</u>

    **AND NOW**, this _____ day of _____, 2022, upon consideration of Defendant Lehigh County Board of Elections' Motion for Summary Judgment, and Plaintiffs' Cross-Motion for Summary Judgment, and any responses thereto, it is hereby ordered that Defendant's Motion for Summary Judgment is **GRANTED**, Plaintiffs' Cross-Motion for Summary Judgment is **DENIED**, and Plaintiffs' Complaint filed against Defendant Lehigh County Board of Elections, is **DISMISSED WITH PREJUDICE**.

_____
Joseph F. Leeson, Jr., J.

1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA MIGLIORI, et al., | : | |
| | : | No. ___5:22-CV-00397___ |
| Plaintiffs, | : | |
| | : | |
| v. | : | |
| | : | |
| LEHIGH COUNTY BOARD OF ELECTIONS, | : | |
| | : | |
| | : | |
| Defendant. | : | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

For the reasons set forth in full in the contemporaneously filed Brief in Support of Defendants' Motion for Summary Judgment and in Opposition to Plaintiff's Cross-Motion for Summary Judgment, which is incorporated herein by reference as if set forth in full detail, Lehigh County Board of Elections, above-captioned Defendant, requests dismissal, with prejudice, of Plaintiffs' Complaint in its entirety, based on Federal Rule of Civil Procedure 56.

Respectfully Submitted,

*Lucas J. Repka*                                      *Joshua S. Mazin*
_____                    _____
Lucas J. Repka, Esq.                                Joshua S. Mazin, Esq.
Pa. ID. No. 93509                                    Pa. ID No. 87680
108 East Center Street                             108 East Center Street
Nazareth, Pennsylvania 18064                  Nazareth, Pennsylvania 18064
Phone: (610) 365-2670                            Phone: (610) 365-2670

DATED: <u>February 11, 2022</u>

2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **LINDA MIGLIORI, et al.,** | : | | |
| | : | No. | **5:22-CV-00397** |
| **Plaintiffs,** | : | | |
| | : | | |
| **v.** | : | | |
| | : | | |
| **LEHIGH COUNTY BOARD OF ELECTIONS,** | : | | |
| | : | | |
| | : | | |
| **Defendant.** | : | | |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFFS' CROSS-MOTION
FOR SUMMARY JUDGMENT**

Lucas J. Repka, Esq.                Joshua S. Mazin, Esq.
Pa. ID. No. 93509                   Pa. ID No. 87680
108 East Center Street              108 East Center Street
Nazareth, Pennsylvania 18064        Nazareth, Pennsylvania 18064
Phone: (610) 365-2670               Phone: (610) 365-2670


Attorneys for Defendant, Lehigh County Board of Elections

## I.   INTRODUCTION

The sole issue before this Court is whether the Lehigh County Board of Elections (Board) must count 257 mail-in ballots that were submitted with a facially deficient ballot-return envelope. Specifically, all 257 mail-in ballots at issue failed to contain the date, as required by Pennsylvania law, next to the signature line on the envelope.  Upon receipt of the mail-in ballot and discovery of the missing date, the ballots at issue were not opened and immediately set aside as required under Pennsylvania law.

The 2021 Municipal Election was held on November 2, 2021.  In that Election, six candidates vied for three open seats on the Lehigh County Court of Common Pleas.  At present, two of the three judicial positions have been certified and Judges have been installed.  The third position, which remains unofficially, but not officially certified under Pennsylvania law, has David Ritter winning final judicial seat over Zachary Cohen by 71 votes.[1]

## II.   BACKGROUND and PROCEDURAL HISTORY

In the 2021 Municipal Election, the County's Office of Voter Registration and Elections received approximately 22,000 mail-in ballots.  Of those ballots, 261 were deemed invalid by the Board's Chief Clerk based on the omission of a date or the inclusion of an improperly placed date on the elector declaration on the ballot-return envelope.  Of the 261 ballots, 257 lacked a date, and 4 ballots contained a date, but in the wrong location.  As such, the Chief Clerk determined the ballots would not be pre-canvassed or canvassed (counted) based on the Pennsylvania Election

---

[1] Of note, originally, 261 mail-in ballots were set aside for defects on the ballot-return envelope.  257 of those ballots were for missing dates, and 4 were previously set aside for having the date in the wrong location on the ballot-return envelope.  Following a decision by the Court of Common Pleas and the conclusion of the Appeal to the Commonwealth Court, the 4 votes with dates in the wrong location were counted.  As a result, at a meeting on February 1, 2022, the Board counted the 4 votes and unofficially recertified the election.  Under 25 P.S. §3154, the certification of an election in Pennsylvania is a two-step process.  The first step requires the Board to unofficially certify the Election and then it must wait 5 calendar days to officially (finally) certify the Election.  At a meeting on February 1, 2022, the Board unofficially certified the Election with David Ritter winning the judicial position by 71 votes over Zachary Cohen.

Pursuant to this Court's Order dated February 2, 2022, and by agreement of the parties, the Board has not taken any action to officially certify the Election results until this Court enters an Order relative to the remaining 257 mail-in ballots that have not been opened, reviewed, or counted to date.

Code ("Election Code"),[2] Pennsylvania case law, and guidance from the Pennsylvania Department of State.

In response, Zachary Cohen challenged the Chief Clerk's decision to set aside these mail-in ballots. On November 15, 2021, the Board held a hearing on Cohen's challenge, and the Board voted 3-0 to canvass the 261 mail-in ballots. Two days later, David Ritter filed an appeal to the Court of Common Pleas of Lehigh County.

Following a hearing and the submission of briefs on all issues raised, including an issue concerning the Materiality Provision of the Civil Rights Act, the Court issued a decision affirming the Board's decision to count all 261 mail-in ballots. David Ritter filed an appeal to the Commonwealth Court of Pennsylvania.

Ultimately, the Commonwealth Court reversed the decision of the Court of Common Pleas, concluding the mail-in ballots should not be counted. In so doing, the Commonwealth Court addressed and rejected the assertions that the Materiality Provision of the Civil Rights Act applied here. The Court also relied upon the Pennsylvania Supreme Court's decision in In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election, 241 A.3d 1058 (Pa. 2020), in reaching its conclusion that the ballots at issue should not be counted. Cohen filed a petition for allowance of appeal to the Pennsylvania Supreme Court, which was denied on January 27, 2022. Ritter v. Lehigh County Board of Election, (Pa. No. 9 MAL 2022, filed Jan. 27, 2022), 2022 WL 244122.

On January 31, 2022, 5 individuals, with the assistance of the American Civil Liberties Union (ACLU), filed the instant lawsuit. All five of the named plaintiffs voted by mail-in ballot in the election, and their ballots were rejected because of the lack of a date on the ballot-return

---

[2] Act of June 3, 1937, P.L. 1333, *as amended*, 25 P.S. §§2601-3591.

envelope.  Initially, this suit sought a preliminary injunction seeking to enjoin the Board from officially certifying the election and future relief consistent with that position.

By agreement, the Board unofficially certified the election, but then took no action to officially certify the election.  Subsequently, the parties, with the Court's consent, agreed to file a stipulation of facts and convert the dispositive request in this matter from a request for preliminary injunction and opposition thereto, to cross-motions for summary judgment.  As the facts of this matter are not in dispute, and the issue before the Court is solely a question of law, the Board respectfully submits that the instant matter is ripe for this Court's disposition.

## III.    STANDARD

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'"  Celotex Corp. v. Catrett, 477 U.S. 317 (1986) (quoting Fed. R.Civ.P. 56(c)).

In deciding a motion for summary judgment, the court must construe the facts and inferences in a light most favorable to the nonmoving party.  Pollock v. Am. Tel. & Tel. Long Lines, 794 F.2d 860, 864 (3d Cir. 1986).  "'With respect to an issue on which the nonmoving party bears the burden of proof, the burden of the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  Conoshenti v. Pub. Serv. Elec. & Gas, 364 F.3d 135, 145–46 (3d Cir. 2004) (quoting Celotex, 477 U.S. at 325).  The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

The summary judgment standard is not affected when the parties file cross-motions for summary judgment.  See Appelmans v. City of Phila., 826 F.2d 214, 216 (3d Cir.1987). Such motions "'are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist.'"  Transportes Ferreos de Venez. II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir.2001) (quoting Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir.1968)).  If after review of cross-motions for summary judgment the record reveals no genuine issues of material fact, then judgment will be entered in favor of the deserving party in light of the law and undisputed facts.  Iberia Foods Corp. v. Romeo, 150 F.3d 298, 302 (3d Cir. 1998).

## IV.    ISSUES PRESENTED

A.    WHETHER THE INSTANT LAWSUIT IS BARRED BY THE DOCTRINE OF RES JUDICATA.

Suggested Answer: Yes.

B.    WHETHER THE PLAINTIFFS HAVE STANDING TO BRING A CLAIM UNDER SECTION 10101(a)(2)(B).

Suggested Answer: No.

C.    WHETHER THE MATERIALITY CLAUSE OF THE CIVIL RIGHTS ACT PROHIBITS THE BOARD FROM REJECTING THE BALLOTS AT ISSUE.

Suggested Answer: No.

D.   WEHTHER   THE   ELECTION   CODE'S   DATE   REQUIREMENT
CONSTITUTES AN UNDUE BURDEN IN VIOLATION OF THE FIRST AND
FOURTEENTH AMENDMENTS.

Suggested Answer: No.

## V.   ARGUMENT

Section 1306-D(a) of the Election Code governs voting by mail-in ballot.  It states, in
relevant part (with emphasis added):

> **(a) General rule.--**At any time after receiving an official mail-in
> ballot, but on or before eight o'clock P.M. the day of the … election,
> the mail-in elector shall, in secret, proceed to mark the ballot …
> enclose and securely seal the [ballot] in the envelope on which is
> printed, stamped or endorsed 'Official Election Ballot.' This
> envelope shall then be placed in the second one, on which is printed
> the form of declaration of the elector, and the address of the elector's
> county board of election and the local election district of the elector.
> *The elector shall* then fill out, *date* and sign *the declaration printed
> on such envelope*. Such envelope shall then be securely sealed and
> the elector shall send same by mail, postage prepaid … or deliver it
> in person to said county board of election.

25 P.S. §3150.16(a).

A little over a year ago, in <u>In re Canvass of Absentee and Mail-in Ballots of November 3,
2020 General Election</u>, 241 A.3d 1058 (Pa. 2020), the Pennsylvania Supreme Court considered
whether the date on the elector declaration on the outside envelope of a mail-in ballot is a
mandatory requirement for purposes of Section 1306-D(a) of the Election Code.  A divided Court
issued three opinions on this issue.

In an Opinion Announcing the Judgment of the Court ("OAJC"), Justice Donahue, joined
by Justices Todd and Baer, determined undated mail-in ballots should be canvassed because an
undated signature on an elector declaration constituted a minor irregularity that did not warrant
invalidation of the ballots.  In so doing, Justice Donahue stated:

The date that the declaration is signed is irrelevant to a board of elections' comparison of the voter declaration to the applicable voter list, and a board can reasonably determine that a voter's declaration is sufficient even without the date of signature.  Every one of the … ballots challenged [in these matters], were received by the boards of elections by 8:00 p.m. on Election Day, so there is no danger that any of these ballots was untimely or fraudulently back-dated. Moreover, in all cases, the receipt date of the ballots is verifiable, as upon receipt of the ballot, the county board stamps the date of receipt on the ballot-return and records the date the ballot is received in the SURE system. The date stamp and the SURE system provide a clear and objective indicator of timeliness, making any handwritten date unnecessary and, indeed, superfluous.

[In our prior decision,] [w]e did not address … whether a county board of elections could find a declaration as sufficient even though it was undated. That question requires an entirely different analysis that depends in significant part on whether dating was a mandatory, as opposed to a directive, requirement. We have conducted that analysis here and we hold that a signed but undated declaration is sufficient and does not implicate any weighty interest.  Hence, the lack of a handwritten date cannot result in vote disqualification. …

[W]e conclude that while failures to include a … date in the voter declaration on the back of the outer envelope, while constituting technical violations of the Election Code, do not warrant the wholesale disenfranchisement of thousands of Pennsylvania voters. As we acknowledged in *Shambach*, 'ballots containing mere minor irregularities should only be stricken for compelling reasons.' *Shambach*, 845 A.2d at 799; *see also Appeal of Gallagher*, 351 Pa. 451, 41 A.2d 630, 632 (1945) ("[T]he power to throw out a ballot for minor irregularities ... must be exercised very sparingly and with the idea in mind that either an individual voter or a group of voters are not to be disfranchised at an election except for compelling reasons."). Having found no compelling reasons to do so, we decline to intercede in the counting of the votes at issue in these appeals.

Id. at 1078.  Thus, three of the Justices of the Supreme Court determined that the lack of a date on the elector declaration on the outside envelope did not justify invalidation of mail-in ballots.

In contrast, Justice Dougherty, in a concurring and dissenting opinion joined by Chief Justice Saylor and Justice Mundy disagreed concluding, "the statutory language expressly requires that the elector provide [a date]." *Id.* at 1090 (Pa. 2020) (Dougherty, J., concurring and dissenting). Thus, three of the Justices of the Supreme Court determined the lack of a date on the elector declaration on the outside envelope of mail-in ballots rendered those ballots invalid.

However, the seventh Justice of the Supreme Court, Justice Wecht, authored a concurring and dissenting opinion in which he agreed with Justices Dougherty and Mundy and Chief Justice Saylor, that an elector's failure to comply with the date requirement on the elector declaration rendered the mail-in ballots invalid.  In so doing, Justice Wecht believed this ruling, which announced a new rule of law, should only be applied prospectively so that the undated mail-in ballots would be canvassed in the November 2020 election, but they would not be counted in future elections.  To that end, Justice Wecht opined:

> I part ways with the conclusion reflected in the [OAJC] … that a voter's failure to comply with the statutory requirement that voters date the voter declaration should be overlooked as a 'minor irregularity.'  This requirement is stated in unambiguously mandatory terms, and nothing in the Election Code suggests that the legislature intended that courts should construe its mandatory language as directory. Thus, in future elections, I would treat the date … requirement as mandatory in both particulars, with the omission of [the date] sufficient without more to invalidate the ballot in question.  However, under the circumstances in which the issue has arisen, I would apply my interpretation only prospectively. So despite my reservations about the OAJC's analysis, I concur in its disposition of these consolidated cases. …

> The only practical and principled alternative is to read 'shall' as mandatory. Only by doing so may we restore to the legislature the onus for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law, especially given the certainty of disparate views of what constitute 'minor irregularities' and countervailing 'weighty interests.'

I do not dispute that colorable arguments may be mounted to challenge the necessity of the date requirement, and the OAJC recites just such arguments. But colorable arguments also suggest its importance, as detailed in Judge Brobson's opinion [below] as well as Justice Dougherty's Concurring and Dissenting Opinion. And even to indulge these arguments requires the court to referee a tug of war in which unambiguous statutory language serves as the rope. That reasonable arguments may be mounted for and against a mandatory reading only illustrates precisely why we have no business doing so.

Ultimately, I agree with Judge Brobson's description of the greatest risk that arises from questioning the intended effect of mandatory language on a case-by-case basis:

> While we realize that our decision in this case means that some votes will not be counted, the decision is grounded in law. It ensures that the votes will not be counted because the votes are invalid as a matter of law. Such adherence to the law ensures equal elections throughout the Commonwealth, on terms set by the General Assembly. The danger to our democracy is not that electors who failed to follow the law in casting their ballots will have their ballots set aside due to their own error; rather, the real danger is leaving it to each county board of election to decide what laws must be followed (mandatory) and what laws are optional (directory), providing a patchwork of unwritten and arbitrary rules that will have some defective ballots counted and others discarded, depending on the county in which a voter resides. Such a patchwork system does not guarantee voters an 'equal' election, particularly where the election involves inter-county and statewide offices. We do not enfranchise voters by absolving them of their responsibility to execute their ballots in accordance with law.

We must prefer the sometimes-unsatisfying clarity of interpreting mandatory language as such over the burden of seeking The Good in its subtext. Substantive perfection is the ever-elusive concern of the legislature. Ours must be consistency of interpretive method without fear or favor, a goal that recedes each time a court takes liberties with statutory language in furtherance of salutary abstractions. Because the OAJC favors a more intrusive and ambitious inquiry, I respectfully dissent.

But just because I disagree with the OAJC's interpretation of the date ... requirement does not inexorably lead me to the conclusion that the votes at issue in this case must be disqualified. While it is axiomatic that *ignorantia legis neminem excusat* (ignorance of the law excuses no one), this Court may elect to apply only prospectively a ruling that overturns pre-existing law or issues a ruling of first impression not foreshadowed by existing law. Indeed, we have done so in at least one case under the Election Code. In *Appeal of Zentner* [626 A.2d 146 (Pa. 1994)], we confronted a statute governing candidates' obligation to submit statements of financial interests by a time certain that had been revised specifically to correct our previously fluid interpretations of the predecessor statute. We were forced to consider whether our newly strict construal of the revised statute should result in the invalidation of entire ballots already cast because they included one or more candidates who had failed to satisfy the statutory disclosures. We held, as the legislature clearly intended, that a candidate's 'failure to file the requisite financial interests statement within the prescribed time shall be fatal to a candidacy.' But we also concluded that to 'void the results of an election where all candidates were submitted to the voters, with late but nonetheless filed financial statements which left adequate time for study by the electorate, would be an unnecessary disenfranchisement.' Thus we determined that our holding should apply prospectively but not to the election at issue.

It goes without saying that 2020 has been an historically tumultuous year. In October of 2019, the legislature enacted Act 77, introducing no-excuse mail-in voting with no inkling that a looming pandemic would motivate millions of people to avail themselves of the opportunity to cast their ballots from home in the very first year that the law applied. Soon thereafter, Act 12, introduced and enacted with unprecedented alacrity in response to the pandemic, further amended the Election Code to address emergent concerns prompted by the looming public health crisis. While aspects of the new provisions that are relevant to this case were not wholly novel to the Code, as such—for example, the provisions that authorized no-excuse mail-in voting by and large just expanded the pool of voters to whom the rules that long had governed absentee balloting applied—the massive expansion of mail-in voting nonetheless presented tremendous challenges to everyone involved in the administration of elections, from local poll workers to the Secretary of the Commonwealth. Importantly, it transformed the incentives of probing the mail-in balloting provisions for vulnerabilities in

furtherance of invalidating votes. For the first time, a successful challenge arising from a given technical violation of statutory requirements might result in the invalidation of many thousands of no-excuse mail-in ballots rather than scores or hundreds of absentee ballots.

In advance of the 2020 election, neither this Court nor the Commonwealth Court had occasion to issue a precedential ruling directly implicating the fill out, date and sign requirement. Moreover, as the OAJC highlights in multiple connections, the Secretary issued confusing, even contradictory guidance on the subject. Thus, local election officials and voters alike lacked clear information regarding the consequence of, e.g., failing to handwrite one's address on an envelope that already contained preprinted text with that exact address or record the date beside the voter's declaration signature.

I have returned throughout this opinion to our decision in *PDP*, and I do so once more. I maintained in that case that the Election Code should be interpreted with unstinting fidelity to its terms, and that election officials should disqualify ballots that do not comply with unambiguous statutory requirements, when determining noncompliance requires no exercise of subjective judgment by election officials. The date requirement here presents such a case. But I also emphasized that disqualification is appropriate '[s]o long as the Secretary and county boards of elections provide electors with adequate instructions for completing the declaration of the elector— including conspicuous warnings regarding the consequences for failing strictly to adhere' to those requirements. I cannot say with any confidence that even diligent electors were adequately informed as to what was required to avoid the consequence of disqualification in this case. As in *Zentner*, it would be unfair to punish voters for the incidents of systemic growing pains.

In case after case involving the Election Code, especially this year, we have been reminded how important it is that the General Assembly provide unambiguous guidance for the administration of the election process. But it is imperative that we recognize when the legislature has done precisely that, and resolve not to question the legislature's chosen language when it has done so. And perhaps it is a silver lining that many of the problems that we have encountered this year, in which a substantially overhauled electoral system has been forced to make its maiden run in stormy seas, are now clear

13

enough that the legislature and Department of State have notice of what statutory refinements are most needful. It is my sincere hope that the General Assembly sees fit to refine and clarify the Election Code scrupulously in the light of lived experience. In particular, because this is the second time this Court has been called upon to address the declaration requirement, it seems clear that the General Assembly might clarify and streamline the form and function of the declaration, perhaps prescribing its form to advance clarity and uniformity across the Commonwealth.

*Id.* at 1079-89 (Wecht, J., concurring and dissenting) (footnotes omitted) (emphasis added). As a result, the majority of the Justices of the Supreme Court held that Section 1306-D(a) of the Election Code requires that the elector declaration on the outside envelope be dated and, at all elections after the November 2020 General Election, the failure to include a date renders undated ballots invalid.

In interpreting the Supreme Court's decision in <u>In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election</u>, the Department of State, through its Deputy Secretary of Elections and Commissions, issued the following guidance (with emphasis added):

Since the Municipal Primary on May 18, [2021] the department has seen several news articles suggesting that some counties are continuing to accept and count ballots that do not contain … a date on the voter's declaration.

As you know, the department updated the content and the instructions on the declaration envelope to ensure that voters know they must sign and date the envelope for their ballot to be counted. Furthermore, our updated guidance is consistent with the Supreme Court's ruling last September in *In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, wherein the Court held that in future elections a voter's declaration envelope must be … dated for the ballot to count. Though we share your desire to prevent the disenfranchisement of any voter, particularly when it occurs because of a voter's inadvertent error, we must strongly urge all counties to abide by the Court's interpretation of this statutory requirement.

> We also believe that it is prudent to again remind you of our previous clarification of 10/25/2020. As noted in that communication, there is no basis to reject a ballot for putting the 'wrong' date on the envelope, nor is the date written used to determine the eligibility of the voter. You should process these ballots normally.

<u>See</u> Ex. A.  This guidance from the Department of State is consistent with the Supreme Court's precedent.

Thus, under Pennsylvania law, and given the determination by the Commonwealth Court, and the denial of review issued by the Pennsylvania Supreme Court in the challenges previously decided in the election at issue here, it is clear that under both, Pennsylvania case law and administrative guidance, that the dating of the ballot-return envelope is an unambiguous statutory requirement, and the failure to affix a date as required invalidates the ballot.

The instant litigation is now a clear attempt to have a second bite at the litigation apple by raising and/or re-raising federal issues that were raised previously, or could have been raised previously, in the prior litigation.  As a result, the Board contends the issues presented in the current litigation are barred by the doctrine of res judicata and/or issue preclusion.  In addition, even if the issues presented are not barred by res judicata or issue preclusion, which is expressly denied, the Board contends the rejection of the 257 mail-in ballots does not constitute a violation of the Civil Rights Act, or that such a requirement is an undue burden under the First and Fourteenth Amendments to the United States Constitution.  Each of these issues are addressed in turn below.

### A.    WHETHER THE INSTANT SUIT IS BARRED BY THE DOCTRINE OF RES JUDICATA.

According to the United States Supreme Court, a "fundamental precept of common-law adjudication, embodied in the related doctrines of collateral estoppel and res judicata, is that a 'right, question or fact distinctly put in issue and directly determined by a court of competent

jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies.'"
Montana v. United States, 440 U.S. 147, 153 (1979) (citation omitted). The three-prong test for the application of res judicata to a given action requires (1) a final judgment in a court of competent jurisdiction in the earlier case; (2) the assertion of the same cause of action in the two cases at issue; and (3) the presence of the same parties or their privies in both suits. See Haefner v. The County of Lancaster, 543 F.Supp. 264, 265 (E.D.Pa.1982), aff'd, 707 F.2d 1401 (3d Cir.1983).

Res judicata also bars claims that could have been, but were not, brought in the first suit.
Gregory v. Chehi, 843 F.2d 111, 116 (3d Cir.1991). Stated otherwise, "it is well established that res judicata precludes a party both from relitigating matters already litigated and decided and from litigating matters that have never been litigated, yet should have been advanced in an earlier suit."
Huck on Behalf of Sea Air Shuttle Corp. v. Dawson, 106 F.3d 45 (3d Cir. 1997) (internal citations omitted) (citing 18 Charles A. Wright, et al., FEDERAL PRACTICE AND PROCEDURE § 4406 (1981)).

Of significant import here, when a prior case has been adjudicated in a state court, federal courts are required by 28 U.S.C. §1738 to give full faith and credit to the state judgment and, in Section 1983 cases, apply the same preclusion rules as would the courts of that state. Migra v. Warren City Sch. Dist. Bd. of Educ., 465 U.S. 75, 85–87 (1984) (claim preclusion); Allen v. McCurry, 449 U.S. 90, 95–105 (1980) (issue preclusion). Additionally, decisions of state administrative agencies that have been reviewed by state courts are also given preclusive effect in federal courts. Kremer v. Chemical Constr. Corp., 456 U.S. 461, 479–85 (1982).

Here, as outlined above, and admitted by Plaintiffs in their pleadings, the candidates for the judicial position at issue in the Election, Cohen and Ritter, pursued several levels of review through the judicial process seeking to determine whether the 257 ballots, including the ballots of the 5 Plaintiffs in this suit, should be counted. Following the initial determination by the Chief

Clerk of the Board, Cohen challenged that determination before the Board, from which an appeal was taken by Ritter to the Court of Common Pleas and to the Commonwealth Court. The matter only ended when the Pennsylvania Supreme Court denied Cohen's petition for allowance of appeal.

Thus, it is clear that the first element for the application of res judicata is satisfied. Specifically, the Commonwealth Court squarely addressed the applicability of the Materiality Clause in its decision, and the request for review to the Pennsylvania Supreme Court was denied. This action constitutes a final adjudication under Pennsylvania law, and given that the undisputed facts in this matter clearly evidence that all three claims in the instant suit are based on the same set of operative facts as the prior litigation, and there was no impediment to bringing those claims (*i.e.*, after-discovered evidence), res judicata and/or claim preclusion applies to bar these claims as well. Bank of Nova Scotia v. Bloch, 533 F.Supp. 1356, 1359 (D.VI), aff'd, 707 F.2d 1388 (3d Cir. 1982).

Moreover, the appeal taken to the Court of Common Pleas was heard *de novo* and because the challenge presented questions of law, the Court's scope of review was plenary. In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election, 241 A.3d 1058 (Pa. 2020). As such, there was absolutely no restriction on the type or nature of claims that could be raised before the Court of Common Pleas. Indeed, while there exists some question as to how the issue was raised, albeit not important to the instant inquiry, the issue of the Materiality Clause of the Civil Rights Act (Voting Rights Act) was raised at the hearing, and the presiding judge permitted the parties to brief the issue.

Likewise, the second element of res judicata is satisfied. As noted above, the Court of Common Pleas, on Cohen's request, invited the parties to submit argument on the Materiality

Clause of the Civil Rights Act, and the Commonwealth Court specifically addressed the applicability of that clause in its decision.  Additionally, the doctrine of res judicata applies to bar the additional two Counts under the United States Constitution raised in this litigation as those claims could have been raised in the prior litigation.

Of significant import, the second element of res judicata, identity of causes of action, does not require that the form and theory of liability be the same in the two actions.  Kelly, 887 A.2d at 792; Dempsey, 653 A.2d at 681-82.  "The form in which two actions are commenced does not determine whether the causes of action are identical."  Dempsey, 653 A.2d at 682.  Rather, the critical issue is whether the plaintiff is suing to recover for the same acts and alleged wrong that were the subject of the prior action.[3]  BuyFigure.com, Inc., 76 A.3d at 556-57, 561-62 (res judicata barred second action even though prior action asserted contract and tort claims for damages and second action sought declaratory judgment, injunctive relief, and an accounting); Kelly, 887 A.2d at 792 (cause of action was the same and res judicata barred second action even though prior proceeding was petition to enforce settlement and second action was a complaint asserting an unjust enrichment claim); Dempsey, 653 A.2d at 681-83 (cause of action was the same and res judicata barred second proceeding even though prior action was claim for damages for fraud in inducing a settlement and second proceeding was a petition to set aside the settlement).[4]

---

[3] This statement is consistent with Section 24 of the Restatement (Second) of Judgments (1982) which describes the scope of res judicata as follows:

(1)      When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

[4] Section 25 of the Restatements as provides, the rule of § 24 applies to extinguish a claim by the plaintiff against the defendant even though the plaintiff is prepared in the second action:

Additionally, the fact that a plaintiff seeks different relief in a subsequent action does not negate the identity of the causes of action.  Heart Care Consultants, LLC v. Albataineh, 239 A.3d 126 (Pa. Super. 2020).  A party cannot avoid the consequences of a prior judicial determination merely by altering the character of the relief sought.  Id.  Where the damages suffered are a consequence of the same actions alleged in an earlier suit, a new cause of action is not present merely because the relief sought has changed.  Id.

Here, the instant litigation seeks the same relief, for the same acts, and challenges the same perceived wrong at issue in the prior litigation, under an additional legal theory.  Given the nature of the current litigation in relation to the prior litigation, it is clear it is based on the same set of operative facts, and the causes of action are identical according to the Third Circuit's transactional approach used in determining the applicability of res judicata.  Williams v. Lehigh County Department of Corrections, 19 F. Supp. 409 (E.D. Pa. 1998).

As such, Williams is instructive.  There, an inmate brought two separate suits against the county jail.  In examining the doctrine of res judicata in the second suit, the District Court noted, in each case, the plaintiff alleged he was brutalized after he requested clean underwear from the correctional officer distributing laundry on October 30, 1996.  Focusing, as the Third Circuit directs, not on a mechanical application of the res judicata test, but rather on its ultimate purpose of requiring a plaintiff to present all claims arising out of the same occurrence in a single suit, see Board of Trustees, 983 F.2d at 504, the Court held it was clear that the plaintiff's claim could not

---

(1)      To present evidence or grounds or theories of the case not presented in the first action; or,
(2)      To seek remedies or forms of relief not demanded in the first action.
Restatement (Second) of Judgments § 25; see also Restatement (Second) of Judgments § 25 cmt. (a) (The rule of § 24 puts pressure on the plaintiff to present all his material relevant to the claim in the first action.... The material to be brought forward comprises, roughly, 'evidence'—connoting facts; 'grounds'—facts grouped under a legal characterization; 'theories of the case'—premises drawn from the substantive law; 'remedies or forms of relief'— measures or kinds of recovery).  Huck at 50.  Further, Restatement (Second) of Judgments § 25 cmt. (f) states "[A]fter judgment for or against the plaintiff, the claim is ordinarily exhausted so that the plaintiff is precluded from seeking any other remedies deriving from the same grouping of facts....").  Id.

be pursued a second time.  See also Davis v. United States Steel Supply, Etc., 688 F.2d 166, 174 (3d Cir. 1982) (stating that purpose of res judicata is to preserve judicial resources, avoid repetitive litigation, and encourage parties to plead all grounds for relief in a single lawsuit).  Williams.  The same rationale employed in Williams applies in the instant matter and compels the same result.

Similarly, the third element required for the applicability of res judicata dictates the subsequent litigation must involve the same parties or their privities.  Res judicata applies equally when there is complete identity of parties, privity with prior parties, or when the parties have an otherwise "'close or particular relationship.' "  See Greenberg, 869 F.Supp. at 330 (citing Avins v. Moll, 610 F.Supp. 308, 316 (E.D. Pa. 1984)).

Here, the Board was the named defendant in the prior action and is named again as the defendant in the present suit.  Thus, the question presented to this Court is whether Cohen, as the candidate seeking to have the ballots at issue counted, was in sufficient privity with the voter, to apply res judicata.  The Board respectfully submits that the answer to this question is yes.

While the third element appears to require strict application, over the last 40 years, Courts have abolished this element in the strict sense.  Avins v. Moll, F.Supp. 308 (E.D. 1984).  Consistent with that advancement, the Court of Appeals for the Third Circuit, among other courts, has broadened the availability of res judicata to persons who were not parties to or in "privity" with parties in the earlier case.  See Bruszewski v. United States, 181 F.2d 419 (3d Cir.), cert. denied, 340 U.S. 865 (1950).  For example, where the same plaintiff files multiple suits on identical causes of action, defendants in the later suits, who were not named as defendants in the earlier suits, are entitled to the benefit of res judicata so long as there is a close or particular relationship with the defendants in the earlier suit.  Avins.

20

In addition, where different plaintiffs sue the same defendant in successive suits, many courts question the fairness of invoking res judicata against the defendant unless a significant relationship can be found between the plaintiffs.  But where res judicata is invoked against a plaintiff who has twice asserted essentially the same claim, even against different defendants, courts have, as indicated in the case law cited above, enlarged the area of res judicata beyond any definable categories of privity between the defendants.  Thus, the Court in <u>Avins</u> stated that it was in agreement with this development of the law away from formalism which impedes the achievement of fair and desirable results.

This precept must also be applied where different plaintiffs seeking to sue the same defendant for the same acts, from the same set of operative facts, and for the same relief, especially where the litigants in the prior litigation possess a more tangible, practical, and vested interest in the litigation.  Here, the ACLU elected not to intervene in the challenges brought by the candidates challenging the same contested mail-in ballots in the state courts.  That matter was fully litigated by the parties, including the judicial candidates, who held a significant and vested interest in the outcome of the election, with the impetus and ability to bring all claims arising from (or related to) the same set of operative facts in the instant matter.  The relationship of the candidates to the individual voter was so inexplicably intertwined, that the particular relationship between voter and candidate in this instance constitutes the relationship necessary for the application of the doctrine of res judicata.

More specifically, in the prior and the current litigation, the facts and questions of law are identical – should a mail-in ballot that lacks a date on the ballot-return envelope be counted if the ballot is otherwise valid?  To deny that privity exists where, as here, the relationship between the voter and the candidate is so close as to be undistinguishable, and the first suit was pursued by the

individual that would tangibly benefit from the result, is illogical.  It is clear the voters' requested relief to have the ballot counted was appropriately and sufficiently protected by the candidates' prior actions so as to bar the instant litigation.

To conclude otherwise, would produce an absurd result and the potential for limitless litigation in election lawsuits.  Indeed, if the instant suit is not barred by the doctrine of res judicata, there is no applicable legal limitation to the subsequent filing of 257 individual, successive lawsuits (one for each of the voters whose ballots were excluded by the Commonwealth Court's decision) against the same defendant for the same action, without recourse, even though the facts, claims, and relief sought are identical.

This is especially true in the instant matter where a voter was presented to the Court of Common Pleas as a witness in the prior litigation to address the identical claim to the claims asserted in the current suit.  The presentation of this evidence further demonstrates that there was no limitation to the presentation of evidence in the challenge presented by the candidates and all issues arising from the missing date on the ballot-return envelope could, and should have been raised and addressed in the state-court litigation.  Permitting the instant litigation to advance, flies in the face of the entire purpose of res judicata, to avoid repetitive, vexatious litigation that wastes judicial resources.  <u>Williams</u>.  Based on the foregoing, the Board respectfully submits the doctrine of res judicata bars Plaintiffs' suit, and Defendant is entitled to summary judgment as a matter of law.

B.    **WHETHER THE PLAINTIFFS HAVE STANDING TO BRING A CLAIM UNDER SECTION 10101(a)(2)(B).**

Plaintiffs argue Pennsylvania's requirement to include the date of signature on the ballot-return envelope amounts to a violation of Section 10101(a)(2)(B)'s Materiality Provision.[5]  This

---

[5] 52 U.S.C. §10101(a)(2)(B).

Section provides that no one acting under the color of law may "deny the right of any individual to vote in any election because of an error or omission" on a registration application or voting ballot if the error or omission "is not material" in determining whether the individual is qualified to vote. 52 U.S.C. §10101(a)(2)(B). Further, subsection (c) of that Section states that when any person has deprived another of "any right or privilege secured by subsection (a) ... the Attorney General may institute for the United States ... a civil action or other proper proceeding for preventive relief." 52 U.S.C. §10101(c) (emphasis added).

As neither the United States Supreme Court nor the Third Circuit Court of Appeals has directly addressed whether Section 10101(c) provides a private cause of action, a review of the decisions of two Circuit Courts that have examined this issue is helpful. Upon review, the Board contends the rationale of the Sixth Circuit is persuasive and should be followed by this Court.

In examining the clear identification of the Attorney General in subsection (c), the Court in Willing v. Lake Orion Community Schools Bd. of Trustees, 924 F.Supp. 815 (S.D. Mich. 1996), concluded Section 1971 of the Voting Rights Act (now Section 10101(a)(2)(B)) does not afford individuals a private cause of action. See also Good v. Roy, 459 F.Supp. 403, 405 (D. Kan. 1978) (subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons.... [T]he unambiguous language of Section 1971 will not permit us to imply a private right of action, and, thereby, refusing to imply a private right of action.").

To that end, Section 10101 is intended to prevent racial discrimination at the polls and is enforceable by the Attorney General, not by private citizens. Id.; 52 U.S.C. §10101(c). Not only is the statutory language affirmative, the Sixth Circuit has also held the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action. McKay v. Thompson, 226 F.3d 752, 756 (6th Cir. 2000).

Conversely, Eleventh Circuit erred in concluding a private cause of action exists for a perceived violation of the Civil Rights Act under Section 10101(a)(2)(B).  Schwier.  In discussing the Sixth Circuit's decisional law, the Court in Schwier noted previous decisions holding other provisions of the Voting Rights Act were enforceable by private causes of action, even though those sections also provide for enforcement by the Attorney General.  See Allen v. State Board of Elections, 393 U.S. 544 (1969); Morse v. Republican Party of Virginia, 517 U.S. 186 (1996) (plurality opinion).  In support of its holding, the Court noted, the provision giving the Attorney General the right to bring a civil suit under §1971 (now 10101(c)) was not added until 1957. Schwier.  Therefore, the Court stated, from the enactment of §1983 in 1871 until 1957, plaintiffs could and did enforce the provisions of § 1971 under § 1983.  Id.

The Eleventh Circuit's rationale, however, is flawed.  To that end, it is well settled that "[t]he first step in interpreting a statute is to determine 'whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute in the case.' " Valansi v. Ashcroft, 278 F.3d 203, 209 (3d Cir. 2002) (quoting Marshak v. Treadwell, 240 F.3d 184, 192 (3d Cir. 2001) (internal citations omitted)). "Where the language of the statute is clear ... the text of the statute is the end of the matter." Steele v. Blackman, 236 F.3d 130, 133 (3d Cir. 2001).  The clear language of the statutory provision here compels a result contrary to the decision reached by the Court in Schwier.

More specifically, the Eleventh Circuit failed to undertake an examination of the clear language of the statutory provision at issue utilizing statutory construction principles.  Despite the clear and unambiguous language in the statute, the Court elected to ignore the language in order to read into the statute that the notation of the Attorney General was not intended to limit who can bring suit.  The result of such action is to assume Congress intended to authorize a private cause

of action that existed at the time the statute was amended despite the statute's clear limitation on who could enforce the rights contained in the express language of the amendment.  Such action is nothing short of a Court inappropriately and improperly rewriting a statute to reach a specified result, in direct contravention of well-settled statutory construction principles.

Where, as here, the language is clear and unambiguous, Courts are required to give effect to all of the words of the statute and recognize that if Congress intended to provide a nonexclusive enforceability provision, especially where the right was in existence at the time of the amendment, it would have said so.  In the absence of a clear directive in the statute itself, an implication crafted by a Court is simply insufficient to render such a determination proper or persuasive.  Based on the Sixth Circuit's logical approach to the language, together with the parameters set forth under the well-settled statutory construction principles, this Court must find the Plaintiffs to the instant litigation lack standing to pursue a claim under Section 10101(a)(2)(B).  For this additional reason, Plaintiffs' suit is barred, and Defendant is entitled to summary judgment.

### C.   WHETHER THE MATERIALITY CLAUSE OF THE CIVIL RIGHTS ACT PROHIBITS THE BOARD FROM REJECTING THE BALLOTS AT ISSUE.

At the outset, the Board recognizes that "[t]he right to vote is ... a right of paramount constitutional significance, the violation of which permits federal court intercession." Hall v. Holder, 117 F.3d 1222, 1231 (11th Cir.1997). While it is undisputed that the right to vote is fundamental, this right it not absolute; it is subject to control by the States.  Friedman v. Snipes, 345 F.Supp.2d 1356 (S.D. Fla/ 2004).  See, e.g., Bush v. Gore, 531 U.S. 98, 104 (2000) ("The individual citizen has no federal constitutional right to vote for electors for the President of the United States unless and until the state legislature chooses a statewide election as the means to implement its power to appoint members of the electoral college.") (citing U.S. Const., Art. II, §

1.); <u>Tashjian v. Republican Party of Connecticut</u>, 479 U.S. 208, 217 (1986) ("The power to regulate the time, place, and manner of elections does not justify, without more, the abridgment of fundamental rights, such as the right to vote ...."); <u>Dunn v. Blumstein</u>, 405 U.S. 330, 336 (1972) (stating that the "'equal right to vote' is not absolute; the States have the power to impose voter qualifications, and to regulate access to the franchise in other ways." (internal citation omitted)).

Although Courts have an obligation to ensure that a state does not engage in the "arbitrary and disparate treatment of the members of its electorate," <u>Bush v. Gore</u>, 531 U.S. at 105, Courts must also not act in a manner that would contravene the well-established and long-held principle that States "'have broad powers to determine the conditions under which the right of suffrage may be exercised.'" <u>McDonald v. Bd. of Election Comm'rs of Chicago</u>, 394 U.S. 802, 807 (1969) (quoting <u>Lassiter v. Northampton County Bd. of Elections</u>, 360 U.S. 45, 50 (1959)). This is especially true in the context of mail-in ballots as there is no fundamental right to vote by absentee (mail-in) ballot. <u>See</u> <u>id.</u>

In their Complaint, the ACLU, on behalf of the named Plaintiffs, argues that the mandatory requirement to date the ballot-return envelope under Pennsylvania law violates the Materiality Clause of the Civil Rights Act. However, before a violation can be found, it is axiomatic that the provision alleged to be violated must be applicable to the case at bar. The Board contends that here it does not.

Section 10101(a)(2)(B) of the Civil Rights Act (Voting Rights Act), states, in relevant part:

> No person acting under the color of state law shall…deny the right of any individual to vote in any election because of an error or omission on any records or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State Law to vote in such election.

52 U.S.C. § 10101(a)(2)(B).  This section, often referred to as "the materiality provision," <u>Schwier</u>, 340 F.3d at 1297, was designed to eliminate practices that could encumber an individual's ability to <u>register</u> to vote.  <u>Id.</u> (emphasis added). According to the <u>Schwier</u> Court:

> 42 U.S.C. § 1971(a)(2)(B) of the Voting Rights Act [now 10101(a)(2)(B) of the Civil Rights Act] ... forbids the practice of disqualifying potential voters for their failure to provide information irrelevant to determining their <u>eligibility</u> to vote.

<u>Id.</u> (emphasis added).

This provision was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters.  <u>See</u> <u>Condon v. Reno</u>, 913 F.Supp. 946, 949–50 (D.S.C.1995).  For example, one "such tactic[ ] [was to] disqualify[ ] an applicant who failed to list the exact number of months and days in his age." <u>Id.</u>

In <u>Schwier</u>, voter registrants brought suit against Georgia's Secretary of State, seeking declaratory and injunctive relief on the ground that Georgia's requirement that <u>prospective</u> voters provide their social security numbers violated 10101 (a)(2)(B) (42 U.S.C. § 1971(a)(2)(B)).  <u>Id.</u> at 1285, 1296. (emphasis added).  However, there is no precedent that Section 10101(a)(2)(B) was intended to apply or applies to the counting of ballots by individuals already deemed qualified to vote.  <u>Friedman</u>, at 1371.

In an attempt to expand the plain language of Section 10101(a)(2)(B), the plaintiffs in <u>Schwier</u> point to Section 10101(e) to define the word "vote".  Section 10101(e) states:

> the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election.

Id.  The plaintiffs argued that because the word "vote" in Section (e) "includes all action necessary to make a vote effective including ... having such ballots counted and included in the appropriate totals of votes cast," the defendants' refusal to count the mail-in ballots based on the missing dates on the ballot-return envelope constitutes a violation of Section (a)(2)(B).

That expansive argument fails because Courts are required to avoid an interpretation of a statute that "renders some words altogether redundant."  United States v. Alaska, 521 U.S. 1, (1997) (quoting Gustafson v. Alloyd Co., 513 U.S. 561 (1995)).  If "vote" means "all action necessary to make a vote effective including registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast," then such a definition should include the more limited phrase "an error or omission on any record or paper relating to any application, registration, or other act requisite to voting."  Friedman, at 1372-73.  Congress may well have been concerned about denials of the right to vote at all stages and components of the voting process—from application to registration to casting to counting—but Section 101010(a)(2)(B) specifically provides for protections against denials based on errors or omissions on "records or papers" that are immaterial to the determination of an individual's qualification to vote.  Id.

The error and omission alleged in the instant litigation does not pertain to determining the eligibility to vote. Plaintiffs' application of "vote" and broader interpretation of Section 10101(a)(2)(B) renders redundant the more-narrow protection of the provision.  Friedman. Because the error and omission alleged here did not occur in relationship to a determination of the Plaintiffs' eligibility to vote, but rather is in relation to their actual ballots, Plaintiffs have not and cannot, as a matter of law, establish a claim of violation of 52 U.S.C. § 10101(a)(2)(B).

Moreover, Plaintiffs' citation to two unreported decisions, Ford v. Tenn. Senate, No. 06-2031-DV, 2006 WL 8435145 (W.D. Tenn. 2006), and League of Women Voters of Ark. V. Thurston, 2021 WL 5312640 (W.D. Ark. 2021), do alter this result.  First, in Ford, the challenge stemmed from a requirement that an individual was required to sign both, an application for a ballot and the poll book, to qualify to vote.  Those electors who did not sign both would not be qualified to vote under Tennessee law.  Id. (emphasis added).  While it is clear that Court was examining the qualifications for voting, which is contemplated within the plain language of Section 10101(a)(2)(B), it did state that the application of Section (e) includes not only the registration and eligibility to vote, but also the right to have that vote counted.

The Court's decision is unpersuasive here for three reasons.  First, as the Court's determination was examining requirements under state law relative to qualifications for voting, instead of the act of voting as is the case here, the case is factually inapposite.  Next, as the Court was tasked with examining qualifications of voting, review and applicability of Section (e) was unnecessary and constitutes *dicta*.  Additionally, the Court failed to consider, distinguish, or even address the well-reasoned statutory construction analysis set forth in Friedman.

Similarly, the decision in League of Women Voters of Arkansas, does not mandate a different conclusion.  First, that decision was on a motion to dismiss and did not conclusively address the applicability of the definition of "vote" under section 10101(e).  Second, the Court failed to consider, distinguish, or even address the well-reasoned statutory construction argument set forth in Friedman.  Lastly, when considering the applicability of the Materiality Clause, even under the expanded definition of "vote" under 10101(e), the Court acknowledged where absentee voters have only one opportunity to provide information required by state law, it would be difficult

to find that rejection of their ballots because of an error or omission concerning this information violates the Materiality Provision.

As such, even if this Court finds that the Materiality Provision applies, which is expressly denied, Pennsylvania's date requirement does not constitute a substantive violation of that federal statute.

Several Courts have been tasked with defining materiality under this provision; a brief examination of those decisions is helpful.  In Hoyle v. Priest, 265 F.3d 699, 704 (8th Cir.2001), the Eight Circuit held that an Arkansas voting initiative procedure, which required petition signers to be "qualified electors," was material and outside the scope of 42 U.S.C. § 1971(a)(2)(B). Additionally, a Virginia District Court, in Howlette v. City of Richmond Virginia, 485 F.Supp. 17, 21–22 (E.D.Va.1978), concluded a city referendum procedure which required that the signatures of qualified voters on a referendum petition be verified by a notary and subjecting those who take the oath to possible criminal liability for perjury was not "immaterial" and thus did not violate 42 U.S.C. § 1971(a)(2)(B).

Likewise, the Pennsylvania Supreme Court has addressed this issue, holding that a requirement for voting qualification is material and/or mandatory if it serves weighty interests.  In re Canvass, 241 A.3d at 1091.  There is no question that Section 3150.16(a) of Pennsylvania's Election Code, 25 P.S. §2150.16(a), plainly and unambiguously mandates that electors date the voter declaration on the ballot-return envelope.  Upon review, the Pennsylvania Supreme Court concluded the requirement of dating the ballot-return envelope served "weighty interests," which also militated in favor of deeming this requirement mandatory.  In re Canvass, 241 A.3d at 1076-77.

This determination was followed as precedent when the Commonwealth Court reversed the Court of Common Pleas' decision in the prior litigation here.  While the Court of Common Pleas held that the date requirement was mandatory, it then engaged in a tortured analysis to conclude the date requirement did not serve a weighty interest.  The Commonwealth Court, stating the Supreme Court's rationale as contained in concurring and dissenting opinion authored by Justice Dougherty was persuasive, concluded the date requirement was a material requirement under the Election Code because it served weighty interests, and the Civil Rights Act could not serve as a basis to alter its conclusion.  Ritter v. Lehigh County Board of Elections, 2022 WL 16577 (Pa. Cmwlth. 2022), at *9.  The Pennsylvania Supreme Court then declined to review the Commonwealth Court's decision rendering this rationale final.

Of particular interest, the weighty interests noted by the Courts was that the declaration on the ballot-return envelope is a necessary safeguard against fraud.  Under the framework established previously by the Pennsylvania Supreme Court, fraud prevention renders voting requirements mandatory.  Appeal of John Pierce, 843 A.2d 1223 (Pa. 2004).  In Appeal of John Pierce, the Court held, even absent an express sanction, where legislative intent is clear and supported by a weighty interest like fraud prevention, it would be unreasonable to render such a concrete provision ineffective.  Indeed, in In re Canvass, Justice Dougherty observed the date requirement implicates weighty interests explaining, "[t]he presence of the date also establishes the point in time against which to measure the elector's eligibility to cast the ballot".  Id. at 1091.

In this regard, it is also of note that by executing the voter declaration, the mail-in elector is not only attesting to the ballot's timely submission, but also representing, under penalty of law, that the voter is: (a) qualified to cast the enclosed ballot; and (b) the voter did not already vote in

the election for which the ballot was issued. 25 P.S. § 3150.14(b); see also In re Nov. 3, 2020 General Election, 240 A.3d at 595 n.4.

The accuracy of both representations is contingent on the date on which the representation was made for at least two reasons.  First, whether a person is a "qualified elector" entitled to vote at a particular election depends on the specific date on which that individual either became a resident of a given district or ceased residing there.  See 25 P.S. § 2811 (explaining that every citizen of the Commonwealth eighteen years of age or older is qualified to vote, provided, inter alia, "[h]e or she shall have resided in the election district where he or she shall offer to vote at least thirty days immediately preceding the election, except that if qualified to vote in an election district prior to removal of residence, he or she may, if a resident of Pennsylvania, vote in the election district from which he or she removed his or her residence within thirty days preceding the election.").  Second, whether an elector has already voted in the election for which the ballot was issued, by its very nature, depends on the date on which the declaration was signed.  See In Re 2,349 Ballots, 2020 WL 6820816, at *6.

In sum, as Justice Dougherty observed, the date requirement is not a minor irregularity that can be overlooked; instead, it serves "weighty interests," including fraud prevention, and is mandatory.  As such, the absence of a date on the ballot-return envelope is not a minor defect, and instead is material, and the enforcement of such a requirement under Pennsylvania law does not violate the Materiality Provision of the Civil Rights Act.  See In re Morrison-Wesley, 946 A.2d 789, 795 (Pa. Cmwlth. 2008) ("[t]he date is essential to determine the validity of the signature").  For these reasons, Plaintiffs' argument that the date requirement violates the Materiality Provision of the Civil Rights Act fails as a matter of law, and Defendant is entitled to summary judgment on this claim.

### D.   WEHTHER THE DATE REQUIREMENT UNDER PENNSYLVANIA LAW CONSISTITUTES AN UNDUE BURDEN IN VIOLATION OF THE FIRST AND FOURTEENTH AMENDMENTS.

Although it is beyond dispute that "voting is of the most fundamental significance under our constitutional structure ... [i]t does not follow … that the right to vote in any manner and the right to associate for political purposes through the ballot are absolute." Burdick v. Takushi, 504 U.S. 428 (1992) (citations omitted).   In fact, the Constitution itself provides that states may prescribe the "Times, Places and Manner of holding Elections" and the United States Supreme Court has recognized that states retain the power to regulate their elections.  Id.; see also Siegel v. Lepore, 234 F.3d 1163, 1179–80 (11th Cir. 2000); Art. I, § 4, cl. 1 of the Constitution. As the United States Supreme Court noted in Burdick, "[c]ommon sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; 'as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes.'" 504 U.S. at 433 (quoting Storer v. Brown, 415 U.S. 724, 730 (1974)).

It is also well-settled that all election laws result in the imposition of some burden on voters. Id.  As a result, not every election law will be subjected to strict scrutiny by the courts.  Id.; see also Anderson v. Celebrezze, 460 U.S. 780, 788 (1983).  In Anderson, the United States Supreme Court established that a court considering a challenge to a state election law must instead weigh the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate.  It must then identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule. "In passing judgment, the Court must consider the extent to which those interests make it necessary to burden the plaintiff's rights." Id. at 789, 103 S.Ct. at 1570.

Whether an election law is subject to strict scrutiny or some lesser standard of review depends on the extent to which the law burdens a plaintiff's First and Fourteenth Amendment rights.  Burdick, 504 U.S. at 434.  If the election law imposes a "severe" restriction on a plaintiff's First and Fourteenth Amendment rights, the election law must be "narrowly drawn to advance a state interest of compelling importance."  Id. (citing Norman v. Reed, 502 U.S. 279, 289 (1992)). If the election law imposes "reasonable, nondiscriminatory restrictions" upon the plaintiff's First and Fourteenth Amendment rights, the "State's important regulatory interests are generally sufficient to justify" the restrictions imposed by the election law.  Id. (citing Anderson, 460 U.S. at 788, 103 S.Ct. at 1569–70); accord McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 345 (1995) (applying strict scrutiny to election law which directly regulated free speech and which did not merely control the "mechanics of the electoral process"); Rosario v. Rockefeller, 410 U.S. 752 (1973); Green Party v. Weiner, 216 F.Supp.2d 176, 187 (S.D.N.Y.2002) (finding that lesser standard of review applied to election law which mandated that primaries for certain parties would be conducted on paper ballots rather than voting machines because law only regulated the "mechanics" of the election).

Where, as here, Pennsylvania's Election Code imposes only "reasonable, nondiscriminatory" restrictions on the right to vote, strict scrutiny is not required.  Further, a showing there are important regulatory interests that justify the limited restrictions imposed, must result in a determination that no violation of First and Fourteenth Amendment rights has occurred. See Arizona Democratic Party v. Hobbs, 18 F.4th 1179 (9th Cir. 2021) ("We first hold that, under the framework articulated by [Anderson], and [Burdick], known as the "Anderson/Burdick framework," the State has an important regulatory interest in reducing the administrative burden on poll workers, especially during the busy days immediately following an election. In light of the

minimal burden on the voter to sign the affidavit or to correct a missing signature by election day, the State's interest sufficiently justifies the election-day deadline.")

In Burdick, the plaintiff was a registered voter who challenged Hawaii's prohibition of allowing voters to vote for write-in candidates in primary or general elections. Burdick claimed Hawaii's ban on write-in voting violated his First Amendment right of expression and association and asked the district court to enter a preliminary injunction ordering the state to permit and count write-in votes in the general election. The Ninth Circuit held, although Hawaii's ban on write-in voting placed some restrictions on Burdick's right to vote, the restriction was justified in light of Hawaii's broad powers to regulate elections and the specific interests advanced by the state. Burdick appealed to the United States Supreme Court, which agreed with the Ninth Circuit.

The United States Supreme Court recognized Hawaii's election law did have an impact on Burdick's right to vote; however, the Court found that the ban on write-in voting did not unconstitutionally limit the right of voters to have candidates of their choice placed on the ballot. In finding Hawaii's system provided easy access to ballots and that any burden on voters was limited to those voters who chose their candidate days before the election, the Court in Burdick gave little weight to the interest a voter may have in "making a later rather than an early decision to seek independent ballot status." Id. at 437. In affirming the Ninth Circuit's decision vacating the injunction, the Burdick Court concluded, "[r]easonable regulation of elections does not require voters to espouse positions that they do not support; it does require them to act in a timely fashion if they wish to express their views in the voting booth." Id.

Similarly, in Rosario, the United States Supreme Court upheld New York's election law which imposed a deadline by which voters were required to enroll in a political party in order to vote in a subsequent election. In holding a New York election law did not constitute a ban on the

voters' freedom of association under the First Amendment, the <u>Rosario</u> Court emphasized the statute did not "absolutely disenfranchise the class to which the petitioners belong ... [r]ather, the statute merely imposed a time deadline on their enrollment, which they had to meet in order to participate in the next primary." <u>Id.</u> at 757.

The Court distinguished the limited restrictions on the petitioners' right to vote imposed by the law in those cases from cases in which state election laws "totally denied the electoral franchise to a particular class or residents, and there was no way in which the members of that class could have made themselves eligible to vote." <u>Id.</u> (referring to <u>Carrington v. Rash</u>, 380 U.S. 89 (1965) (where the Texas constitution prohibited all servicemen from voting regardless of the length of residence in the state); <u>Kramer v. Union Free Sch. Dist. No. 15</u>, 395 U.S. 621 (1969) (state law prohibited residents who were not parents or property owners from participating in school board elections); <u>Cipriano v. City of Houma</u>, 395 U.S. 701 (1969) (state law prohibited residents who were not property owners from voting in bond elections); <u>Evans v. Cornman</u>, 398 U.S. 419 (1970) (state law prohibited residents of a national facility located in the state from voting in any election)).

Since the voters could have enrolled in a party before the deadline in time to vote in the next election, the <u>Rosario</u> Court held the deadline imposed by the state did not constitute a ban on the voters' First Amendment freedoms but was merely a time limitation on when the voters had to act in order for them to participate in the next election. <u>Id.</u> at 758; <u>see also</u> <u>Friedman</u> (where law does not deny the right to vote to a class of persons, the state had a substantial interest in regulating their elections in order to make the elections "fair and honest" and to ensure that "some sort of order, rather than chaos, is to accompany the democratic processes.

Here, in support of their position, Plaintiffs cite <u>Northeast Ohio Coalition for the Homeless</u> <u>v. Husted</u>, 837 F.3d 612 (6th Cir. 2016).  There, the Court was faced with a challenge to the requirement under Ohio law that voters who failed to write their correct address and birthdate on absentee-ballot envelopes would not have their ballot counted.  While acknowledging the requirements were small, the Court held that the state failed to set forth any justification for mandating technical precision in the address and birthdate fields of the absentee-ballot identification envelope.  However, the Court did note that "combatting voter fraud perpetrated by mail is undeniably a legitimate concern," (<u>citing</u> <u>Purcell v. Gonzalez</u>, 549 U.S. 1, 4 (2006) (<u>per</u> <u>curiam</u>), yet before the District Court, Ohio did not even "offer[ ] combatting voter fraud" as a relevant interest.

The Court's decision in <u>Northeast Ohio</u> is factually and legally inapposite here.  First, both the Commonwealth Court and the Pennsylvania Supreme Court have examined the sufficiency of the date requirement on the ballot-return envelope, and both Courts conclusively determined it serves weighty governmental interests.  In so doing, and as noted above, the Pennsylvania Supreme Court stated, the date requirement is not a minor irregularity that can be overlooked; instead, it serves "weighty interests," including fraud prevention, and is mandatory.  As such, the absence of a date on the ballot-return envelope is not a minor defect.  <u>In re Canvass</u>, <u>see</u> <u>also</u> <u>In re Morrison-Wesley</u>, 946 A.2d at 795 ("[t]he date is essential to determine the validity of the signature").

Likewise, the Commonwealth Court, stating the Supreme Court's rationale as contained in the concurring and dissenting opinion authored by Justice Dougherty in <u>In re Canvass</u> was persuasive, concluded the date requirement was a material requisite under the Election Code because it justified weighty interests, <u>Ritter v. Lehigh County Board of Elections</u>, 2022 WL 16577

(Pa. Cmwlth. 2022), at *9, and the Pennsylvania Supreme Court declined to review this determination.

Thus, the interest, as determined by both the Pennsylvania Supreme Court and the Commonwealth Court of Pennsylvania, of ensuring a fair and honest election, and the manner in which Pennsylvania has elected to address this concern is minimal and purely mechanical, justifies the Burdick/Anderson framework.   As a result, the burden placed upon mail-in voters under Pennsylvania law to include the date on the outer envelope of their ballot does not constitute an undue burden under the First or Fourteenth Amendments to the United States Constitution and is justified by Pennsylvania's weighty interests in fraud prevention and ensuring the integrity of its elections.   Indeed, where, as here, Pennsylvania's Election Code imposes only "reasonable, nondiscriminatory" restrictions on the right to vote, strict scrutiny is not required.   Further, a showing there are important regulatory interests that justify the limited restrictions imposed, must result in a determination that no violation of First and Fourteenth Amendment rights has occurred. Therefore, Plaintiffs cannot demonstrate the requisite element of a viable claim under this Count as a matter of law.   Hobbs.

In sum, all of Plaintiffs' claim fail and, therefore, based on the undisputed facts Defendant is entitled to summary judgment as a matter of law.

Respectfully Submitted,


*Lucas J. Repka*                                    *Joshua S. Mazin*

_____          _____
Lucas J. Repka, Esq.                                Joshua S. Mazin, Esq.
Pa. ID. No. 93509                                   Pa. ID No. 87680
108 East Center Street                             108 East Center Street
Nazareth, Pennsylvania 18064                       Nazareth, Pennsylvania 18064
Phone: (610) 365-2670                              Phone: (610) 365-2670



DATED: <u>February 11, 2022</u>

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | | |
|---|---|---|---|
| **LINDA MIGLIORI, et al.,** | : | | |
| | : | No. | **5:22-CV-00397** |
| **Plaintiffs,** | : | | |
| | : | | |
| **v.** | : | | |
| | : | | |
| **LEHIGH COUNTY BOARD OF ELECTIONS,** | : | | |
| | : | | |
| | : | | |
| **Defendant.** | : | | |

## CERTIFICATE OF SERVICE

I, Joshua S. Mazin, Esq. hereby certify a true and correct copy of the foregoing Brief was served on the following parties electronically through the Court's ECF System:

Joshua J. Voss
Kleinbard LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
jvoss@kleinbard.com
*Attorneys for David Ritter*

Witold Walczak (No. 62976)
Richard Ting  (No. 200438)
ACLU OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
vwalczak@aclupa.org
rting@aclupa.org
*Attorneys for Plaintiffs*

Stephen A. Loney, Jr.  (No. 202535)
Marian K. Schneider (No. 50337)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
sloney@aclupa.org
mschneider@aclupa.org
*Attorneys for Plaintiffs*


DATE:        February 11, 2022              By:   *Joshua S. Mazin*
                                                  Joshua S. Mazin, Esq.
                                                  Pa. I.D. No. 87680
                                                  17 South Seventh Street,
                                                  Room 440
                                                  Allentown, Pa. 18101
                                                  *Attorney for Lehigh County*
                                                  *Board of Elections*