# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| LINDA MIGLIORI, ET AL., | : No. 5:22-cv-00397-JFL |
|  | : |
| Plaintiffs, | : |
|  | : |
| v. | : |
|  | : |
| LEHIGH COUNTY BOARD OF ELECTIONS, | : |
|  | : |
| Defendant. | : |

## INTERVENOR DEFENDANT DAVID RITTER'S BRIEF
## IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
James G. Gorman (No. 328376)
Samantha G. Zimmer (No. 325650)
Francis G. Notarianni (No. 327461)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: jvoss@kleinbard.com
svance@kleinbard.com
jgorman@kleinbard.com
szimmer@kleinbard.com
fnotarianni@kleinbard.com

*Attorneys for Intervenor Defendant David Ritter*

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................1

II.     STATEMENT OF FACTS ...............................................................................3

        A.   The 2020 election cycle and subsequent events ........................................ 3

        B.   The 2021 Municipal Election in Lehigh County ....................................... 6

        C.   Pennsylvania state court litigation regarding the Disputed Ballots ................................. 8

        D.   The present lawsuit, parties, and procedural posture ................................ 11

III.    STATEMENT OF QUESTIONS INVOLVED...............................................14

IV.     SUMMARY OF ARGUMENT ......................................................................15

V.      ARGUMENT ...............................................................................................16

        A.   Plaintiffs' claims are barred under the doctrine of laches because they inexcusably delayed in bringing this action and the delay has prejudiced Ritter. ................................ 16

        B.   Plaintiffs' claims are barred by res judicata because there is a shared identity between the things sued for, the causes of actions, the parties, and the capacity of the parties in the state court action and the present case. ........................................................... 22

        C.   Plaintiffs' Count I Materiality Provision claim fails procedurally and substantively. ..... 26

             1.   Because the Materiality Provision may be enforced only by the United States Attorney General, Plaintiffs lack standing................................. 27

             2.   Section 101 of the Civil Rights Act is wholly inapplicable and, in any event, does not prohibit states from requesting that an elector's voter declaration be accompanied by a dated signature. ........................................................... 32

                  (a)   Section 101 of the Civil Rights Act is aimed at discriminatory conduct and, thus, is inapposite...................................................... 32

                  (b)   The Materiality Provision is not implicated, since it applies exclusively to voter registration laws.................................................... 34

                  (c)   Even if applicable, Section 101 is not violated by requiring voters to furnish a dated signature on their voter declaration. ................................ 35

        D.   Plaintiffs' Count II fails as a matter of law because the requirement that electors date mail-in ballot declarations is, at best, a minimal burden that is supported by important regulatory interests............................................................. 36

i

      1.   Requiring voters to date a mail-in ballot declaration is a minimal burden.................. 37

      2.   Important state regulatory interests in preventing fraud, promoting voter confidence, and ensuring orderly administration of elections justify the minimal burden imposed by the dated declaration requirement......................................................................... 39

VI.     CONCLUSION................................................................................................................41

VII.    PROPOSED ORDER.......................................................................................................41

## TABLE OF AUTHORITIES

**Cases**

*Alexander v. Sandoval*, 532 U.S. 275 (2001)...................................................... 28, 29, 31

*Allen v. State Board of Elections*, 393 U.S. 544 (1969)......................................... 31

*Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021)...................... 38, 39

*Balent v. City of Wilkes-Barre*, 669 A.2d 309 (Pa. 1995).................................... 22

*Ball v. Brown*, 450 F. Supp. 4 (N.D. Ohio 1977)................................................. 33

*Ballas v. Symm*, 351 F. Supp. 876 (S.D. Tex. 1972)............................................. 33

*Boyle v. Grizzly Industrial, Inc.*, No. 18-cv-854, 2018 WL 2331896 (E.D. Pa. May 23, 2018) .. 21

*Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) ................................ 36

*Broyles v. Texas*, 618 F. Supp. 2d 661 (S.D. Tex. 2009)....................................... 31

*Burdick v. Takrushi*, 504 U.S. 428 (1992) ............................................................ 37, 39

*Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385 (E.D. Pa. 2008) .................................. 29

*Cartagena v. Crew*, No. 96 Civ. 3399, 1996 WL 524394 (E.D.N.Y. Sept. 5, 1996) .................. 30

*Common Cause v. Thomsen*, No. 19-CV-323-JDP, 2021 WL 5833971 (W.D. Wis. Dec. 9, 2021) .................................................................................................... 36

*Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups*, 439 F. Supp. 2d 1294 (N.D. Ga. 2006) ............................................................................ 34

*Compare Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775 (S.D. Ind. 2006).......... 33, 35

*Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181 (2008) .................................. 40

*Crookston v. Johnson*, 842 F.3d 396 (6th Cir. 2016)............................................ 16, 21

*Cruz v. Bd. of Elections of New York*, 396 F. Supp. 2d 354 (S.D. N.Y. 2005)............ 25

*Dempsey v. Cessna Aircraft Co.*, 653 A.2d 679 (Pa. Super. 1995) .......................... 24

*Diaz v. Cobb*, 435 F. Supp. 2d 1206 (S.D. Fla. 2006) .......................................... 35

*Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95 (3d Cir. 2008) .............................. 28, 29

*Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331 (W.D. Pa. 2020) .......... 37

*Fishman v. Schaffer*, 429 U.S. 1325 (1976) (Marshall, J.) ........................................................ 16

*Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153 (11th Cir. 2008) ............................ 33

*Frazier v. Callicutt*, 383 F. Supp. 15 (N.D. Miss. 1974) ............................................................ 34

*Friedman v. Snipes*, 345 F. Supp. 2d 1356 (S.D. Fla. 2004) ..................................................... 34

*Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271 (E.D.N.Y. 2004) ................. 30

Gonzaga University v. Doe, 536 U.S. 273 (2002) .................................................................. 28, 29

*Good v. Roy*, 459 F. Supp. 403 (D. Kan. 1978) .......................................................................... 30

*Harding v. Edwards*, 487 F. Supp. 3d 498 (M.D. La. 2020) ...................................................... 38

*Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77 (2d Cir. 2005) ........................................ 25

*In re 2,349 Ballots in 2020 Gen. Election*, 241 A.3d 694 (Pa. Cmwlth. 2020) .......................... 40

*In Re 2,349 Ballots*, 2020 WL 6820816 ..................................................................................... 35

*In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020) .................................................................................................................. passim

*Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1284 (2021) ........................................................................................................................................ 27

*Kelly v. Commonwealth*, 240 A.3d 1255  (Pa. 2020) ................................................................. 17

*King v. Whitmer*, 505 F. Supp. 3d 720 (E.D. Mich. 2020) .................................................... 16, 20

*Lawrence v. Bd. of Election Com'rs of City of Chicago*, 524 F. Supp. 2d 1011 (N.D. Ill. 2007) 25

*League of Women Voters of Ohio v. Larose*, 489 F. Supp. 3d 719 (S.D. Ohio 2020) ................. 38

*Malinou v. Bd. of Elections*, 271 A.2d 798 (R.I. 1970) .............................................................. 33

*McArdle v. Tronetti*, 607 A.2d 1219 (Pa. Super. 1993) ............................................................. 23

*McField ex rel. Ray v. Philadelphia Hous. Auth.*, 992 F. Supp. 2d 481 (E.D. Pa. 2014) ............ 28

*McGovern v. City of Philadelphia*, 554 F.3d 114 (3d Cir. 2009) ........................................... 28, 31

*McKay v. Altobello*, No. CIV. A. 96-3458, 1996 WL 635987 (E.D. La. Oct. 31, 1996) ............ 30

*McKay v. Thompson*, 226 F.3d 752 (6th Cir. 2000) ................................................................... 30

*Nader v. Keith*, 385 F.3d 729 (7th Cir. 2004) .......................................................................... 16

*Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299 (3d Cir. 2009)..............
................................................................................................................................... 22, 23, 24

*Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016) .................................. 30

*New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265 (N.D. Ga. 2020) .................. 38, 41

*Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790 (W.D. Mo. 2020) .............................. 34

*Pa. Democratic Party v. Republican Party of Pa.*, No. 16-cv-5664, 2016 WL 6582659 (E.D. Pa. Nov. 7, 2016) .......................................................................................................................... 16

*Pearson v. Sec. Dept. of Corrections*, 775 F.3d 598 (3d Cir. 2015)........................................... 16

*Ritter v. Lehigh Cty. Bd. of Elections*, No. 9 MAL 2022 WL 244122 (Pa. Jan. 27, 2022)........... 10

*Ritter v. Lehigh Cty. Bd. of Elections*, No. 1322 C.D. 2021 WL 16577 (Pa. Cmwlth. Jan. 3, 2022)
............................................................................................................................................. 10

*Rosario v. Rockefeller*, 410 U.S. 752 (1973) ........................................................................... 38

*Sabree ex rel. Sabree v. Richman*, 367 F.3d 180 (3d Cir. 2004) ................................................ 28

*Santana Products, Inc. v. Bobrick Washroom Equipment, Inc.*, 401 F.3d 123 (3d Cir. 2005).........
............................................................................................................................................ 16, 17

*Schwier v. Cox*, 340 F.3d 1284 (11th Cir.2003) ................................................................ 31, 34

*Sec'y United States Dep't of Labor v. Kwasny*, 853 F.3d 87 (3d Cir. 2017) .............................. 23

*Spivey v. Ohio*, 999 F. Supp. 987 (N.D. Ohio 1998) .................................................................. 30

*Stein v. Cortes*, 223 F. Supp. 3d 423 (E.D. Pa. 2016)....................................................... passim

*Storer v. Brown*, 415 U.S. 724 (1974) ..................................................................................... 37

*Taylor v. Sturgell*, 553 U.S. 880 (2008).................................................................................... 23

v

*Thrasher v. Illinois Republican Party*, No. 4:12-CV-4071-SLD-JAG, 2013 WL 442832  (C.D. Ill. Feb. 5, 2013) ............................................................................................... 31

*Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412 (3d Cir. 2004) ........... 27

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 .............................................. 37

*Towns v. Cowen*, 786 F. Supp. 699 (N.D. Ill. 1992) .................................................. 25

*Turner v. Crawford Square Apartments II, L.P.*, 449 F.3d 542 (3d Cir. 2006) ...................... 22, 23

*Vanderklok v. United States*, 868 F.3d 189 (3d Cir. 2017) .......................................... 27

*Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815 (E.D. Mich. 1996) ... 30

*Wisniewski v. Rodale, Inc.*, 510 F.3d 294 (3d Cir. 2007) ............................................ 29, 31

*Wolfe v. Beard*, No. CIV.A. 10-2566 WL 601632 (E.D. Pa. Feb. 15, 2011) ............................ 29

*Ziglar v. Abbasi*, 137 S. Ct. 1843 (2017) ........................................................... 31

**Statutes**

25 P.S. § 3146.9(a) ........................................................................... 19

25 P.S. § 3157 ................................................................................ 17

25 P.S. § 3263 ................................................................................ 17

25 P.S. § 3313 ................................................................................ 17

25 P.S. § 3456 ................................................................................ 17

25 P.S. § 3553 ................................................................................ 40

25 P.S. §§ 3146.6(a) .......................................................................... 3

28 U.S.C. § 1746 .............................................................................. 39

3150.16 (a) ................................................................................... 3

42 U.S.C. § 1971(a)(2)(B) ..................................................................... 26

52 U.S.C. § 10101 (a)(2)(B) ................................................................... 34

52 U.S.C. § 10101(a) .......................................................................... 29, 32, 39

52 U.S.C. § 10101(a)(2)(B) ............................................................................ passim

52 U.S.C. § 10101(c) ........................................................................... 27, 29

78 Stat. 241, 241 (1964) ........................................................................... 26

**Rules**

Pa.R.C.P. No. 2329 ........................................................................... 25

**Other Authorities**

Richard L. *Hasen, Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937 (2005) ........................................... 17

## I.     INTRODUCTION

This case represents no less than ***the fourth court review*** regarding a set of 257 invalid absentee and mail-in ballots that were submitted during the November 2, 2021 municipal election in Lehigh County. Under the Pennsylvania Election Code, an absentee or mail-in ballot that does not have a dated declaration is invalid. This rule was first established by the Pennsylvania Supreme Court in *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020). As part of underlying state court litigation in this matter, the Pennsylvania Commonwealth Court applied this rule to the 257 ballots at issue here and ruled that they should not be counted. The Pennsylvania Supreme Court denied taking up this issue again, thus resolving the issue of whether or not undated declaration ballots should be counted. As a result, as of this filing, Intervenor Defendant David Ritter is a presumptive successful candidate for the office of Judge of the Court of Common Pleas of Lehigh County.

Despite all of the foregoing, Plaintiffs Linda Migliori, Francis J. Fox, Richard E. Richards, Kenneth Ringer, and Sergio Rivas have filed this belated action seeking to enjoin Defendant Lehigh County Board of Elections ("the Board") from certifying the final results of the November 2, 2021 election. Plaintiffs also seek to compel the Board to count the defective ballots.

However, because this is ***the fourth action*** directed to these same ballots, Plaintiffs' claims retread ground that has already been covered and the claims suffer from a variety of threshold defects that warrant granting summary judgment in Ritter's favor. First, Plaintiffs inexcusably languished on asserting their rights and all of their claims are barred under the laches doctrine. Indeed, Plaintiffs waited 90 days from the election to file this action at the last possible second. Plaintiffs delay is now severely prejudicing both Ritter, the presumptive winner of a judicial seat on the Lehigh County Court of Common Pleas, and that understaffed court

itself. Second, Plaintiffs' claims are barred by res judicata because, again, all of these claims were covered in the prior *three* state court cases.

Even when addressing the merits of Plaintiffs' claims, each fail as a matter of law. Plaintiffs' Count I asserts a claim under the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), but that statute does not allow for or provide a private right of action and, thus, this Court cannot consider it. But even if this Court is inclined to reach the merits of this claim, Plaintiffs are not entitled to relief because: (1) the Materiality Provision does not apply outside the context of voter registration schemes; (2) Plaintiffs have not even alleged in the Complaint—let alone established—that the Election Code's mail-in voting regulations discriminate against a class of individuals to which they belong; and (3) the dating requirement relative to voter declarations is material to determining the voter's eligibility.

Next, Plaintiffs' Count II asserts a claim for undue burden on the right to vote under the First and Fourteenth Amendments, however, any burden on Plaintiffs' right to vote by the Board's enforcement of the statutory requirement that voters date their absentee and mail-in ballot declarations is minimal, at best, and advances important regulatory interests in preventing fraud and ensuring orderly administration of elections. Therefore, the dated declaration requirement is not an undue burden on Plaintiffs' right to vote under the First and Fourteenth Amendments and Ritter is entitled to judgment as a matter of law on Count II.

Accordingly, because there are no genuine issues of fact, and the law is clear, this Court should grant this Motion, enter judgment in Ritter's favor, and once and for all resolve the adjudication of these 257 invalid ballots.

2

II.    **STATEMENT OF FACTS**

A.    **The 2020 election cycle and subsequent events**

As it concerns the declaration on the outer envelope of an absentee or mail-in ballot, the Pennsylvania Election Code, in material part, states as follows: "The elector shall then fill out, date and sign the declaration printed on such envelope." Joint Stipulated Facts (hereafter, "Stip. Facts") at ¶ 6 (ECF 27); 25 P.S. §§ 3146.6(a) and 3150.16 (a).[1] This provision was at the heart of several challenges during the 2020 election cycle, which resulted in the meaning of the provision being posed to the Pennsylvania Supreme Court in multiple consolidated appeals. Stip. Facts at ¶ 7. This yielded a split 3-1-3 decision in *In re Canvass of Absentee and Mail-in Ballots of November 3, 2020 Gen. Election*, 241 A.3d 1058 (Pa. 2020), whereby a four-justice majority held that the dated declaration requirement in Section 3150.16(a) is mandatory in all elections following the 2020 General Election. Stip. Facts at ¶ 7.

After *In re Canvass*, a number of material events occurred concerning elections in Lehigh County and statewide. Stip. Facts at ¶ 8. For instance, after the opinion, the Board changed the outer envelope for mail-in ballots. Stip. Facts at ¶¶ 8-9; *compare* Exhibit B (containing the Board supplied envelope for absentee and mail-in voters for the 2020 election cycle), *with* Exhibit C (containing the Board supplied envelope for absentee and mail-in voters for the 2021 election cycle).[2] Specifically, the Board added text to the flap regarding what must be done for the ballot to be counted:

---

[1] Because the legal issues surrounding the declaration on mail-in and absentee ballots are the same under the Pennsylvania Election Code, the ballots at issue are referred to throughout this Brief as simply "mail-in" ballots.

[2] All references to "Exhibits" in this Brief refer to those attached to the Joint Stipulated Facts (ECF 27).

**Your ballot must have the following to be counted:**
- ☐ You sign and date the voter's declaration in your own handwriting
- ☐ You **seal** your ballot inside the white secrecy envelope ("Official Election Ballot") and place it in here

Stip. Facts at ¶¶ 8-9; Exhibit C. The Board also added the word "required" after the signature

block and the date block:

Voter, sign or mark here (required) /
Votante, firme o marque aquí (obligatorio)

✘

Date (MM/DD/YYYY) (required) /
Fecha (MM/DD/AAAA) (obligatorio)

Stip. Facts at ¶¶ 8-9; Exhibit C. The Board's revised 2021 envelope was approved by the

Secretary of the Commonwealth. Stip. Facts at ¶ 10.

    Further still, for the 2021 election, the Board supplied standalone instructions to each

potential mail-in voter, which gave additional information on the date requirement:

# FOR YOUR BALLOT TO BE COUNTED:



## 1. Pack and seal it properly
- Put your ballot in the white secrecy envelope that says **"Official Election Ballot"** and seal it. Do not place any mark, text or symbol on the inner secrecy envelope.
- Put the secrecy envelope in the pre-addressed return envelope and seal it.



## 2. Sign and date the return envelope
- **Sign** and write **today's date** in the Voter's Declaration section.



## 3. Return it
- By mail—Remember to include postage.
- In person—Drop your ballot off at your county board of elections, or another drop-off location designated by the board. Check the county website for times and locations.

If you do not follow these instructions, your ballot will be rejected.

4

Stip. Facts at ¶¶ 11-12; Exhibit D (containing the instructions the Board supplied to absentee or mail-in voters during for the 2021 election).

During the 2021 primary, Lehigh County **did not** count mail-in ballots with an undated declaration on the envelope. Exhibit F at 51:12-15 (Board Nov. 15, 2021 public hearing transcript); Exhibit G at 28:13-15, 29:2-4 (Lehigh County Court of Common Pleas Nov. 22, 2021 hearing transcript).

Next, the Supreme Court's opinion directly caused the Pennsylvania Department of State to issue supplemental guidance to the various county election boards for the 2021 Municipal Election. Stip. Facts at ¶ 13. The Department did so via a June 1, 2021 email, with the subject line "DOS Email: Reminder Regarding Requirement to Sign AND Date Declaration Envelopes." Stip. Facts at ¶¶ 13-14; Exhibit E (June 1, 2021 DOS Email). The guidance stated:

> Since the Municipal Primary on May 18, the department has seen several news articles suggesting that some counties are continuing to accept and count ballots that do not contain both a signature and a date on the voter's declaration.
>
> As you know, the department updated the content and the instructions on the declaration envelope to ensure that voters know they must **sign and date** the envelope for their ballot to be counted. Furthermore, our updated guidance is consistent with the Supreme Court's ruling last September in *In Re: Canvass of Absentee and Mail-in Ballots of November 3, 2020 General Election*, wherein the Court held that in future elections a voter's declaration envelope must be both signed and dated for the ballot to count. Though we share your desire to prevent the disenfranchisement of any voter, particularly when it occurs because of a voter's inadvertent error, we must strongly urge all counties to abide by the Court's interpretation of this statutory requirement.
>
> We also believe that it is prudent to again remind you of our previous clarification of 10/25/2020. As noted in that communication, there is no basis to reject a ballot for putting the "wrong" date on the envelope, nor is the date written used to determine the eligibility of the voter. You should process these ballots normally.
>
> ….

Exhibit E (emphasis in original).

**B.     The 2021 Municipal Election in Lehigh County**

This dispute concerns 261 mail-in ballots with two date issues on the outer envelope (hereafter, "the Disputed Ballots"): 257 had no date on the declaration, while 4 had a date in the wrong place. Stip. Facts at ¶ 23. The Disputed Ballots were all timely received by the Board and none are the subject of known or suspected fraud. Stip. Facts at ¶ 26. As of the date of this Brief, the contents of the ballots within the Disputed Ballots (save for the 4 wrong-place-date ballots, described below) remain unknown to anyone; i.e., which candidates would receive additional votes is unknown. Stip. Facts at ¶ 51. The Disputed Ballots were the subject of extensive Pennsylvania state court proceedings described more fully below. Stip. Facts at ¶¶ 23, 30-50.

The Disputed Ballots are potentially material to a single election in Lehigh County. Stip. Facts at ¶ 16. Specifically, David Ritter is a candidate for the office of Judge of the Court of Common Pleas of Lehigh County. Stip. Facts at ¶¶ 18-19, 95. Three vacancies for such office were on the November 2, 2021 ballot, with six candidates vying for the three available offices. Stip. Facts at ¶ 17. As of November 15, 2021, Ritter had received the third-most votes from the Municipal Election—and was thus a presumptive successful candidate—leading the fourth-place candidate, Zachary Cohen, by 74 votes. Stip. Facts at ¶ 18. The overall vote totals were as follows:

| Candidate | Vote Total |
|---|---|
| Tom Caffrey (REP) | 35,301 |
| Tom Capehart (REP) | 33,017 |
| David Ritter (REP) | 32,602 |
|  |  |
| Zachary Cohen (DEM) | 32,528 |
| Maraleen Shields (DEM) | 32,041 |
| Rashid Santiago (DEM) | 29,453 |

Stip. Facts at ¶ 19. Judges Tom Caffrey and Tom Capehart have already been sworn in as commissioned judges in Lehigh County as a result of the outcome of the November 2 election;

they were sworn in on or about January 3, 2022. Stip. Facts at ¶ 20.

Approximately 72,000 electors have had their ballots tallied in Lehigh County from the 2021 Municipal Election. Stip. Facts at ¶ 21. Thus the Disputed Ballots concern less than half of one percent of all ballots counted to date. Of the over 70,000 ballots counted in Lehigh County, approximately 22,000 were cast by mail-in ballot. Stip. Facts at ¶ 21.

As the Board received mail-in ballots for the November 2 election, if they did not have a date on the voter declaration, or had a date in the wrong place, they were set aside. Stip. Facts at ¶ 22. The Board then marked those ballots "cancelled" in the Statewide Uniform Registry of Electors ("SURE") system. Stip. Facts at ¶ 28. The Pennsylvania Department of State developed the SURE system. Stip. Facts at ¶ 27. It contains various information about each elector in the Commonwealth, and county boards of election, like the Board, are able to access the SURE system to add, modify, or delete information in the system as necessary. Stip. Facts at ¶ 27. The Board's change in the SURE system was designed to cause an automatically generated email to be sent by the Department of State, from the email address RA-voterregstatcert@state.pa.us, to the impacted elector if he or she had an email address on file. Stip. Facts at ¶ 29.[3] An example of such an email is set forth at Exhibit M, which is an email sent to Plaintiff Linda Migliori in this matter on October 29, 2021, after her ballot was marked cancelled in the SURE system that same day:

---

[3] Moreover, for the 2021 election, the Pennsylvania Department of State maintained a website where voters could check the status of their ballots; that website was: www.pavoterservices.pa.gov/Pages/Ballot_Tracking.aspx. Compl. at ¶ 22. As of February 11, 2022, if a person accesses the foregoing website they will receive the following message: "PA Voter Services is temporarily unavailable." Thus, exactly what that website would have said to an inquiring elector about the status of his/her ballot during and immediately after the November 2, 2021 election is now unknown due to Plaintiffs' delay in bringing the present action.

Dear LINDA D MIGLIORI,

Your ballot has been received by LEHIGH County on 10/29/2021.

Your ballot status has been updated to cancelled because it cannot be counted due to voting at the polling place.

If you have questions about your ballot, please contact LEHIGH County at (610) 782-3194.

Thank you.

****Please do not reply to this email.****

Stip. Facts at ¶¶ 59, 61-62; Exhibit M. Of note, Plaintiff Richard Richards also received some kind of email notice regarding his ballot before the November 2 election, but he has since lost that email. Stip. Facts at ¶ 74.

The cancelling of the ballots by the Board did not eliminate the elector's ability to vote. Stip. Facts at ¶¶ 36-37; Exhibit G at 54:5-11. To the contrary, after the Board cancelled a ballot, the Board afforded the elector the opportunity to cure their ballot defect(s), including missing dates on the voter declaration. Stip. Facts at ¶¶ 36-37; Exhibit G at 54:12-20. The Board's chief clerk—Tim Benyo—testified in court that some electors chose to cure their cancelled ballots in advance of the November 2, 2021 election. Stip. Facts at ¶¶ 36-37; Exhibit G at 54:21-55:3.[4]

C.   **Pennsylvania state court litigation regarding the Disputed Ballots**

After the November 2 election, the Board convened a hearing on November 15, 2021 to consider the Disputed Ballots. Stip. Facts at ¶ 30. Both Ritter and Candidate Cohen presented

---

[4] Q.   Did any voters – did voters have an opportunity to cure those defects prior to or on Election Day?
A.   Certain defects, yes.
Q.   Was the date defect one of them?
A.   Yes it was.
Q.   Did any voters come in to cure that defect?
A.   They did.
Exhibit G at 54:21-55:3.

argument regarding the Disputed Ballots. Stip. Facts at ¶ 33; Exhibit F at 35:5-71:6. The Board also heard testimony from the chief clerk to the Board. The chief clerk testified that it was his opinion the undated declaration ballots were not effective, and should not be counted, because they did not meet the requirements to be counted, based on his discussion with the Law Department. Exhibit F at 51:3-11. The Board's solicitor also stated that he understood that the Pennsylvania Department of State had advised that a dated declaration was required. Exhibit F at 56:23-57:10. Despite this testimony from the chief clerk and the statement from the solicitor, the Board voted 3-0 to count the Disputed Ballots. Stip. Facts at ¶ 34; Exhibit F at 64:18-66:2.

On November 17, 2021, Ritter promptly filed an appeal of the Board's decision to count the Disputed Ballots with the Court of Common Pleas of Lehigh County. Stip. Facts at ¶ 35.

After the appeal was filed, on or about November 20, 2021, after reviewing the Disputed Ballots, staff working on behalf of candidate Zac Cohen were able to generate a list of electors whose voter declaration was undated. Stip. Facts at ¶ 25. The list reflected their names, address, party registration, and age. Stip. Facts at ¶ 25.

The Lehigh County trial court held an evidentiary hearing, and then heard argument, at a transcribed hearing on November 22, 2021. Stip. Facts at ¶ 36. The Court heard testimony from the Board's chief clerk. Exhibit G at 11:14-12:2, 59:7-20. The court also heard testimony from Richard Richards, one of the Plaintiffs in this matter. Exhibit G at 59:4-63:20. At the end of the hearing, the trial court judge took the matter under advisement. He later issued an opinion and order on November 30, 2021, which affirmed the Board's decision to count the Disputed Ballots. Stip. Facts at ¶ 38; Exhibit H (Court of Common Pleas of Lehigh County November 30, 2021 opinion and order).

On December 1, 2021, Ritter appealed the trial court's decision to the Pennsylvania Commonwealth Court and argued, *inter alia*, that the Court of Common Pleas had no authority to ignore *In re Canvass*. Stip. Facts at ¶ 40. The next day, on December 2, 2021, Ritter filed for a stay pending appeal with the Court of Common Pleas, and that stay was granted on December 3, 2021, which prohibited the Board from opening and counting the Disputed Ballots. Stip. Facts at ¶¶ 41-42.

On January 3, 2022, the Commonwealth Court issued an opinion and order, and relying on *In re Canvass*, concluded 257 of the Disputed Ballots could not be counted, while permitting the 4 wrong-date-location ballots to be canvassed. *See Ritter v. Lehigh Cty. Bd. of Elections*, No. 1322 C.D. 2021, 2022 WL 16577 (Pa. Cmwlth. Jan. 3, 2022); Stip. Facts at ¶¶ 43-44; Exhibit I (Commonwealth Court January 3, 2022 opinion and order). As is material here, not only did the Commonwealth Court hold that the Disputed Ballots could not be counted under the Pennsylvania Election Code, the Court further ruled that the Materiality Provision, 52 U.S.C. § 10101(a)(2)(B), was "inapplicable," and further ruled that even if it did apply, it was not violated because "the dating of mail-in ballots is a 'material' requisite under the Election Code[.]" *See Ritter*, 2022 WL 16577, at *9.

Candidate Cohen filed a petition for allowance of appeal with the Pennsylvania Supreme Court on January 7, 2022. Stip. Facts at ¶ 45. On January 27, 2022, the Pennsylvania Supreme Court the petition. *Ritter v. Lehigh Cty. Bd. of Elections*, No. 9 MAL 2022, 2022 WL 244122 (Pa. Jan. 27, 2022); Stip. Facts at ¶ 46; Exhibit J (Pennsylvania Supreme Court's January 27, 2022 order).

Following that decision, also on January 27, 2022, the Lehigh County Court of Common Pleas issued an order on remand directing the Elections Board "to exclude the 257 ballots at

issue in this case that fail to include a date on the return envelope from the certified returns of the 2021 municipal election of Lehigh County." Stip. Facts at ¶ 48; Exhibit K (Court of Common Pleas of Lehigh County January 27, 2022 order). On January 31, 2022, the Board canvassed the 4 ballots that contained dates in the wrong location, which yielded 3 additional votes for Candidate Cohen, reducing Ritter's vote lead to 71. Stip. Facts at ¶ 50. The Board has not yet fully and finally certified the election results from the November 2 election. Stip. Facts at ¶ 52.

### D.      The present lawsuit, parties, and procedural posture

On January 31, 2022, ninety days after the November 2, 2021 election, Plaintiffs filed the instant action challenging the adjudication of the 257 mail-in ballots that have no date on the voter declaration. (ECF 1.) Specifically, Plaintiffs asserted the following three claims: Count I (Violation of the Materiality Provision of the Civil Rights Act), Count II (Undue Burden on the Right to Vote Under the First and Fourteenth Amendment), and Count III (Denial of Voting Rights Without Notice and Procedural Due Process). (ECF 1.) Recently, on February 10, 2022, Plaintiffs stipulated to dismiss Count III. (ECF 27.)

All five of the Plaintiffs submitted mail-in ballots with no date on the voter declaration, and thus their ballots are among the remaining 257 ballots from the Disputed Ballots. Stip. Facts at ¶¶ 53-54; Exhibit L (copies of the outer envelopes of Plaintiffs' November 2, 2021 ballots).

Plaintiff Linda Migliori's mail-in ballot was received by the Board on October 28, 2021. Stip. Facts at ¶ 58. The Board marked her ballot cancelled in the SURE system on October 29, 2021. Stip. Facts at ¶ 59. Plaintiff Migliori has a valid email address on file in the SURE system. Stip. Facts at ¶ 60. On October 29, 2021, Plaintiff Migliori received an email, from RA-voterregstatcert@state.pa.us. Stip. Facts at ¶ 61; Exhibit M (October 29, 2021 email sent to Plaintiff Migliori regarding her cancelled ballot).

Plaintiff Francis Fox's mail-in ballot was received by the Board on October 18, 2021. Stip. Facts at ¶ 66. The Board marked his ballot cancelled in the SURE system on October 20, 2021. Stip. Facts at ¶ 67. Plaintiff Fox does not have a valid email address on file in the SURE system. Stip. Facts at ¶ 68.

Plaintiff Richard Richards's mail-in ballot was received by the Board on October 14, 2021. Stip. Facts at ¶ 73. Plaintiff Richards received an email confirmation from the Board that it had received his mail-in ballot; he no longer has a copy of that email. Stip. Facts at ¶ 74. The Board marked his ballot cancelled in the SURE system on October 20, 2021. Stip. Facts at ¶ 75. Plaintiff Richards has a valid email address on file in the SURE system. Stip. Facts at ¶ 76. Plaintiff Richards testified regarding his undated declaration during the hearing before the Court of Common Pleas of Lehigh County on November 22, 2021. Exhibit G at 59:4-63:20.

Plaintiff Kenneth Ringer's mail-in ballot was received by the Board on November 1, 2021. Stip. Facts at ¶ 83. The Board marked his ballot cancelled in the SURE system on November 1, 2021. Stip. Facts at ¶ 84. Plaintiff Ringer has a valid email address on file in the SURE system. Stip. Facts at ¶ 85.

Plaintiff Sergio Rivas' mail-in ballot was received by the Board on October 25, 2021. Stip. Facts at ¶ 90. The Board marked his ballot cancelled in the SURE system on October 26, 2021. Stip. Facts at ¶ 91. Plaintiff Rivas does not have a valid email address on file in the SURE system. Stip. Facts at ¶ 92.

Ritter is a licensed Pennsylvania attorney, and a candidate for Judge of the Court of Common Pleas of Lehigh County on the November 2, 2021 ballot. Stip. Facts at ¶ 95. The Board is a 3-member board established under the Pennsylvania Election Code, whose responsibilities

include canvassing and counting ballots and certifying to the Pennsylvania Department of State election results. Stip. Facts at ¶ 96.

On February 1, 2022, Ritter filed a motion to intervene in this action, which was granted by the Court on February 2, 2022. (ECF 14, 18.) The Court further ordered that Ritter's Answer, which was attached to the Motion to Intervene, was deemed to be filed as a responsive pleading in this matter. (ECF 18.) Ritter's Answer contains several affirmative defenses, including laches and res judicata. (ECF 14-1.)

### III.     STATEMENT OF QUESTIONS INVOLVED

1.      Should the Court grant judgment in Ritter's favor as to all claims under the doctrine of laches because Plaintiffs' inexcusably delayed in filing this civil action, resulting in prejudice to Ritter?

*Suggested Answer*: Yes.

2.      Should the Court grant judgment in Ritter's favor as to all claims because Plaintiffs' claims are barred by res judicata as a result of the shared identity of causes of action and parties in the prior state court proceedings and the adequate representation of their interests there?

*Suggested Answer*: Yes.

3.      Should the Court grant judgment in Ritter's favor as to Count I because (1) the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), does not allow for or provide a private right of action; and (2) Plaintiffs have otherwise failed to state a claim under the Materiality Provision?

*Suggested Answer*: Yes.

4.      Should the Court grant judgment in Ritter's favor as to Count II because any burden on Plaintiffs' right to vote by the Board's enforcement of the statutory requirement that voters date their absentee or mail-in ballot declarations is minimal, at best, and advances important regulatory interests in preventing fraud and ensuring orderly administration of elections.

*Suggested Answer*: Yes.

## IV.    SUMMARY OF ARGUMENT

Ritter is entitled to summary judgment in his favor because there are no genuine issues of material fact and all of Plaintiffs' claims are barred at the outset by laches and res judicata. Plaintiffs' claims are barred under the laches doctrine because Plaintiffs inexcusably delayed in commencing this suit, to the detriment of Defendant Ritter. Plaintiffs' claims are barred by res judicata as a result of the shared identity of causes of action and the parties in the prior state court proceedings and the adequate representation of Plaintiffs' interests in those matters.

Even if this Court opts to address the merits of Plaintiffs' claims (it should not), each of their claims fails as a matter of law. Plaintiffs' Count I asserts a claim under Materiality Provision of the Civil Rights Act, but that statute does not allow for or provide a private right of action and, thus, this Court cannot consider it. But even if this Court is inclined to reach the merits of this claim, Plaintiffs are not entitled to relief because: (1) the Materiality Provision does not apply outside the context of voter registration schemes; (2) Plaintiffs have not even alleged in the Complaint—let alone established—that Election Code's mail-in voting regulations discriminates against a class of individuals to which they belong; and (3) the dating requirement relative to Voter Declarations is material to determining the voter's eligibility.

Plaintiffs' Count II asserts a claim for undue burden on the right to vote under the First and Fourteenth Amendments; however, any burden on Plaintiffs' right to vote by the Board's enforcement of the statutory requirement that voters date their absentee or mail-in ballot declarations is minimal, at best, and advances important regulatory interests in preventing fraud and ensuring orderly administration of elections.

15

## V.    ARGUMENT

Intervenor Defendant Ritter is entitled to summary judgment on Count I (Violation of the

Materiality Provision of the Civil Rights Act), and Count II (Undue Burden on the Right to Vote

Under the First and Fourteenth Amendment) for the following two threshold reasons: (1) laches

and (2) res judicata. Further, even if this Court chooses to address the merits of Plaintiffs' claims

(it should not), the claims still fail for the reasons fully set forth below.

### A.    Plaintiffs' claims are barred under the doctrine of laches because they inexcusably delayed in bringing this action and the delay has prejudiced Ritter.

Laches has two elements: "(1) inexcusable delay in bringing suit, and (2) prejudice to the

defendant as a result of the delay." *Santana Products, Inc. v. Bobrick Washroom Equipment,*

*Inc.*, 401 F.3d 123, 138 (3d Cir. 2005). In assessing delay for purposes of laches, a court can use

the potentially applicable statute of limitations as a guide. *See id.* Reference to state law for

purposes of assessing the timeliness of an action under Section 1983 is necessary since state law

provides the time within which such a claim must be brought. *See Pearson v. Sec. Dept. of*

*Corrections*, 775 F.3d 598, 602 (3d Cir. 2015). Laches is particularly appropriate to apply in

election cases, given the tight statutory deadlines and the negative impact on the public at large

with unresolved elections. *See King v. Whitmer*, 505 F. Supp. 3d 720, 731 (E.D. Mich. 2020)

("Courts apply laches in election cases." (citing cases)); *see also Crookston v. Johnson*, 842 F.3d

396, 398 (6th Cir. 2016); *Stein v. Cortes*, 223 F. Supp. 3d 423, 436 (E.D. Pa. 2016); *Pa.*

*Democratic Party v. Republican Party of Pa.*, No. 16-cv-5664, 2016 WL 6582659, at *4 (E.D.

Pa. Nov. 7, 2016); *see generally Fishman v. Schaffer*, 429 U.S. 1325, 1327-28 (1976) (Marshall,

J.) (single justice opinion denying application for injunction in election matter where district

court found suit barred based on laches); *Nader v. Keith*, 385 F.3d 729, 736-37 (7th Cir. 2004)

("By waiting as long as he did to sue … Nader created a situation in which any remedial order would throw the state's preparations for the election into turmoil.").[5]

The Court should apply the doctrine of laches in this matter and bar all of Plaintiffs' claims.

To begin the analysis, Plaintiffs inexcusably delayed in bringing this action. As was noted in *Stein*, the Pennsylvania Election Code has various post-election deadlines for challenging the results thereof, all of which are extremely short. *See* 223 F. Supp. 3d at 427-28. That Court recognized the "Commonwealth has an obvious interest in regulating the conduct of elections," and noted that giving federal relief could "effectively" result in a court "nullify[ing] the Pennsylvania Election Code provisions applied by State Courts and Boards[.]" *See id.* at 436. Here, the most relevant Election Code provision is found in 25 P.S. § 3157, which gives "any person aggrieved" by a decision of a county board regarding the canvassing of election returns **just two days** to file a challenge to that decision. § 3157(a). Notably, that is the very provision invoked by Ritter in initiating his state court appeals. The two-day provision in Section 3157 establishes the appropriate reference point for assessing Plaintiffs' inexcusable delay. *Cf. Santana Products*, 401 F.3d at 138. Furthermore, though there are several ways to challenge election results, and several classes of challenges, the *longest* post-election deadline in the Pennsylvania Election Code to lodge such a dispute is a **mere twenty days**. *See* 25 P.S. § 3456; *see also* 25 P.S. § 3313 (providing only 10 days); 25 P.S. § 3263 (providing only 5 days); *see*

---

[5] *Cf. Kelly v. Commonwealth*, 240 A.3d 1255, 1258 n.2 (Pa. 2020) (Wecht, J., concurring) (citing Richard L. Hasen, *Beyond the Margin of Litigation: Reforming U.S. Election Administration to Avoid Electoral Meltdown*, 62 Wash. & Lee L. Rev. 937, 998 (2005) ("Courts should see it as in the public interest in election law cases to aggressively apply laches so as to prevent litigants from securing options over election administration problems.")).

*generally Stein*, 223 F. Supp. 3d at 427-28 (discussing challenges to election results under Pennsylvania Election Code).

Here, Plaintiffs' serially, and inexcusably sat on their claimed rights. The election was held on November 2, 2021. By that date, the Board staff had already cancelled, and set aside, all undated declaration mail-in ballots. Stip. Facts at ¶¶ 22, 28, 59, 67, 75, 84, 91. Plaintiff Migliori in particular had been sent an email, on October 29, 2021, notifying her that her ballot had been cancelled. Stip. Facts at ¶ 61-62; Exhibit M. Notably, Plaintiff Richards also received some kind of email regarding his ballot, but he no longer has it, so what it said exactly is unknown because of his own actions and delay. Stip. Facts at ¶ 74. Regardless, Plaintiffs did nothing about the decision to cancel their ballots before election day, which cancellation they could have learned about by checking their email, contacting the Board, or perhaps checking the Department of State website.

Next, some thirteen days after the election, during the November 15, 2021 *public* hearing of the Board, judicial candidate Zac Cohen expressly asked the Board to overturn the staff decision, which only then the Board agreed to do. Stip. Facts at ¶¶ 30-34; Exhibit F at 35:18-36:4. Just two days later, on November 17, 2021, Ritter publicly filed a statutory appeal in the Court of Common Pleas, challenging the counting of these undated declaration ballots. Stip. Facts at ¶ 35. That *public* proceeding lasted from November 17 until November 30, 2021, when the trial court issued its opinion. Stip. Facts at ¶¶ 35-39. In those intervening thirteen days when the validity of the undated declaration ballots was very much in doubt, Plaintiffs did nothing to protect their rights.

And by the point of the proceedings in the Common Pleas, Plaintiffs cannot credibly claim they didn't know their rights were in jeopardy—at least not all of them. Named Plaintiff in

18

this matter—Richard Richards—*was a witness in the evidentiary hearing* before Judge Reibman on November 22, and was such a witness solely for the purpose of discussing his undated voter declaration. Stip. Facts at ¶¶ 36-37; Exhibit G at 59:15-63:25. Still, Plaintiffs initiated no proceedings to protect their rights. And any notion that Plaintiffs could not have known by this time that their ballots had been set aside cannot be credited, because by no later than November 20, 2021, candidate Cohen himself (i.e., someone whose ballot had not been set aside) was able to generate a list of all electors with Disputed Ballots, including their name, address, phone number, and age. Stip. Facts at ¶ 25. This confirms the information was *knowable* and *known*. *See also* 25 P.S. § 3146.9(a) ("All official absentee ballots, files, applications for such ballots **and envelopes on which the executed declarations appear**, and all information and lists are hereby designated and declared to be public records …." (emphasis added)).

Plaintiffs' serial, inexcusable delays, continued from there. After Ritter appealed to the Commonwealth Court on December 1, Plaintiffs did nothing. Stip. Facts at ¶ 40. Next, when by public order the trial court stayed counting of the undated declaration ballots on December 3, 2021, Plaintiffs continued to do nothing. Stip. Facts at ¶ 42. When Ritter finally prevailed in the Commonwealth Court on January 3, 2022, the Plaintiffs still did nothing. Stip. Facts at ¶¶ 43-44. Further, even after the Pennsylvania Supreme Court on January 27, 2022 denied discretionary review of the Commonwealth Court's January 3 opinion, Stip. Facts at ¶¶ 46-47, and after the Common Pleas Court ordered the Board to proceed with its certification, Stip. Facts at ¶ 48, Plaintiffs waited another *four days* before coming into this Court seeking "emergency" relief, despite all of the Plaintiffs signing, **and dating**, their declarations in support of the emergency relief on January 30. *See* Complaint at Exhibits 1 through 5 (ECF 1-3 to 1-7).

In sum, between the material dates described above, and the date of filing, Plaintiffs delayed by each and all of the following measures:

| Event | Date | Delay From Event to January 31, 2022 Filing |
|---|---|---|
| Email to Linda Migliori | October 29, 2021 | 94 days |
| Municipal Election | November 2, 2021 | 90 days |
| Board Public Hearing | November 15, 2021 | 77 days |
| Ritter Appeal to Common Pleas | November 17, 2021 | 75 days |
| Cohen Campaign Generating List of Electors | November 20, 2021 | 72 days |
| Richard Richards Testimony in Common Pleas | November 22, 2021 | 70 days |
| Ritter Appeal to Commonwealth Court | December 1, 2021 | 61 days |
| Common Pleas Stay Order | December 3, 2021 | 59 days |
| Commonwealth Court Decision | January 3, 2022 | 28 days |
| Supreme Court Denial of Discretionary Appeal | January 27, 2022 | 4 days |

Against the foregoing, and in light of the state statutory and federal caselaw expectation that election-rated challenges must be pursued swiftly, Plaintiffs inexcusably delayed in pursing their post-election dispute. *Cf. King*, 505 F. Supp. 3d at 731-32 (finding inexcusable delay for laches purposes where plaintiffs waited 21 days after election to file suit); *Stein*, 223 F. Supp. 3d at 437 (finding delay in filing action just three weeks after election was without "credible justification").

Plaintiffs' inexcusable delay has also prejudiced Defendant Ritter. For starters, but-for this late-filed challenge, he would have been certified as the final winner of the November 2 municipal election for Common Pleas Judge (which would have carried certain salary and benefit entitlements). Stip. Facts at ¶ 50. Once sworn in, he would have been able to pursue his public service on behalf of the citizens of Lehigh County, who face a significant civil case back-log, which grows no shorter with the bench down a judge for the indefinite future. *See* Unified Judicial System of Pennsylvania, *County Caseload Statistics*, *Lehigh County*, at 3 (showing

20

2,351 civil actions pending as of 12/31/2020, the last date for which statistics are presently reported).[6]

Next, Plaintiffs' delay has also prejudiced Ritter's defense of this matter, in that some of the relevant evidence has been lost due to Plaintiffs' delay. Indeed, in Plaintiffs' own Complaint, they cite the Pennsylvania Department of State's election website as a material source for how voters could have checked the status of their mail-in ballots during the 2021 election. *See* Compl. at ¶ 22. Yet a visit to that website today shows that the information has been taken down, with the message "PA Voter Services is temporarily unavailable," being posted instead. This means whatever information Ritter could have learned about the notice Plaintiffs' received during the election about the cancellation of their ballots is forever lost due to Plaintiffs' delay. Notably too, at least one of the Plaintiffs—Richard Richards—received some kind of email notice regarding his ballot before election day, but he no longer has that email; i.e., yet more material evidence has been lost. Stip. Facts at ¶ 71.

Finally, the Commonwealth has an interest in holding "orderly elections," and Ritter, as a candidate for one of those elections, and a presumptive winner thereof, is prejudiced when the Commonwealth's interest in the final disposition of an election—*held over three months ago*—remains indefinitely delayed. *See Crookston*, 841 F.3d at 399 ("Crookson's belated challenge to Michigan's election procedures prejudices the State's interest in holding orderly elections."); *see also Stein*, 223 F. Supp. 3d at 436 ("The Commonwealth has an obvious interest in regulating the

---

[6] *Available at* https://www.pacourts.us/Storage/media/pdfs/20211223/182913-lehigh.pdf. *See Boyle v. Grizzly Industrial, Inc.*, No. 18-cv-854, 2018 WL 2331896, at *2 (E.D. Pa. May 23, 2018) (taking judicial notice of information on Pennsylvania Department of State website).

conduct of its elections."). For each of the foregoing reasons, Defendant Ritter has been prejudiced by Plaintiffs' unreasonable delay.

Accordingly, because each of the elements for laches are met here, the Court should summarily reject all of Plaintiffs' claims.

**B.      Plaintiffs' claims are barred by res judicata because there is a shared identity between the things sued for, the causes of actions, the parties, and the capacity of the parties in the state court action and the present case.**

Plaintiffs' present claims are barred by res judicata as a result of the final judgment in the prior state court proceedings and the adequate representation of their interests there. Federal courts must give the same preclusive effect to state court judgments and, thus, look to state law to analyze the application of res judicata in these circumstances. *Turner v. Crawford Square Apartments II, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006). Under Pennsylvania law, claims are barred by res judicata or claim preclusion when the two actions share: (1) the thing sued upon or for; (2) the cause of action; (3) the persons and parties to the action; and (4) the capacity of the parties to sue or be sued. *Id.* Res judicata bars not just claims that were brought previously, but also claims that *could* have been brought during the first case. *Id.* (quoting *Balent v. City of Wilkes-Barre*, 669 A.2d 309, 313 (Pa. 1995)).

While federal courts determine the preclusive effect of state court judgments under state law, the Third Circuit has recognized that "Pennsylvania law is 'not inconsistent' with federal decisions" on collateral estoppel, res judicata, and privity, and considers federal precedent persuasive in deciding these questions. *Nationwide Mut. Fire Ins. Co. v. George V. Hamilton, Inc.*, 571 F.3d 299, 310 (3d Cir. 2009). Under both Pennsylvania and federal law, res judicata extends to bar claims of those who are in privity with the parties of the prior action. Pennsylvania law broadly defines privity as existing where there is a mutual or successive relationship to the same right between parties or an identity of interest between one person and another so as to

22

"represent the same legal right." *Sec'y United States Dep't of Labor v. Kwasny*, 853 F.3d 87, 94-95 (3d Cir. 2017). The U.S. Supreme Court has explained that there are six categories of litigants who may be barred by issue preclusion even if they were not parties to the case – parties who: (1) agree to be bound by the determination of issues in the other action; (2) have a pre-existing substantive legal relationship with a party to the prior case; (3) have interests that were adequately represented by a party to the prior suit with the same interests; (4) assumed control over the prior litigation; (5) did not participate in the prior litigation but now bring suit as a proxy of one of the parties to the prior suit; or (6) are foreclosed from successive litigation by a statutory scheme. *Taylor v. Sturgell*, 553 U.S. 880, 893-96 (2008); *see Nationwide*, 571 F.3d at 310-11 (applying *Sturgell* to determine privity of parties with a Pennsylvania state court action for preclusion purposes).

Applying the foregoing standards, Plaintiffs' claims should be deemed barred.

First, the thing sued upon or for is the same in both the state court action and the present case. The state court proceedings centered on whether the Board could count the Disputed Ballots. Plaintiffs' present claims focus on the same dispute and the same ballots. While fashioning their claims in a slightly different package, Plaintiffs' ultimately seek the same relief the Board defended in state court: that the disputed ballots be counted. *See* Compl. at Prayer for Relief ¶ 3.

Second, the cause of action is the same in both cases. The "identity of the cause of action turns on "the essential similarity of the underlying events giving rise to the various legal claims." *Turner*, 449 F.3d at 549 (quoting *McArdle v. Tronetti*, 607 A.2d 1219, 1222 (Pa. Super. 1993)). This requires considering the similarity of acts complained of, the demand for recovery, the identity of witnesses, documents, and facts alleged. *Dempsey v. Cessna Aircraft Co.*, 653 A.2d

23

679, 681 (Pa. Super. 1995). The underlying events giving rise to Plaintiffs' claims are identical to the events that gave rise to the state court proceedings. As such, the parties were able to stipulate to all relevant facts in order to move this matter quickly to summary judgment. In both the state court proceedings and the present case, the ultimate driving force was and continues to be whether the Disputed Ballots can be counted. Therefore, the cause of action is the same.

Third, the parties to both causes of actions are the same. Plaintiffs are in privity with the parties and participants in the prior court litigation and their interests were adequately represented there. Plaintiffs' interests were aligned with the Board and Mr. Cohen during the state court proceedings and still remain aligned with Mr. Cohen now. *See Nationwide Mut. Fire. Ins. Co.*, 571 F.3d 299 at 313(explaining that under the adequate representation exception, "the interests of the party and nonparty must be squarely aligned"). The Board voted to count the ballots with undated declarations and defended that position throughout the appeals to the trial court, the Commonwealth Court, and the Supreme Court. Mr. Cohen also actively participated at every stage of the state court proceedings and repeatedly represented the interests of voters like Plaintiffs who favored counting mail-in ballots with undated declarations.[7] Indeed, as explained above, named Plaintiff Richard Richards testified in the trial court hearing before Judge Reibman. Mr. Cohen called Mr. Richards to testify for the express purpose of demonstrating that Mr. Richards would like his ballot to be counted. *See* Exhibit G at 58:10-16. Therefore, as of at least November 22, 2021, Mr. Richards was on notice that the interests he now asserts were at

---

[7] Although the trial court denied Mr. Cohen's petition to intervene and Mr. Cohen did not seek leave to intervene before the Commonwealth Court, Mr. Cohen actively participated at all levels of the state court proceedings. Mr. Cohen participated in the Board hearing and trial court hearing, submitted briefing to the Commonwealth Court, and even filed the Petition for Allowance of Appeal to the Supreme Court. At each stage, Mr. Cohen argued that the disputed ballots should be counted.

stake in the state court proceedings. Nonetheless, Mr. Richards did not assert that his interests were not adequately represented by the Board or Mr. Cohen and seek to participate in those proceedings. *See generally* Pa.R.C.P. No. 2329 (intervention shall be granted unless, *inter alia*, the intervening party's interest is already adequately represented).

Because candidates and voters often have the same legal interests, res judicata can be a bar to voters' claims on the basis of privity. *See, e.g.*, *Lawrence v. Bd. of Election Com'rs of City of Chicago*, 524 F. Supp. 2d 1011 (N.D. Ill. 2007) (finding voter plaintiffs' claims barred by res judicata because the voters shared interests with the candidate even if the candidate did not raise their exact claims in the state court proceedings); *Towns v. Cowen*, 786 F. Supp. 699, 703 (N.D. Ill. 1992) (finding privity for purposes of res judicata between voter who signs a nominating petition and the candidate because they share the same legal interests). Further, privity can exist between voters and a candidate to bar subsequent federal litigation after a loss in state court if the voter is considered a proxy for the candidate. *See Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 96 (2d Cir. 2005) (concluding plaintiff voters may be "in effect the candidates' puppets" such that they are in privity and their federal claims may be barred); *Cruz v. Bd. of Elections of New York*, 396 F. Supp. 2d 354, 355 n.1 (S.D. N.Y. 2005) (finding that that plaintiff voters claims may be barred by privity if they are "in reality the candidates' pawns") (quoting *Hoblock*, 422 F.3d at 91). Again, as of the date of the trial court hearing, at least Mr. Richards knew that the validity of disputed ballots like his were at the center of the proceedings. However, he did not seek to participate in those proceedings nor did he bring his federal claims. Instead, he waited until all avenues of appeal were exhausted and the position advocated for by the Board ***and*** Mr. Cohen throughout the state court proceedings was no longer viable before bringing the

25

present action. This gives a strong inference that Plaintiffs are in privity with Mr. Cohen, who adequately represented their interests in the prior action.

Fourth and finally, the capacity of the parties sued are the same. The parties are either the same or in privity with those in the state court action and the Board is a party in the same capacity in both actions, in its role as the entity that counts the ballots and certifies the election.

In sum, the state courts decided that the Disputed Ballots cannot be counted. Plaintiffs' current claims share the same identity of those state court claims in all requisite respects, including, through privity, the identity of the parties. In short, Plaintiffs' interests in having those ballots counted were adequately represented in the state proceedings. Accordingly, the claims are barred by res judicata.

### C.   Plaintiffs' Count I Materiality Provision claim fails procedurally and substantively.

This Court should dismiss Count I of the Complaint because it is procedurally defective and substantively flawed. Most fundamentally, Section 101(a)(2)(B) of the Civil Rights Act of 1964,[8] *see* 52 U.S.C. § 10101(a)(2)(B), which is the statutory predicate for Count I, does not allow for a private right of action. But even if this Court is inclined to reach the merits of this claim, as developed below, Plaintiffs are not entitled to relief because: (1) the Materiality Provision does not apply outside the context of voter registration schemes; (2) Plaintiffs have not even alleged in the Complaint—let alone established—that Election Code's mail-in voting regulations discriminates against a class of individuals to which they belong; and (3) the dating requirement relative to Voter Declarations is material to determining the voter's eligibility.

---

[8] Pub. L. No. 88-352, § 101(a)(1)(B), 78 Stat. 241, 241 (1964). Before being moved to Title 52 in 2014, Section 101 was codified at 42 U.S.C. § 1971(a)(2)(B).

1.     **Because the Materiality Provision may be enforced only by the United States Attorney General, Plaintiffs lack standing.**

The provision Plaintiffs invoke in Count I—the Materiality Provision—provides, in relevant part, as follows:

> No person acting under color of law shall … (B) deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]

52 U.S.C. § 10101(a)(2)(B); *see also* Compl. at ¶ 39. As is important here, paragraph (c) of the same section—entitled "Preventative relief; injunction, rebuttable literacy presumption; liability of the United States for costs; State as party defendant"—provides as follows:

> Whenever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), ***the Attorney General*** may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order.

52 U.S.C. § 10101(c) (emphasis added).

Given that Count I seeks enforcement of a federal statutory provision, the "threshold question" is whether the Materiality Provision affords Plaintiffs a private right of action. *Vanderklok v. United States*, 868 F.3d 189, 197 (3d Cir. 2017). As a general matter, because only "'Congress creates federal causes of action,' where 'the text of a statute does not provide a cause of action, there ordinarily is no cause of action.'" *Jaroslawicz v. M&T Bank Corp.*, 962 F.3d 701, 709 (3d Cir. 2020), *cert. denied*, 141 S. Ct. 1284 (2021). In limited circumstances, however, an implied right of action may exist if, "a statute [manifests] Congress's intent to create (1) a personal right, and (2) a private remedy." *Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004). In discerning this intent, the inquiry must focus

27

principally on the "the text and structure of the statute[.]" *Id. see also McGovern v. City of Philadelphia*, 554 F.3d 114, 119 (3d Cir. 2009) ("The judicial task is to interpret the statute Congress has passed to determine whether it displays an intent to create not just a private right but also a private remedy." (quoting *Alexander v. Sandoval*, 532 U.S. 275 (2001))).

Examining Plaintiffs' statutory claim against this backdrop, Count I should be dismissed for lack of standing, as the text and structure of the Materiality Provision confers neither a personal right, nor a private remedy, both of which must be established to find an implied right of action.

First, the Materiality Provision does not grant an individual right, as the statute does not contain "rights-creating language" that "clearly impart an 'individual entitlement,' with an "'unmistakable focus on the benefitted class.'" *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 187 (3d Cir. 2004) (quoting Gonzaga University v. Doe, 536 U.S. 273, 287 (2002)); *see also Doe v. Pennsylvania Bd. of Prob. & Parole*, 513 F.3d 95, 104 (3d Cir. 2008) ("Statutory language that is rights-creating is explicit in conferring a right directly on a class of persons that includes the plaintiff in a particular case." (internal quotation marks omitted)) (explaining that "rights-creating language" "has generally been the most accurate indicator of the propriety of implication of a cause of action." (internal citations and quotation marks omitted)). Specifically, although it ostensibly exists for the benefit of voters, Section 101 does not affirmatively guarantee an individual right, but rather, proscribes certain conduct by election officials. Such "focus on the person regulated rather than the individuals protected," is precisely the type of statutory language that courts have found insufficient to confer a personal right. *See McField ex rel. Ray v. Philadelphia Hous. Auth*., 992 F. Supp. 2d 481, 486 (E.D. Pa. 2014) (explaining that a statute must "contain 'individually focused terminology'" to create a personal right and holding

that the provision in question did not "create a private right enforceable through § 1983" because it "focuse[d] on the person regulated rather than the individuals protected" (quoting *Gonzaga University*, 536 U.S. at 287); *Sandoval*, 532 U.S. at 289; *see also Doe*, 513 F.3d at 104; *Byers v. Intuit, Inc.*, 564 F. Supp. 2d 385, 415 (E.D. Pa. 2008) ("In inquiring whether Congress intended for the statute in question to create a personal right, I must review the text and structure of the statute to determine whether the statute contains rights-creating language that focuses on the 'individual protected' rather than the person regulated." (cleaned up)).

Second, a review of the text and structure of the Materiality Provision also demonstrates that Congress did not intend to create a private remedy. Specifically, Section 101 vests the Attorney General with power to enforce the Materiality Provision. *See* 52 U.S.C. § 10101(c) (quoted above). While the Attorney General's enforcement authority is not made exclusive, a statute that provides for "agency enforcement creates ***a strong presumption*** against implied private rights of action that must be overcome." *Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 305 (3d Cir. 2007) (emphasis added) (citing *Sandoval*, 532 U.S. at 290 ("The express provision of one method of enforcing a substantive rule suggests that Congress intended to preclude others.")); *accord Wolfe v. Beard*, No. CIV.A. 10-2566, 2011 WL 601632, at *3 (E.D. Pa. Feb. 15, 2011) ("When a statute provides for alternative enforcement mechanisms, there is a strong presumption against implied rights of action."). This presumption is particularly difficult to overcome here given that Section 101 repeatedly references the Attorney General in describing enforcement proceedings under the provision, but makes no mention of private enforcement.[9] In short, Congress's intent to vest the United States Attorney General with exclusive authority to

---

[9] *See* 52 U.S.C. § 10101(a), (a)(2)(C), (c), (e) & (g).

enforce the Materiality Provision—thereby precluding a private right of action—is manifest from the text and structure of the Civil Rights Act.

Finally, while this precise issue has not been squarely addressed by any court in this Circuit, the majority of courts, including the Sixth Circuit Court of Appeals have held that Section 101 does **not** provide for a private right action. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 630 (6th Cir. 2016) (examining the Materiality Provision and reaffirming its prior holding "that the negative implication of Congress's provision for enforcement by the Attorney General is that the statute does not permit private rights of action" (citing *McKay v. Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) ("Section [101] is enforceable by the Attorney General, not by private citizens.")); *Gilmore v. Amityville Union Free Sch. Dist.*, 305 F. Supp. 2d 271, 279 (E.D.N.Y. 2004) (noting that Section 101 "does not provide for a private right of action by individuals" and concluding that "[i]ts provisions are only enforceable by the United States of America in an action brought by the Attorney General and may not be enforced by private citizens"); *Spivey v. Ohio*, 999 F. Supp. 987, 996 (N.D. Ohio 1998) ("An individual does not have a private right of action under [Section 101]."); *Willing v. Lake Orion Community Sch. Bd. of Trustees*, 924 F. Supp. 815, 820 (E.D. Mich. 1996) ( holding Section 101 "is enforceable by the Attorney General, not by private citizens."); *Good v. Roy*, 459 F. Supp. 403, 405 (D. Kan. 1978) (holding a private right of action does not exist under Section 101 because "subsection (c) provides for enforcement of the statute by the Attorney General with no mention of enforcement by private persons"); *McKay v. Altobello*, No. CIV. A. 96-3458, 1996 WL 635987, at *2 (E.D. La. Oct. 31, 1996) (holding Section 101 "is enforceable only by the Attorney General, not impliedly, by private persons"); *Cartagena v. Crew*, No. 96 Civ 3399, 1996 WL 524394, at *3 n.8 (E.D.N.Y. Sept. 5, 1996) ("To the extent that plaintiffs allege a cause of action under

[Section 101] in their memorandum of law, such claim is precluded since a private right of action has not been recognized under this section.").[10]

Furthermore, although the Eleventh Circuit Court of Appeals recognized a private right of action for such claims in *Schwier v. Cox*, 340 F.3d 1284 (11th Cir.2003), that decision is predicated on authority that no longer holds any precedential value. Specifically, in allowing private parties to enforce the Materiality Provision, the *Schwier* panel relied upon *Allen v. State Board of Elections*, 393 U.S. 544 (1969), which—in the intervening years—has been expressly abrogated by the United States Supreme Court. *See Ziglar v. Abbasi*, 137 S. Ct. 1843, 1855 (2017) (explaining that "[i]n the mid–20th century, the Court followed a different approach to recognizing implied causes of action than it follows now[,]" and listing *Allen* among the cases from the "*ancien regime*" that have been abandoned by a series of decision, including *Sandoval*). Indeed, even before *Ziglar*, the Third Circuit Court of Appeals in *McGovern* cautioned against reliance on pre-*Sandoval* Supreme Court authority, since many of those decisions have been "'altered ... virtually beyond recognition' by subsequent decisions of the Supreme Court." *McGovern*, 554 F.3d at 118–19 (quoting *Wisniewski*, 510 F.3d at 299). As such, to the extent *Schwier* recognizes a private right of action to enforce the Materiality Provision, it is inconsistent with recent Supreme Court precedent and should be rejected.

---

[10] At least two other Courts have questioned, albeit in dicta, a party's standing to enforce Section 101 by private action. *See Broyles v. Texas*, 618 F. Supp. 2d 661, 697 (S.D. Tex. 2009), ("There is also authority in this circuit that, in light of the language in [Section 101(c)], [the Materiality Provision] cannot be enforced as a private right of action, even under § 1983."), *aff'd*, 381 F. App'x 370 (5th Cir. 2010); *Thrasher v. Illinois Republican Party*, No. 4:12-CV-4071-SLD-JAG, 2013 WL 442832, at *4 (C.D. Ill. Feb. 5, 2013) ("[I]t is unclear whether [the plaintiff] even has standing to assert a private right of action under [the Materiality Provision], as [Section 101(c)] provides that the Attorney General—not private citizens—may institute civil actions to remedy violations of subsections (a) and (b).").

In sum, consistent with the conclusion reached by the majority of courts that have faced this issue, this Court should hold Plaintiffs lack a private right of action.

      2.      **Section 101 of the Civil Rights Act is wholly inapplicable and, in any event, does not prohibit states from requesting that an elector's voter declaration be accompanied by a dated signature.**

Even if this Court is inclined to proceed to the merits of Count I, Plaintiffs are unable to state a claim for a violation of the Materiality Provision because: (1) Section 101 prohibits discriminatory conduct—specifically, racial discrimination, which Plaintiffs have neither alleged nor established; (2) the Materiality Provision prohibits certain conduct relative to voter registration, not ballot tabulation and rejection; and (3) even if it is applicable, the Materiality Provision does not require the ballots in question to be canvassed, since a dated voter declaration accompanying a mail-in or absentee ballot is material to determining an elector's eligibility to vote and, thus, does not violate Section 101.

      (a)      **Section 101 of the Civil Rights Act is aimed at discriminatory conduct and, thus, is inapposite.**

First, unlike other federal statutes—such as the Help America Vote Act—Section 101 is not a general regulation of state election laws; rather it is aimed specifically and exclusively at state election laws that illegally discriminate based on race. Turning, initially, to the plain language of Section 101, Subsection (a), which contains the Materiality Provision, is titled "[r]ace, color, or previous condition not to affect right to vote; uniform standards for voting qualifications; errors or omissions from papers; literacy tests[.]" 52 U.S.C. § 10101(a). The Materiality Provision's focus on racial discrimination comes into sharper focus, when considered against the broader statuary scheme. Specifically, it bears reiterating that Section 101 was enacted as part of the landmark 1964 Civil Rights Act, which sought to eliminate certain racially discriminatory conduct by states. *Fla. State Conf. of N.A.A.C.P. v. Browning*, 522 F.3d 1153,

1173 (11th Cir. 2008) (explaining that the Materiality Provision "was at the time the latest entry in a spurt of federal enforcement of voting rights after a long slumber following syncopated efforts during Reconstruction[,]" which was intended to overcome "unsuccessful attempts to counteract state and local government tactics of using, among other things, burdensome registration requirements to disenfranchise African–Americans"). Accordingly, both the structure and history of the statute suggest that Section 101 is limited to claims of racial discrimination.

Moreover, while sometimes disagreeing on its precise contours, federal courts appear to uniformly acknowledge that an allegation of discrimination—whether based on race or otherwise—is a prerequisite to applying Section 101. *Compare Indiana Democratic Party v. Rokita*, 458 F. Supp. 2d 775, 839 (S.D. Ind. 2006) (concluding, based on the legislative history of Section 101, that it was designed to prohibit racial discrimination and, thus, dismissing a claim under that provision since the "[p]laintiffs ha[d] not alleged, much less proven, any discrimination based on race"); *Ballas v. Symm*, 351 F. Supp. 876, 889 (S.D. Tex. 1972) (holding Section 101 "applies specifically and exclusively to situations of racial discrimination"), *aff'd*, 494 F.2d 1167 (5th Cir. 1974); *Malinou v. Bd. of Elections*, 271 A.2d 798, 803 (R.I. 1970) (concluding that Section 101 "is aimed at any state law which has the effect of denying citizens their right to vote because of their race"); *with*, *Ball v. Brown*, 450 F. Supp. 4, 7 (N.D. Ohio 1977) (finding that "the prevalent trend permits [Section 101] actions to redress non-racial discrimination" and, thus, concluding that "plaintiff's allegations of discrimination in voter registration on the basis of sex are properly before the Court"); *Frazier v. Callicutt*, 383 F. Supp. 15, 19 (N.D. Miss. 1974) (holding Section 101 applies to "non-racial discrimination as well as racial").

33

Here, Plaintiffs have not alleged in the Complaint that requiring a dated signature on a voter declaration is borne out of an *intent* to discriminate against a certain class of voters; nor has any discriminatory *impact* been alleged in the Complaint—let alone proven.

**(b)     The Materiality Provision is not implicated, since it applies exclusively to voter registration laws.**

Second, Section 101 applies only to voter registration laws and regulations. Turning initially to the text of Section 101, that statute, by its plain terms prohibits denial of the right to vote "because of an error or omission on any *record or paper relating to any application, registration, or other act requisite to voting*, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election[.]" 52 U.S.C. § 10101(a)(2)(B) (emphasis added). It is unsurprising, therefore, that the vast majority of the decisions arising under this statute deal specifically with voter registration schemes.[11] Moreover, on the few occasions that courts have been expressly asked to extend this statute beyond the limited scope of voter registration laws, they have declined to do so. *See Friedman v. Snipes*, 345 F. Supp. 2d 1356, 1370-71 (S.D. Fla. 2004) (explaining that Section 101 "was designed to eliminate practices that could encumber an individual's ability to *register* to vote" and "[n]othing in [the Court's] review of the case law in this jurisdiction or in other jurisdictions indicates that section [101] was intended to apply to the counting of ballots by individuals *already deemed qualified to vote*" (emphasis in original)); *Indiana Democratic Party*, 458 F. Supp. at 841 ("We agree with Defendants' assertion that the act of presenting photo

---

[11] *See, e.g.*, *Common Cause/Georgia League of Women Voters of Georgia, Inc. v. Billups*, 439 F. Supp. 2d 1294, 1358 (N.D. Ga. 2006) ("[A]s the Eleventh Circuit has noted, [the Materiality Provision] 'was intended to address the practice of requiring unnecessary information for voter registration with the intent that such requirements would increase the number of errors or omissions on the application forms, thus providing an excuse to disqualify potential voters.'" (quoting *Schwier*, 340 F.3d at 1294)); *accord Org. for Black Struggle v. Ashcroft*, 493 F. Supp. 3d 790, 803 (W.D. Mo. 2020).

identification in order to prove one's identity is by definition not an 'error or omission on any record or paper' and, therefore, [Section 101](a)(2)(B) does not apply to this case.").

> **(c)** **Even if applicable, Section 101 is not violated by requiring voters to furnish a dated signature on their voter declaration.**

Finally, in the event this Court is inclined to apply Section 101—notwithstanding the fact that no discrimination is alleged and the provision of the Election Code at issue is not a voter registration requirement—requiring electors to date their voter declaration *is material* to determining their qualifications. Thus, the Election Code's mandate is consistent with federal law.

To reiterate, as both the Commonwealth Court and the Supreme Court have acknowledged, requiring voters to supply a ***dated*** signature is important in assessing their qualifications. *See In re Canvass*, 241 A.3d at 1090-91 (Dougherty, J., concurring and dissenting) ("[T]he date on the ballot envelope provides proof of when the 'elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place. The presence of the date also establishes a point in time against which to measure the elector's eligibility to cast the ballot[.]'" (quoting *In Re 2,349 Ballots*, 2020 WL 6820816, at *6); *see also id.* at 1087 (Wecht, J., concurring and dissenting) (acknowledging that "colorable arguments" suggest the importance of prohibiting boards of elections from canvassing ballots with undated voter declarations). Courts presented with such reasonable regulations have been almost universal in holding that the Materiality Provision is not violated. *Cf. Diaz v. Cobb*, 435 F. Supp. 2d 1206, 1211 (S.D. Fla. 2006) (holding Florida law that required applicants to sign an affirmation that they are citizens, who are not convicted felons whose rights have not been restored, and have not been adjudicated mentally incompetent did not violate the Materiality Provision, since all three facts were material in determining qualification to vote); *Common*

35

*Cause v. Thomsen*, No. 19-CV-323-JDP, 2021 WL 5833971, at *3 (W.D. Wis. Dec. 9, 2021) (holding "[a] statute requiring a signature or an expiration date on a voter ID is a long way away from tactics such as disqualifying an applicant who failed to list the exact number of months and days in his age on his or her registration application" and, thus, did not violate the Materiality Provision).

In this regard, the absence of any specific allegations of fraud relative to the ballots specifically at issue here is also immaterial. As the United States Supreme Court recently explained in holding that Arizona's statutory scheme governing mail-in voting did not violate the Voting Rights Act, "it should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders" because federal law "does not demand that 'a State's political system sustain some level of damage before the legislature can take corrective action." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2348 (2021) (cleaned up) (further observing that the "Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James Baker … noted that absentee balloting is vulnerable to abuse in several ways" and remarking that "[f]raud is a real risk that accompanies mail-in voting even if Arizona had the good fortune to avoid it").

Accordingly, no violation of Section 101 exists.

D.    **Plaintiffs' Count II fails as a matter of law because the requirement that electors date mail-in ballot declarations is, at best, a minimal burden that is supported by important regulatory interests.**

Any burden on Plaintiffs' right to vote by the Board's enforcement of the statutory requirement that voters date their mail-in ballot declarations is minimal, at best, and advances important regulatory interests in preventing fraud and ensuring orderly administration of elections. Therefore, the dated-declaration requirement is not an undue burden on Plaintiffs' right

to vote under the First and Fourteenth Amendments and Plaintiffs cannot prevail as a matter of law on Count II.

###### 1.    Requiring voters to date a mail-in ballot declaration is a minimal burden.

It is a minimal burden to require Plaintiffs and all other voters to date the declarations on mail-in ballots, as this requirement is a standard type of voting regulation. It is foundational that there must be "substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process." *Burdick v. Takrushi*, 504 U.S. 428, 433 (1992) (quoting *Storer v. Brown*, 415 U.S. 724 (1974)); *see also Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (noting "it is also clear that States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election – and campaign – related disorder"). Because it would "tie the hands of States" seeking to efficiently and fairly administer elections if every voting regulation were subject to strict scrutiny, only regulations that *severely* burden the right to vote are subject to strict scrutiny. *Donald J. Trump for President, Inc. v. Boockvar*, 493 F. Supp. 3d 331, 383-84 (W.D. Pa. 2020). In recognition that some regulation must govern the manner of elections, courts apply a more flexible standard for reasonable non-discriminatory regulations governing voting. *See id.* Therefore, under the *Anderson-Burdick* test, voting restrictions that minimally burden the right to vote are upheld so long as they are supported by sufficiently important state regulatory interests. *Timmons*, 520 U.S. at 358. Simple and reasonable regulations that govern the conduct of voting create minimal burdens on voters. *See Burdick*, 504 U.S. at 433.

The requirement to date mail-in ballot voter declarations is comparable to other restrictions that also have been found to constitute, at most, a minimal burden on the right to vote that need only satisfy important state interests. *See Arizona Democratic Party v. Hobbs*, 18 F.4th

1179, 1189 (9th Cir. 2021) (finding minimal burden in the requirement to sign an affidavit or correct an unsigned affidavit by the election-day deadline); *New Georgia Project v. Raffensperger*, 484 F. Supp. 3d 1265, 1291 (N.D. Ga. 2020) (finding that a voter assistance ban for absentee ballots was a moderate burden justified by the state interest in orderly administration of elections); *Harding v. Edwards*, 487 F. Supp. 3d 498, 515 (M.D. La. 2020) (concluding that the statutory requirements limiting who can vote by mail was a burden to be evaluated under *Anderson-Burdick*); *League of Women Voters of Ohio v. Larose*, 489 F. Supp. 3d 719, 735-37 (S.D. Ohio 2020) (finding signature-matching requirements for absentee voting to impose a moderate burden that was justified by the state's interests in combatting fraud and promoting orderly election administration). Dating a mail-in ballot declaration is a minimal burden with which countless Pennsylvanians have complied.

Plaintiffs' source of their disenfranchisement is not from the Board's application of this neutral requirement, but from their own error. *See Arizona Democratic Party v. Hobbs*, 18 F.4th 1179 (9th Cir. 2021). Similar to Plaintiffs here, the voters in *Hobbs* alleged an undue burden on the right to vote from the state's election-day deadline for correcting missing signatures on mail-in ballots. Finding this burden to be minimal, the Court reasoned that to the extent the burden of signing the ballots or correcting a missing signature by the deadline "results in voters' not casting a vote in an election, that result was not caused by [the statutory requirements]," but by the voters' "own failure to take timely steps to effect their [vote]." *Id.* at 1189 (quoting *Rosario v. Rockefeller*, 410 U.S. 752, 758 (1973)). As in *Hobbs*, Plaintiffs' alleged disenfranchisement results not from the requirement that they date the declarations on their mail-in ballots, but from their own failure to complete their ballots as required. To determine otherwise and measure the burden of a voting prerequisite by the consequence of a voter's noncompliance would be to find

38

that every voting prerequisite imposes the same burden and is subject to the same degree of strict scrutiny. *Hobbs*, 18 F.4th at 1188. This is contrary to common sense and the *Anderson-Burdick* framework. *See id.* Accordingly, the dated declaration requirement imposes a minimal burden at best.

      **2.**      **Important state regulatory interests in preventing fraud, promoting voter confidence, and ensuring orderly administration of elections justify the minimal burden imposed by the dated declaration requirement.**

The minimal burden imposed by the mail-in ballot dating requirement is supported by the important state regulatory interests of preventing fraud, promoting voter confidence, and ensuring orderly administration of elections. In placing their focus on the role that the dated declaration plays in determining the timeliness of mail-in ballots, Plaintiffs overlook that the dated declaration requirement is a mechanism for preventing fraud. It is not a "superfluous" requirement that electors date their mail-in ballot declarations, but a critical component that accompanies any sworn declaration. In fact, Plaintiffs signed *and* dated sworn affidavits in support of their Complaint before this Court to attest to the truthfulness of their statements. *See* Complaint Exhibits 1 through 5 (ECF 1-3 to 1-7). This is consistent with federal law, which requires that sworn declarations be both signed and dated. *See* 28 U.S.C. § 1746; *see also Bonds v. Cox*, 20 F.3d 697, 702 (6th Cir. 1994) (applying Section 1746, stating: "Although Bonds' additional affidavits were subscribed under penalty of perjury, they were undated. Given the explicit language of the statute, they must therefore be excluded from consideration."). Similarly, when attesting to the completion of their mail-in ballots, all electors must sign and date their attestation that they are qualified to vote in this election, have not already voted in this election, and marked their ballot in secret. That attestation carries with it criminal consequences if false. *See* 25 P.S. § 3553 ("Violations of provisions relating to absentee and mail-in ballots").

39

The Commonwealth Court and Justices Wecht and Dougherty underscored the importance of this requirement in the mail-in ballot scheme of the Election Code when analyzing this exact provision, explaining that signing and dating the declaration is a security measure that preserves integrity. *In re 2,349 Ballots in 2020 Gen. Election*, 241 A.3d 694 (Pa. Cmwlth. 2020) ("The date provides a measure of security, establishing the date on which the elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing at the polling place."); *In re Canvass*. 241 A.3d 1058, 1087 (Pa. 2020) (Wecht, J., concurring and dissenting) (reasoning that reading the dated declaration requirement as mandatory is the only way to "restore to the legislature the onus for making policy judgments about what requirements are necessary to ensure the security of our elections against fraud and avoid inconsistent application of the law"); *id.* at 1091 (Dougherty, J., concurring) ("The date also ensures the elector completed the ballot within the proper time frame and prevents the tabulation of potentially fraudulent back-dated votes"). Signing and dating a mail-in ballot declaration are both requisite aspects to signing an attestation under oath. By requiring declarations to be dated, the Commonwealth seeks to prevent fraud and ensure that only validly cast votes are counted. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 185 (2008) ("There is no question about the legitimacy or importance of a State's interest in counting only eligible voters' votes.").

Along with and in furtherance of seeking to prevent fraud, the dated declaration requirement serves other important regulatory interests as well. The importance of these interests is best explained by the district court in the Northern District of Georgia, which recently rejected various challenges to absentee voting procedures as unlikely to succeed on the merits. *See Raffensperger*, 484 F. Supp. 3d 1265. The Court found that important state interests justified voting regulations such as notice provisions and a ban on voter assistance for absentee ballots,

40

recognizing that minimal restrictions such as these advance important interests in preventing voter fraud, permitting county officials the flexibility to do their jobs, promoting voter confidence, and ensuring orderly administration of elections. *Id.* at 1291, 1299-1300. Similar to those restrictions in *Raffensperger*, the dated declaration requirement here is a component of preventing voter fraud. In turn, consistently applying the dated declaration requirement promotes voter confidence in the fairness and integrity of the election system. Further, by applying this simple requirement, county boards of elections are able to carry out the administration of elections efficiently and equally by having confirmation of the integrity of the ballot and without needing to implement procedures to otherwise confirm the information that is attested to on the mail-in ballot declaration.

In order to prevent fraud, promote voter confidence, and ensure efficient administration of elections, requiring voters to sign *and* date mail-in ballot declarations is a minimal burden that is justified by important state interests in preventing fraud and ensuring efficient election administration. The disqualification of Plaintiffs' ballots as a result of their own failure to comply with the requirements of this minimal voting regulation does not unduly burden the right to vote. Accordingly, Plaintiffs are not entitled to judgment as a matter of law on Count II.

**VI.   CONCLUSION**

For the foregoing reasons, Intervenor Defendant Ritter respectfully requests that this Court grant his Motion for Summary Judgment and enter judgment in his favor.

**VII.   PROPOSED ORDER**

A proposed order has been attached to the Motion. It seeks the following:

AND NOW, this _____ day of_____, 20___, upon consideration of Intervenor Defendant David Ritter's ("Ritter") Motion for Summary Judgment, and the response thereto, it is hereby ORDERED that the Motion is GRANTED, and it is further

41

ORDERED that judgment is entered in Ritter's favor.

Respectfully submitted,

Dated: February 14, 2022

/s/ Joshua J. Voss
Joshua J. Voss (No. 306853)
Shohin H. Vance (No. 323551)
James G. Gorman (No. 328376)
Samantha G. Zimmer (No. 325650)
Francis G. Notarianni (No. 327461)
KLEINBARD LLC
Three Logan Square
1717 Arch Street, 5th Floor
Philadelphia, PA 19103
Ph: (215) 568-2000
Fax: (215) 568-0140
Eml: jvoss@kleinbard.com
svance@kleinbard.com
jgorman@kleinbard.com
szimmer@kleinbard.com
fnotarianni@kleinbard.com

*Attorneys for Intervenor Defendant David Ritter*