UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| LINDA MIGLIORI, *et al.*, | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | No. 5:22-cv-00397 |
| | : | |
| LEHIGH COUNTY BOARD OF ELECTIONS | : | |
| *et al.*, | : | |
| Defendants. | : | |

**O P I N I O N**
**Plaintiffs' Motion for Summary Judgment, ECF No. 33 – Denied**
**Defendants' Motions for Summary Judgment, ECF Nos. 33 and 34 -- Granted**

**Joseph F. Leeson, Jr.**                                                      **March 16, 2022**
**United States District Judge**

## I.      INTRODUCTION

This matter involves a recent election held in Lehigh County to elect a judge to the Court of Common Pleas.  The ballots of the five Plaintiffs here,[1] as well as 252 other ballots, were not counted in the election because those 257 ballots lacked a handwritten date next to the voter declaration signature on the outer envelope.

The issue of whether to count the undated ballots was litigated in the state courts, which determined that the 257 ballots could not be counted.  Plaintiffs now bring claims arising under federal law before this Court.  In particular, Plaintiffs assert that the Lehigh County Board of Election's (LCBE) decision to not count the undated ballots violates the Civil Rights Act of 1964, the First Amendment, and the Fourteenth Amendment.

---

[1]      Linda Migliori, Francis J. Fox, Richard E. Richards, Kenneth Ringer, and Sergio Rivas.

The LCBE agreed to pause certification of the election until these questions could be resolved. Following an expedited briefing schedule agreed to by the parties and intervenors, Plaintiffs, the LCBE, and Intervenor-Defendant David Ritter filed cross-motions for summary judgment. Upon review, this Court grants Defendants' motions for summary judgment and enters judgment in favor of Defendants on all counts.

## II.   PROCEDURAL HISTORY

On January 31, 2022, the five named Plaintiffs filed suit in the Eastern District of Pennsylvania. *See* Compl., ECF No. 1. Each Plaintiff is a citizen of Lehigh County who is registered to vote. *See* Joint Stip. of Facts ("JSOF") ¶¶ 55, 64, 71, 79, 88, ECF No. 27. In addition, each Plaintiff submitted a ballot in the November 2, 2021 election that was undated next to the voter declaration signature. *See id.* ¶ 53. Accordingly, Plaintiffs' ballots were not counted. *See id.* Plaintiffs asserted three claims in their Complaint: (1) Count I for violation of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), (2) Count II for undue burden on the right to vote in violation of the First and Fourteenth Amendments, and (3) Count III for violation of procedural due process under the Fourteenth Amendment. *See* Compl. On February 10, 2022, Plaintiffs stipulated to the voluntary dismissal of Count III, their procedural due process claim. *See* Stip. Count III, ECF No. 26. Accordingly, only Counts I and II remain.

Following initiation of this action, this Court granted the intervention motions of David Ritter and Zachary Cohen, who are the two candidates in the subject election. *See* Order 2/2/22, ECF No. 18; Order 2/11/22, ECF No. 29. On February 8, 2022, this Court approved a stipulation reached by the parties, which set the briefing and hearing schedule for this matter. *See* Stip., ECF No. 23. The parties have agreed to proceed by way of cross-motions for summary judgment. *See id.* In accordance with that stipulation, Plaintiffs, the LCBE, and Ritter all filed

cross-motions for summary judgment on February 11, 2022.  *See* Pl. MSJ, ECF No. 33; LCBE

MSJ, ECF No. 32; Ritter MSJ, ECF No. 34.  Thereafter Plaintiffs, Ritter, and Cohen filed

responses to the various motions.  *See* Pl. Resp, ECF No. 44; Ritter Resp., ECF No. 43; Cohen

Resp., ECF No. 45.  Ritter and Plaintiffs also filed replies in support of their respective motions.

See Ritter Reply, ECF No. 47; Pls. Reply, ECF No. 48.

In addition to the motions and responses, this Court granted leave for the filing of two

amici briefs.  The first amicus brief was filed by leaders within the Pennsylvania Legislature.[2]

*See* Legis. Amicus, ECF No. 37.  The second was filed by the Commonwealth of Pennsylvania.

*See* Commw. Amicus, ECF No. 40.

On February 24, 2022, all parties, intervenors, and amici indicated to the Court that they

wished to rely solely on their briefs and waived oral argument.  Accordingly, the oral argument

originally scheduled for March 2, 2022 was cancelled.

## III.   UNDISPUTED MATERIAL FACTS

Pursuant to the expedited briefing schedule, ECF No. 24, the parties filed a Joint

Stipulation of Facts.  *See* JSOF.  The relevant undisputed facts are drawn therefrom.

### A.   The 2020 Election Cycle

Pennsylvania law provides for the provision of absentee ballots to qualifying voters as

well as mail-in ballots to any registered voter who requests one.  *See id.* ¶ 1.  To acquire either an

absentee or mail-in ballot, the voter must fill out an application that requires them to provide

their name, address of registration, and proof of identification.  *See id.* ¶ 2.  Once this

---

[2]    The amicus brief was filed by the Speaker of the Pennsylvania House of Representatives, Bryan Cutler, the Majority Leader of the Pennsylvania House of Representatives, Kerry Benninghoff, the President Pro Tempore of the Pennsylvania Senate, Jake Corman, and the Majority Leader of the Pennsylvania Senate, Kim Ward.

information is verified, the voter receives a ballot package that contains a ballot, a "secrecy envelope," a return envelope—which contains the voter declaration required by Pennsylvania law—and instructions for completing the absentee or mail-in ballot.  *See id.* ¶ 3.

After marking his or her ballot and placing it in the secrecy envelope, the voter is to then place the secrecy envelope into the return envelope.  *See id.* ¶ 4.  Title 25 P.S. §§ 3146.6(a), 3150.16(a) require that the voter "fill out, date and sign the declaration," otherwise known as the "voter declaration," printed on the return envelope.  *See id.* ¶ 6.  During the 2020 election cycle, this provision was the subject of several legal challenges.  *See id.* ¶ 7.  Following a split decision from the Pennsylvania Supreme Court, undated ballots from the 2020 election cycle were counted.  *See id.* ¶ 7.  After this decision, the LCBE made design changes to the outer envelope for absentee and mail-in ballots in anticipation of the 2021 election cycle.  *See id.* ¶ 8.  This redesign was approved by the Secretary of the Commonwealth.  *See id.* ¶ 9.

### B.    The 2021 Lehigh County Election

On November 2, 2021, Lehigh County held an election to fill vacancies for office of Judge of the Court of Common Pleas of Lehigh County.  *See id.* ¶¶ 16–17.  Six candidates vied for three available judgeships.  *See id.* ¶ 17.  Candidates Judge Thomas Caffrey and Judge Thomas Capehart garnered the most votes, and have already been sworn into office.  *See id.* ¶¶ 19–20.  As of November 15, 2021, candidate David Ritter received the third most votes in the election, and therefore was the presumptive third and final successful candidate for judge.  *See id.* ¶ 18.  Ritter's lead over the candidate in fourth place, Zachary Cohen, currently stands at seventy-four votes.  *See id.*

During the counting of the ballots, any mail-in or absentee ballots that lacked a handwritten date next to the voter declaration signature were set aside.  *See id.* ¶ 22.  In total, 257

of the approximately 22,000 mail-in and absentee ballots were set aside as undated.  *See id.* ¶¶ 21, 23.  An additional four ballots were received with the date in the wrong location on the outer envelope; these ballots were also set aside.  *See id.*  Both the undated and misdated ballots are referred to, collectively, as the disputed ballots.  All of the disputed ballots were timely received by the LCBE.  *See id.* ¶ 26.

C.      **State Court Litigation regarding the Disputed Ballots**

On November, 15, 2021, the LCBE convened a public hearing to consider whether to count the disputed ballots.  *See id.* ¶ 30.  During the hearing, both Ritter and Cohen presented argument on the issue.  *See id.* ¶ 33.  Following argument, the LCBE voted unanimously to count the disputed ballots.  *See id.* ¶ 34.

On November 17, 2021, Ritter filed an appeal with the Lehigh County Court of Common Pleas, challenging the LCBE's decision to count the ballots.  *See id.* ¶ 35.  Following an evidentiary hearing and oral argument, the Court of Common Pleas affirmed the LCBE's decision to count the disputed ballots.  *See id.* ¶¶ 36, 38.  Ritter then appealed the trial court's decision to the Commonwealth Court of Pennsylvania.  *See id.* ¶ 40.  On January 3, 2022, the Commonwealth Court issued its opinion and order, ultimately concluding that the undated ballots should not be counted.  *See id.* ¶ 44.  On January 27, 2022, the trial court entered an order, directing the LCBE to count the four misdated ballots but not to count the 257 undated ballots.  *See id.* ¶ 48.

On January 31, 2022, Plaintiffs filed the within lawsuit in the Eastern District of Pennsylvania.  *See* Compl.

## IV.    LEGAL STANDARDS

### A.    Motion for Summary Judgment – Review of Applicable Law

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A disputed fact is "material" if proof of its existence or nonexistence might affect the outcome of the case under applicable substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Id.* at 257.

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Once such a showing has been made, the non-moving party must go beyond the pleadings with affidavits, depositions, answers to interrogatories or the like in order to demonstrate specific material facts which give rise to a genuine issue.  Fed. R. Civ. P. 56(c); *Celotex*, 477 U.S. at 324; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (stating that the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts").  The party opposing the motion must produce evidence to show the existence of every element essential to its case, which it bears the burden of proving at trial, because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  *Celotex*, 477 U.S. at 323.  The court must consider the evidence in the light most favorable to the non-moving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).

**B.      The Defense of Laches – Review of Applicable Law**

"Laches is an equitable defense which can limit or bar certain claims." *Fenton v. Balick*,

821 F. Supp. 2d 755, 761 (E.D. Pa. 2011) (citing *Holmes v. Pension Plan of Bethlehem Steel*

*Corp.*, 213 F.3d 124, 134 (3d Cir.2000)).  "Declaratory judgments are equitable in nature and

thus the doctrine of laches applies." *Id.* (citing *Building Ind. Ass'n of Lancaster Cnty. v.*

*Manheim Twp.*, 710 A.2d 141, 146–47 (Pa. Commw. Ct. 1998)).  "Under Pennsylvania law, the

doctrine of laches has two elements: (1) inexcusable delay; and (2) prejudice." *Id.* (quoting

*Holmes*, 215 F.3d at 134).  "Laches arises when a defendant's position or rights are so prejudiced

by length of time and inexcusable delay, plus attendant facts and circumstances, that it would be

an injustice to permit presently the assertion of a claim against him." *Id.* (quoting *Jacobs v.*

*Halloran*, 710 A.2d 1098, 1102 (Pa. 1998)).

**C.      Claim Preclusion (Res Judicata) – Review of Applicable Law**

"Claim preclusion—which some courts and commentators also call res judicata—protects

defendants from the risk of repetitious suits involving the same cause of action once a court of

competent jurisdiction has entered a final judgment on the merits." *Beasley v. Howard*, 14 F.4th

226, 231 (3d Cir. 2021) (quoting *United States v. Tohono O'Odham Nation*, 563 U.S. 307, 315

(2011)).  The doctrine prevents parties "from raising issues that could have been raised and

decided in a prior action—even if they were not actually litigated." *See id.* (quoting *Lucky Brand*

*Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, ––– U.S. ––––, 140 S. Ct. 1589, 1594 (2020)).

Where a defendant seeks to invoke claim preclusion based on a matter litigated in

Pennsylvania state court, this Court "must give the same preclusive effect to the [state court]

judgment . . . that the courts in Pennsylvania, the state in which the judgment was entered, would

give." *See Rosemont Taxicab Co. v. Phila. Parking Auth.*, 327 F. Supp. 3d 803, 815 (E.D. Pa. 2018) (quoting *Turner v. Crawford Square Apartments III, L.P.*, 449 F.3d 542, 548 (3d Cir. 2006)).  Under Pennsylvania law, a defendant may invoke claim preclusion only where the prior action and current matter share four "identities":

> (1)  "the things sued upon or for;"
>
> (2)  "the cause of action;"
>
> (3)  "the persons and parties to the action;" and
>
> (4)  "the capacity of the parties to sue or be sued."

*See id.* (quoting *Turner*, 449 F.3d at 548).

 "Although Pennsylvania requires an 'identity of persons and parties' for claim preclusion to apply, that concept includes a party's privies." *Toll Bros., Inc. v. Century Sur. Co.*, 318 F. App'x 107, 110 (3d Cir. 2009) (quoting *Turner*, 449 F.3d at 548 n.11).  Privity is defined as "mutual or successive relationships to the same right of property, or such an identification of interest of one person with another so as to represent the same legal right." *See id.* (quoting *Ammon v. McCloskey*, 655 A.2d 549, 554 (Pa. Super. Ct. 1995)).  Accordingly, "privity is not established by the mere fact that persons may be interested in the same question or in proving the same facts." *Bergdoll v. Pennsylvania*, 858 A.2d 185, 197 n.4 (Pa. Commw. Ct. 2004) (quoting *Day v. Volkswagenwerk Aktiengesellschaft*, 464 A.2d 1313, 1317 (Pa. Super. Ct. 1983)).

### D.    Civil Rights Act (52 U.S.C. § 10101) – Review of Applicable Law

The Civil Rights Act of 1964 was enacted, in part, to "enforce the constitutional right to vote." *See* Pub. L. 88-352.  Formerly codified in 42 U.S.C. § 1971, the provisions of the Act aimed at securing the right to vote are currently codified in 52 U.S.C. § 10101. *See* 52 U.S.C. § 10101 (formerly 42 U.S.C. § 1971).  The opening provision thereof provides that

> [a]ll citizens of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, shall be entitled and allowed to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

*See id.* § 10101(a)(1)

In pursuit of that purpose, § 10101(a)(2) prohibits three categories of activity related to voting and voting qualification. *See id.* § 10101(a)(2). First, § 10101(a)(2)(A) prohibits the application of "any standard, practice, or procedure different from the standards, practices, or procedures applied under such law or laws to other individuals within the same county, parish, or similar political subdivision who have been found by State officials to be qualified to vote." *See id.* § 10101(a)(2)(A). Second, § 10101(a)(2)(B), otherwise known as the "materiality provision," prohibits denial of "the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." *See id.* § 10101(a)(2)(B). Finally, § 10101(a)(2)(C) places restrictions on the use of literacy tests as a means of determining voter qualification. *See id.* § 10101(a)(2)(C).

Subsection (c) of § 10101 provides for enforcement of the law's substantive provisions through suit brought by the Attorney General. *See id.* § 10101(c). In relevant part, § 10101(c) provides that

> [w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), the Attorney General may institute for the United States, or in the name of the United States, a civil action or other proper proceeding for preventive relief . . . .

*See id.* § 10101(c).

E.      Determining the Existence of Implied Private Rights of Action – Review of

Applicable Law

"A private right of action is the right of an individual to bring suit to remedy or prevent

an injury that results from another party's actual or threatened violation of a legal requirement."

*Wisniewski v. Rodale, Inc.*, 510 F.3d 294, 296 (3d Cir. 2007).  "Many federal statutes provide a

private right of action through their express terms."  *Id.* at 297.  "Other federal statutes, however,

merely define rights and duties, and are silent about whether an individual may bring suit to

enforce them."  *Id.*  "For some statutes in this latter category, courts have held that 'implied'

private rights of action exist."  *Id.*

Prior to the Supreme Court's decision in *Cort v. Ash*, 522 U.S. 66 (1975), the judicial

approach to finding implied rights of actions was "less restrictive."  *See id.* at 298 (citing *J.I.

Case Co. v. Borak*, 377 U.S. 426 (1964)).  The existence of a private right of action turned on

"Congress's general purpose in enacting the statute" rather than "Congress's intent regarding a

private right of action."  *See id.*  With the passage of *Cort*, the Supreme Court began to alter the

focus of the inquiry from that of "congressional purpose" to one of "congressional intent" to

create a private right of action.  *See id.* (citing *Cort*, 522 U.S. 46; *Touche Ross & Co. v.

Redington*, 442 U.S. 560 (1979)).

In 2001, the Supreme Court revisited this issue in *Alexander v. Sandoval*.  *See* 532 U.S.

275 (2001).  Therein, the Supreme Court did not consider the factors set out by *Cort*, and instead,

it set forth the following test for determining whether a private right of action exists:

> Like substantive federal law itself, private rights of action to enforce federal law
> must be created by Congress . . . .  The judicial task is to interpret the statute
> Congress has passed to determine whether it displays an intent to create not just a
> private right but also a private remedy . . . .  Statutory intent on this latter point is
> determinative . . . .  Without it, a cause of action does not exist and courts may not

create one, no matter how desirable that might be as a policy matter, or how
compatible with the statute.

*See Wisniewski*, 510 F.3d at 299–300 (alterations in original) (quoting *Sandoval*, 532 U.S. at

286–87).

Accordingly, whether a private right of action exists under a given statute depends on the

intent of Congress.  *See Sandoval*, 532 U.S. 275, 286–87 (2001).  A reviewing court must

determine whether Congress intended to create a personal right *and* a private remedy for

vindication of that right.  *See Wisniewski*, 510 F.3d at 301.  While *Sandoval* began and ended its

analysis based on the "text and structure" of the statute, the Third Circuit has determined that

*Sandoval* left open the possibility that legislative history and other considerations relevant to

congressional intent can inform the analysis.  *See id.* at 301 n.16 ("Although we have

acknowledged that Justice Scalia, the author of the *Sandoval* majority opinion, disapproves of

the use of legislative history . . . nothing in *Sandoval* expressly condemns its use.").

**F.    Undue Burdens on the Right to Vote under the First and Fourteenth
Amendments – Review of Applicable Law**

"Voting is of the most fundamental significance under our constitutional structure."

*Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quoting *Illinois Bd. of Elections v. Socialist

Workers Party*, 440 U.S. 173, 184 (1979)).  "It does not follow, however, that the right to vote in

any manner and the right to associate for political purposes through the ballot are absolute."  *Id.*

(citing *Munro v. Socialist Workers Party*, 479 U.S. 189, 193 (1986)).  "States may prescribe

'[t]he Times, Places and Manner of holding Elections for Senators and Representatives . . . .'"  *Id.*

(quoting U.S. CONST. art I., § 4, cl. 1).

"Election laws will invariably impose some burden upon individual voters." *Id.*
Accordingly, in determining the appropriate level of scrutiny to be applied to laws that burden the right to vote,

> [a] court considering a challenge to a state election law must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiff's rights.

*See id.* at 434 (quoting *Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983)).  Where the right to vote is "subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance.'"  *See id.* (quoting *Norman v. Reed*, 502 U.S. 298, 289 (1992)).  "But when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (quoting *Anderson*, 460 U.S. at 788).

## V.    ANALYSIS

Plaintiffs present two claims for relief.  First, Plaintiffs assert that the decision to not count the undated ballots is a violation of the materiality provision, 52 U.S.C. § 10101(a)(2)(B). Specifically, Plaintiffs argue that their failure to include a handwritten date on the outer envelope amounts to an immaterial omission, or, put another way, one that has no material effect on their qualification to vote.  Second, Plaintiffs claim that the handwritten date requirement itself is an undue burden on the right to vote that violates the First and Fourteenth Amendments.  In particular, Plaintiffs argue that the government lacks an important interest in the requirement sufficient to sustain it in light of the burden it imposes on voters.

Prior to addressing Plaintiffs' claims on the merits, Defendants assert two threshold defenses in their respective motions: (1) laches and (2) claim preclusion, or res judicata. This Court addresses those threshold defenses before turning to the merits of Plaintiffs' claims. In summary, this Court finds neither threshold defense applicable and reviews Plaintiffs' claims on the merits.

With respect to Plaintiffs' claim under § 10101(a)(2)(B), this Court concludes that Plaintiffs lack the capacity to bring suit under this provision. Specifically, this Court holds that § 10101 does not provide for a private right of action. With respect to Plaintiffs' First and Fourteenth Amendment claim, this Court finds that the slight burden imposed by the handwritten date requirement is justified by important governmental interests, and accordingly, it does not amount to an undue burden on the right to vote. Having reached these conclusions, the Court grants Defendants' motions for summary judgment, and enters judgment in their favor on all Counts.

## A. Threshold Defenses

In their respective motions, Defendants lodge two threshold defenses. First, Ritter asserts that Plaintiffs' claims should be barred by the doctrine of laches. Second, both Ritter and the LCBE argue that Plaintiffs' claims should be dismissed under the doctrine of claim preclusion or res judicata. Following a review of both defenses, this Court concludes that Defendants have failed to adequately establish either. Accordingly, Defendants' motions for summary judgment on the basis of laches and claim preclusion are denied.

### 1. The Defense of Laches

Ritter first asserts that this Court should grant summary judgment in his favor based on the affirmative defense of laches. Specifically, Ritter argues that Plaintiffs waited an inexcusable

amount of time following the end of the election to file the instant matter.  To establish laches, Ritter must show (1) that the Plaintiffs engaged in inexcusable delay in the filing of this action, and (2) that Ritter suffered prejudice as a result.  *See Fenton*, 821 F. Supp. 2d at 761 (quoting *Holmes*, 215 F.3d at 134).

A review of the stipulated facts in this matter compels denial of Ritter's laches defense, as he has failed to show that the Plaintiffs engaged in inexcusable delay.  The disputed election was held on November 2, 2021.  *See* JSOF ¶¶ 16-17.  When the question arose whether to count or dispose of the undated ballots, the LCBE convened a public hearing on November 15, 2021.  *See id.* ¶ 30.  At that hearing, the LCBE voted to count the undated ballots.  *See id.* ¶ 34.  Two days after the decision was made to count the ballots, Ritter initiated an appellate process of that decision, which would last until January 27, 2022.  *See id.* ¶¶ 35, 40.  That appellate process culminated in the Pennsylvania Supreme Court's denial of an allowance of appeal.  *See id.* ¶ 46.  On January 27, 2022, on remand from the Superior Court, the Lehigh County Court of Common Pleas entered an order directing that the undated ballots not be counted.  *See id.* ¶ 48.

Within just four days of learning that their ballots would go uncounted, Plaintiffs filed suit in this Court.  *See* Compl.  On these agreed-upon facts, this Court finds that the Plaintiffs did not engage in inexcusable delay.  Up and until at least January 3, 2022 ,when the Commonwealth Court issued its opinion, Plaintiffs had every reason to believe their ballots would be counted.  Moreover, it was not until January 27, 2022 that the order that directed the ballots not be counted was entered.  While Ritter had every right to appeal the LCBE's decision and trial court's opinion, he cannot now claim that his exercise of that right represents a delay attributable to Plaintiffs.  Accordingly, that Plaintiffs filed this matter following the exhaustion of all state appellate efforts does not indicate that they engaged in inexcusable delay.

Ritter has failed to establish that the Plaintiffs engaged in inexcusable delay in the filing of this matter.  Therefore, Ritter's motion for summary judgment on the basis of laches is denied.

### 2.        The Doctrine of Claim Preclusion

Next, Defendants argue that Plaintiffs claims are barred by the doctrine of claim preclusion or res judicata.  In order to successfully assert claim preclusion, Defendants must show an identity of (1) the thing sued for, (2) the cause of action, (3) the persons and parties to the action, and (4) the capacity of the parties to sue or be sued.  *See Rosemont Taxicab Co.*, 327 F. Supp. 3d at 815 (quoting *Turner*, 499 F.3d at 548).  Here, even assuming that Defendants can make out the three remaining factors, Defendants fail to establish that the Plaintiffs in this lawsuit were party to, or in privity with a party to, the state lawsuit involving the disputed ballots.

Importantly, there is no dispute that the Plaintiffs here were not party to the state lawsuit. Instead, Defendants attempt to argue that the Plaintiffs were in privity with a party to the state lawsuit.  On one hand, the LCBE argues that there is a privity "between the voter and the candidate" that is "so close as to be undistinguishable."  *See* LCBE MSJ 21.  On the other hand, Ritter attempts to claim that the Plaintiffs are in privity with the LCBE and Cohen.  *See* Ritter MSJ 24.

Notwithstanding, this Court finds that the Plaintiffs were not in privity with any of the parties to the state lawsuit.  Defendants do not argue that the Plaintiffs and the LCBE, Cohen, or Ritter have a "mutual or successive relationship to the same right of property."  *See Toll Bros., Inc.*, 318 F. App'x at 110 (quoting *Ammon*, 655 A.2d at 554).  Moreover, while Defendants certainly argue that Plaintiffs shared interest with Cohen in the underlying state action, they do not argue that their interests were so identical as to "represent the same legal right."  *See id.*

Rather, Defendants focus almost exclusively on an "adequate representation" theory of privity. *See* Ritter MSJ 24. In particular, Ritter argues that "Plaintiffs are in privity with the parties and participants in the prior court litigation and their interests were adequately represented there." *See id.* Notwithstanding, the adequate representation exception is far narrower than Ritter would have this Court read it. In *Taylor v. Sturgell*, the Supreme Court indicated that "'in certain limited circumstances,' a nonparty may be bound by a judgment because she was 'adequately represented by someone with the same interests who [wa]s a party' to the suit." *See* 553 U.S. 880, 894 (2008) (alteration in original) (citing *Richards v. Jefferson Cnty., Alabama*, 517 U.S. 793, 798 (1996)). These "certain limited circumstances" include (1) class actions and (2) suits brought by "trustees, guardians, and other fiduciaries." *See id.* (citing *Martin v. Wilks*, 490 U.S. 755, 762 n.2 (1989); *Sea-Land Servs., Inc. v. Gaudet*, 414 U.S. 573, 593 (1974)). Accordingly, this exception does not permit a finding of privity where there is a mere overlapping of the interests between one party and another. *See id.*; *see also Bergdoll*, 858 A.2d at 197 n.4.

Neither Ritter nor the LCBE assert that the underlying state action was a class action, or that it was brought by a trustee, guarantor, or fiduciary of any of the Plaintiffs. Rather, Defendants focus solely on the similarity between the interests of the LCBE and Cohen to those of Plaintiffs here. This argument is unavailing. It is well-settled that privity is not established by a mere shared interest in an identical question or even in proving the same facts. *See id.* Even assuming that Plaintiffs' interests overlap with those of the LCBE and Cohen, Defendants fail to

establish a relationship between Plaintiffs and either of those parties sufficient to find them in privity with one another.[3]

In the absence of a sufficient relationship between the Plaintiffs and the parties to the prior state case, this Court concludes that Defendants have failed to establish the privity necessary for the defense of claim preclusion. Accordingly, Defendants' motions for summary judgment on the basis of claim preclusion are denied.

### B.      Plaintiffs' Claims

Having addressed the threshold defenses offered by Defendants, the Court turns to a review of Plaintiffs' substantive claims. Plaintiffs assert claims under 52 U.S.C. § 10101(a)(2)(B), the First Amendment, and the Fourth Amendment. With respect to the § 10101 claim, Defendants assert that Plaintiffs lack the capacity to bring suit, as § 10101 does not provide for a private right of action. Defendants also argue for summary judgment on Plaintiffs' constitutional claim, asserting that the burden imposed by the handwritten date requirement is slight in light of the important government interests implicated. This Court agrees that Plaintiffs lack the capacity to bring suit under § 10101(a)(2)(B). In addition, this Court agrees that the slight burden imposed by the handwritten date requirement is sufficiently justified

---

[3]      Ritter, in his motion, cites case law in which electors have been found in privity with a candidate. *See* Ritter MSJ 24–25. In particular, Ritter notes that a voter may be considered in privity with a candidate where they are merely a "pawn" or "puppet" of that candidate. *See id.* at 25 (citing *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 96 (2d Cir. 2005); *Cruz v. Bd. of Elections of New York*, 396 F. Supp. 2d 354, 355 n.1 (S.D.N.Y. 2005)). Even assuming that any such relationship existed between Plaintiffs and Cohen, Ritter admits that Cohen was not a party to the underlying state actions. Notably, Cohen's petition to intervene was denied by the trial court, and he did not seek intervention in the appeal to the Commonwealth Court. *See id.* at 24 n.7. Accordingly, Ritter's claim that Cohen adequately represented Plaintiffs' interests in the state litigation is unavailing.

by important government interests.  Accordingly, this Court grants Defendants' motions for summary judgment.

## 1.      Private Right of Action under Title 52 U.S.C. § 10101

The parties dispute whether § 10101 provides for a private right of action.  Both the LCBE and Ritter contend that § 10101 does not allow for suit by private citizens.  In support, the Defendants point to a provision of § 10101 that grants the Attorney General authority to file suit for violations of the statute.  In response, Plaintiffs contend that the Attorney General's authority to bring suit is coextensive with that of private citizens.

The question of whether a private right of action exists under § 10101 has not been addressed by the Third Circuit.  In order to determine whether a private right of action exists, this Court must ascertain the intent of Congress to create (1) a personal right[4] within the statute and (2) a private remedy for enforcement of that personal right.  *See Sandoval*, 532 U.S. at 286–87.

Following a review of the text and structure of § 10101, its legislative history, and relevant case law, this Court concludes that § 10101 does not provide for a private right of action.  In particular, the Court finds that even if Congress intended to create a personal right in § 10101, the text, structure, and history of the statute indicates that Congress did not intend to create a private remedy for the vindication thereof.

### a.      Text and Structure of § 10101

In fidelity to the test set forth in *Sandoval*, the Court begins its analysis with the text and structure of § 10101.  The opening provision of § 10101 provides insight into the congressional

---

[4]      As the Third Circuit did in *Wisniewski*, this Court uses the term "personal right" to refer to the substantive rights granted in statute and the term "private right of action" to refer to the remedial mechanisms for vindicating the personal right.  *See Wisniewski*, 510 F.3d at 300 n.15.

purpose behind the statute, which, although non-dispositive, helps determine the inquiry into Congress's intent to create a personal right.  The provision states:

> *All citizens* of the United States who are otherwise qualified by law to vote at any election by the people in any State, Territory, district, county, city, parish, township, school district, municipality, or other territorial subdivision, *shall be entitled and allowed* to vote at all such elections, without distinction of race, color, or previous condition of servitude; any constitution, law, custom, usage, or regulation of any State or Territory, or by or under its authority, to the contrary notwithstanding.

*See* 52 U.S.C. § 10101(a)(1) (emphasis added).

The subsequent provisions in § 10101 enumerate actions that no individual, acting under color of law, may take with respect to the right to vote.  *See id.* § 10101(a)(2).  When compared to the language analyzed in *Sandoval*, § 10101 can be read to confer a personal right on individuals.  In particular, whereas the provision at issue in *Sandoval* involved the grant of authority to federal agencies, *see Sandoval*, 532 U.S. at 288–89, § 10101 places "[a]ll citizens" qualified to vote at the center of its import and provides that they "shall be entitled and allowed" to vote, *see* § 10101(a)(1).  Accordingly, § 10101 provides a personal right to Plaintiffs. However, this is not the end of the inquiry.  As *Sandoval* made clear, a private right of action only lies where Congress intended to create not only a personal right but a *private remedy* as well.

The text and structure of § 10101 strongly suggest that Congress did not intend to create a private remedy for vindication of the personal right.  Notably, § 10101(c) sets forth an enforcement mechanism for violations of the rights contained in §§ 10101(a) and (b), stating in relevant part,

> [w]henever any person has engaged or there are reasonable grounds to believe that any person is about to engage in any act or practice which would deprive any other person of any right or privilege secured by subsection (a) or (b), *the Attorney General may institute* for the United States, or in the name of the United States, *a civil action or other proper proceeding for preventive relief*, including an

application for a permanent or temporary injunction, restraining order, or other
order. . . .

*See* § 10101(c) (emphasis added).

This provision vests the power to bring suit in the Attorney General. *See id.* The
provision does not, by its terms, contemplate suits by private citizens. *See id.* Moreover, that §
10101(c) provides that the Attorney General "*may* institute . . . a civil action" does not alter the
analysis. *See id.* (emphasis added). The fact that the Attorney General's authority to institute
suit is permissive rather than mandatory does not compel a finding that the alternative to an
Attorney General's institution of suit is a private right of action. To the contrary, that § 10101(c)
expressly provides for enforcement by the Attorney General "creates a strong presumption
against [an] implied private right[] of action that must be overcome." *See Wisniewski*, 510 F.3d
at 305 & n.1 (noting Supreme Court's unwillingness, post *Sandoval*, to find a private right of
action where statutes expressly provide for other means of enforcement).

In addition to the explicit means of enforcement provided by § 10101(c), the language of
other provisions of § 10101 also suggest that Congress did not intend to create a private remedy
therein. For example, § 10101(e) provides that, upon the request of the Attorney General, the
court shall make a finding of whether any race-based deprivation of the right to vote was
pursuant to a pattern or practice. *See id.* § 10101(e). This provision does not provide for such a
request by any other parties. Similarly, § 10101(g) appears to only contemplate suits where the
Attorney General is the plaintiff. That provision describes the procedure required "in the event
neither the *Attorney General* nor any *defendant* files a request for a three-judge court." *See id.* §
10101(g) (emphasis added). Rather than refer to both parties in the general sense, Congress
deliberately refers to the plaintiff party as the "Attorney General" and to the other side of the
caption as "defendant." *See id.*

Accordingly, the text and structure of § 10101 create a strong presumption that Congress did not intend to create a private remedy for vindication of the personal right.

### b.    Legislative History of § 10101

In addition to the text and structure of the statute, legislative history may provide insight into Congress's intent.  House Resolution 6127 contained various amendments and supplements to 42 U.S.C. § 1971, which housed the voting provisions of the Civil Rights Act prior to their transfer to § 10101.  On April 1, 1957, the House Judiciary Committee promulgated House Report Number 85-291, in which the Committee reported its findings on various components of House Resolution 6127.  *See* H.R. Rep. No. 85-291 (1957).  The Committee reported two substantive changes to § 1971 relevant to this matter.  *See id.* at 1976.  The first was a declaration of "the right to vote for federal offices."  *See id.*  This language made it unlawful for anyone acting under color of law "to interfere or attempt to interfere with the right to vote at any general, special or primary election . . . ."  *See id.*  In reporting this amendment, Congress was careful to note that this declaration "does not provide for a remedy."  *See id.*

Rather, the Committee reported that a separate substantive amendment was slated to create a remedy for enforcement of § 1971.  In particular, the Committee noted that "subsection (c) does provide a remedy in the form of a civil action instituted on the part of the Attorney General to prevent an act which would deprive a person of any right of privilege secured by" § 1971.  *See id.*  Congress viewed this amendment as creating a remedy for the enforcement of § 1971.  *See id.*  This understanding is confirmed by Representatives who provided minority views on the legislation.  In those remarks, a number of Representatives characterized subsection (c) as a "plenary grant of authority to the Attorney General . . . ."  *See id.* at 2014.

Indeed, as Attorney General Herbert Brownell, Jr. noted in his remarks to the Speaker of the House, prior to enactment of House Resolution 6127, "[t]he only method of enforcing existing laws protecting [the right of franchise] is through criminal proceedings." *See id.* at 1979.  The Attorney General went on to state that "[c]ivil remedies have not been available to the Attorney General in this field.  We think that they should be." *See id.*  Consistent with this view of enforcement, in discussing the alternative to Attorney General civil action enforcement, the Representatives did not remark on the topic of private citizen suits. *See id.* at 2014.  Rather, the contemplated alternative to civil suit by the Attorney General was continued enforcement through criminal actions. *See id.*

In their response to Defendants' motions, Plaintiffs argue that enforcement by the Attorney General does not entirely eliminate the possibility of private rights of action.  Plaintiffs point to the 1957 amendments of § 1971 as proof that some form of enforcement existed prior to the amendment.  Plaintiffs suggest that the prior era of enforcement took the form of private actions.  While Plaintiffs are correct that agency enforcement mechanisms do not, per se, preclude a private right of action, the presence of the Attorney General enforcement provision creates a strong presumption against the existence of a private right of action. *See Wisniewski*, 510 F.3d at 305 & n.1.  The remarks in the Report cited above suggest that the alternative to the newly devised Attorney General enforcement mechanism was not one of private civil suits, but rather a criminal action.  Accordingly, the legislative history of § 10101 tracks with the text and structure of the statute in suggesting that Congress did not intend to create a private right of action.

c.        Case Law Analysis of  § 10101

Although Congress's intent can be determined from the text, structure, and legislative history of § 10101, the Court finds it useful to briefly review the inter-circuit treatment of the question.  In particular, Plaintiffs cite case law from the Eleventh Circuit, which found that § 10101 does provide for a private right action.  Plaintiffs request that this Court follow the Eleventh Circuit's lead.  For the reasons set forth below, this Court declines to do so.

In *Schwier v. Cox*, 340 F.3d 1284 (11th Cir. 2003), the Eleventh Circuit had the occasion to address whether § 10101 provides for a private right of action.[5]  The court ultimately concluded that a private right of action was available.  *See id.* at 1297.  In doing so, the Eleventh Circuit relied heavily on two Supreme Court cases: *Allen v. State Board of Elections*, 393 U.S. 544 (1969) and *Morse v. Republican Party of Virginia*, 517 U.S. 186 (1996).  *See id.* at 1294– 1296.  In each of those cases, the Supreme Court found private rights of action despite statutory provisions providing for Attorney General enforcement.  *See id.* at 1294 (citing *Allen*, 393 U.S. 544; *Morse*, 517 U.S. 186).  However, both *Morse* and *Allen* were decided based on a jurisprudence of private rights of action that was dispensed with by the Supreme Court in *Sandoval*.  The permissive scheme of granting private rights of action whenever necessary to effectuate congressional purpose was replaced with a more narrowed analysis, one focused exclusively on Congress's intent.[6]  *See Sandoval*, 532 U.S. at 286–87.

---

[5]        Because of the date on which the case was decided, *Schwier* refers to the relevant provisions in their previous codification: 42 U.S.C. § 1971.

[6]        As the Third Circuit has explained, early jurisprudence on the existence of private rights of action rested on a notion that "it is the duty of the courts to be alert to provide such remedies as are necessary to make effective the congressional purpose."  *See Wisniewski*, 510 F.3d at 298 (quoting *Borak*, 377 U.S. at 433).  Even with *Cort*, the inquiry continued to focus on congressional purpose rather than congressional intent.  *See id.*; *see also Cort*, 422 U.S. at 82 (concluding "it is not necessary to show an intention to *create* a private right of action" (emphasis in original)).

This Court does not disagree with *Schwier*'s conclusion that private rights of action may coexist with other statutory enforcement measures. *See Schwier*, 340 F.3d at 1296 (concluding Congress's provision for enforcement by Attorney General does not compel conclusion that no private right of action exists). However, after reaching this conclusion, the *Schwier* court was required, under *Sandoval*, to determine whether Congress indicated an intent to include a private right of action parallel to the Attorney General enforcement provisions. *See Sandoval*, 532 U.S. at 286–87. On that question, the test applied by the Eleventh Circuit in *Schwier* only undertook half of the *Sandoval* analysis. *See id.* at 1296–97.

Importantly, *Sandoval* requires that a reviewing court inquire into (1) whether Congress intended to create a personal right, and (2) if so, whether Congress also intended to create a private *remedy* for enforcement of that personal right. *See Sandoval*, 532 U.S. at 286–87. In *Schwier*, the Court asked only whether Congress intended to create a personal right in the relevant statute. *See Schwier*, 340 F.3d at 1296 (inquiring into whether "the statute contains 'explicit right- or duty-creating language.'" (quoting *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 n.3 (2002))) . Finding that Congress did intend to create a specific personal right, and having found that the language in the statute was mandatory, the *Schwier* court determined that § 1971 did provide for private enforcement. *See id.* at 1296–97.

While this Court agrees that § 10101 provides for a personal right, the inquiry does not end there. Rather, *Sandoval* also requires inquiry into whether Congress intended to create a private remedy for the vindication of the personal right. *See Sandoval*, 532 U.S. at 286–87. While the Eleventh Circuit's review of the specific and mandatory nature of the statutory language may help inform whether Congress intended to create a personal right, these considerations are not dispositive of whether Congress intended there to be a private *remedy*.

Since the Eleventh Circuit did not address the second—and important—portion of the *Sandoval* test, this Court does not find *Schwier* persuasive on the question of Congress's intent to create a private *remedy* for the personal rights set forth in § 10101.

In conclusion, having reviewed the text of the statute, the structure of its provisions, and the legislative history, this Court concludes that Congress did not intend to provide a private remedy for the vindication of the personal rights contained in § 10101. Congress's deliberate provision of Attorney General enforcement creates a strong presumption against the existence of a private right of action that Plaintiffs fail to overcome. Accordingly, Plaintiffs are without capacity to bring suit under § 10101, and Defendants' motion for summary judgment on this claim is granted.

### 2.    Claims arising under the First and Fourteenth Amendments

Next, Plaintiffs assert that the burden placed on the right to vote by the handwritten date requirement violates the First and Fourteenth Amendments. In particular, Plaintiffs argue that the government lacks an important interest to justify the burden imposed by the handwritten date requirement. There are two steps to analyzing this claim. First, this Court must set out the burden imposed by the regulation, which, in turn, will determine the level of scrutiny to be applied. *See Burdick v. Takushi*, 504 U.S. at 433–44. Second, this Court must apply the appropriate level of scrutiny to the regulation. *See id.*

On the first step, this Court concludes that the burden imposed by the handwritten date requirement is slight. That voters must provide a handwritten date next to the voter's signature is a minor limitation on the fundamental right to vote. The parties to this matter agree on this point. *See* Pls. MSJ 16. Accordingly, the regulation will survive if an important regulatory interest exists to support it.

This Court concludes that there are important interests sufficient to sustain the regulation in light of the minor requirement imposed.  Indeed, these interests were recently reviewed by the Pennsylvania Supreme Court.  *See In re Canvass of Absentee and Mail-in Ballots of Nov. 3, 2020 General Election*, 241 A.3d 1058 (2020)).    There, two opinions reviewed the differing views on this issue.  *See id.*  The plurality opinion concluded that the voter declaration date requirement "does not implicate any weighty interest." *See id.* at 1078.  However, Justice Dougherty, writing a concurring and dissenting opinion signed by then-Chief Justice Saylor and Justice Mundy, concluded that there was "an unquestionable purpose behind requiring electors to date and sign the declaration."  *See id.* at 1090–91 (Dougherty, J., concurring and dissenting).  As Justice Dougherty noted, "the date on the ballot envelope provides proof of when the 'elector actually executed the ballot in full, ensuring their desire to cast it in lieu of appearing in person at a polling place.'"  *See id.* at 1090 (Dougherty, J., concurring and dissenting) (quoting *In re: 2,349 Ballots in the 2020 General Election*, No. 1162 C.D. 2020, 2020 WL 6820816 (Pa. Commw. Ct. Nov. 19, 2020)).  Moreover, Justice Dougherty noted that the date next to the voter declaration "prevents the tabulation of potentially fraudulent back-dated votes."  *See id.* (Dougherty, J., concurring and dissenting).

Justice Dougherty's concurring and dissenting opinion was cited with approval by the Commonwealth Court in its review of the undated ballots at issue here.  *See Ritter v. Lehigh Cnty. Bd. of Elections*, No. 1332 C.D. 2021, 2022 WL 16577, at *9 (Pa. Commw. Ct. Jan. 3, 2022).  In reviewing Ritter's challenge to the LCBE's decision to count the undated ballots, the Commonwealth Court found that Justice Dougherty's opinion "persuasively explains why there are 'weighty interests'" that support the handwritten date requirement.  *See id.*  Accordingly, having "adopted the rationale of [Justice Dougherty's opinion] as persuasive authority," the

Commonwealth Court concluded "that the dating of mail-in ballots . . . is justified by 'weighty interests' . . . ." *See id.*

While the opinions of Justice Dougherty and the Commonwealth Court do not bind this Court, this Court finds them persuasive in its own review of this claim.[7]  In particular, this Court concludes that the Commonwealth of Pennsylvania, as well as its citizens, have important interests in the integrity of the election process by holding fair, efficient, and fraud-free elections that are supported by the handwritten date requirement.  An elector's compliance with the signature and date requirement is an important guard against fraud.  Where an elector fully complies with the instructions on the outer envelope, the electoral authorities conducting the election can be assured of the date on which the ballot was executed.  Where, however, the outer envelope remains undated, the possibility for fraud is heightened, as individuals who come in contact with that outer envelope may, post hoc, fill in a date that is not representative of the date on which the ballot was executed.  Moreover, that the parties agree to the timeliness of the ballots in this particular case does not alter the analysis.  That these Plaintiffs returned their

---

[7]     This Court also finds persuasive the rationale of Justice Wecht in his concurring and dissenting opinion.  *See In re Canvass November 3, 2020*, 241 A.3d at 1079; *see also Ritter*, 2022 WL 16577, at *4 (noting Justice Wecht's opinion "served as a tie-breaker in the case").  Therein, Justice Wecht expressed his "increasing discomfort with [the Pennsylvania Supreme] Court's willingness to peer behind the curtain of mandatory statutory language in search of some unspoken directory intent."  *See In re Canvass November 3, 2020*, 241 A.3d at 1080.  Justice Wecht agreed with the proposition that "the real danger" to our democracy is "leaving it to each county board of election to decide what laws must be followed (mandatory) and what laws are optional (directory) . . . ."  *See id.* 1087 (quoting *In re 2,349 Ballots*, slip op. at 12–13).  This Court is persuaded by Justice Wecht's analysis.  The handwritten date requirement is mandatory, and to permit each county election board to read it otherwise could well result in disparate vote-counting policies based on the same statutory language.  As Justice Wecht suggested, the policy determination of "what requirements are necessary to ensure the security of our elections against fraud" is one best left to the legislature.  *See id.*

ballots before the deadline does not obviate the requirement's general purpose of combatting fraud in elections.

Accordingly, this Court finds that an important public interest in the integrity of an election process that ensures fair, efficient, and fraud-free elections is served by compliance with the statute mandating the handwritten date requirement. These important government interests outweigh the minor condition imposed by the handwritten date requirement. Therefore, summary judgment is granted in Defendants' favor on Plaintiffs' constitutional claim.

## VI.    CONCLUSION

Plaintiffs asserted two claims for relief, and following a review of each, this Court enters judgment in Defendants' favor on both claims. First, Plaintiffs lack the capacity to bring suit under § 10101. Second, the handwritten date requirement does not pose an undue burden on Plaintiffs' right to vote under the First and Fourteenth Amendments. Accordingly, summary judgment is entered in Defendants' favor on both counts – the relief requested in Plaintiffs' motion for summary judgment is denied.

A separate Order follows.

BY THE COURT:

*/s/ Joseph F. Leeson, Jr.*
JOSEPH F. LEESON, JR.
United States District Judge