# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| LINDA MIGLIORI, FRANCIS J. FOX, RICHARD E. RICHARDS, KENNETH RINGER, and SERGIO RIVAS, | ) ) ) ) | |
| Plaintiffs, | ) ) | No. 5:22-cv-00397-JFL |
| and | ) ) | |
| ZACHARY COHEN, | ) ) | |
| Intervenor-Plaintiff, | ) ) | |
| v. | ) ) | |
| LEHIGH COUNTY BOARD OF ELECTIONS, | ) ) ) | |
| Defendants, | ) ) | |
| and | ) ) | |
| DAVID RITTER, | ) ) | |
| Intervenor-Defendant. | ) ) | |

### PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF
### EMERGENCY MOTION FOR AN INJUNCTION PENDING APPEAL

Stephen A. Loney, Jr.  (No. 202535)
Marian K. Schneider (No. 50337)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
sloney@aclupa.org
mschneider@aclupa.org

Witold Walczak (No. 62976)
Richard Ting (No. 200438)
Connor Hayes (No. 330447)
ACLU OF PENNSYLVANIA
P.O. Box 23058
Pittsburgh, PA 15222
P: 412-681-7864
vwalczak@aclupa.org
rting@aclupa.org
chayes@aclupa.org

*Counsel for Plaintiffs*

## I. INTRODUCTION

Plaintiffs respectfully request that the Court grant emergency relief pursuant to Fed. R. Civ. P. 62(d) enjoining certification of the election at issue here pending appellate review of the Court's Opinion (ECF No. 49) and Order (ECF No. 50).

Plaintiffs are likely to succeed on appeal in demonstrating that the Materiality Provision of the Civil Rights Act, 52 U.S.C. § 10101(a)(2)(B), may be enforced by private parties—a conclusion that flows from the statutory text, context, legislative history, and the case law.  And Plaintiffs, registered voters whose mail ballots were timely received by the County, are also likely to succeed in showing that the requirement that mail ballot voters write the date on the envelope containing their ballots is not material to determining whether they are qualified to vote.  At the very least, Plaintiffs have shown there are serious merits arguments in their favor on both scores.  Meanwhile, Plaintiffs' fundamental right to vote is at stake; without emergency relief to enjoin certification of the election and preserve the status quo pending appeal, the election will be certified without counting Plaintiffs' votes, which will then be irretrievably lost.  That loss of fundamental democratic rights far outweighs any purported inconvenience from some further delay in certifying an election result that was delayed in the first instance by Defendant-Intervenor's decision to initiate legal action in state court.  The requested relief should be granted.

## II. STATEMENT OF FACTS

This Court is familiar with the background of this case, which is summarized here for convenience.  Plaintiffs are five registered voters in Lehigh County who cast mail ballots in 2021 county elections.  ECF No. 49, at 4.  The ballots of Plaintiffs and 252 other Lehigh County mail-ballot voters were set aside because they had not written the date on the envelope containing

1

their mail ballots, as purportedly required by Pennsylvania law, 25 P.S. §§ 3146.6(a), 3150.16(a). *See* ECF No. 49, at 3-5.  Notably, this envelope-dating requirement was the subject of state court litigation during the 2020 election cycle, wherein the Pennsylvania Supreme Court ultimately concluded that ballots contained in undated envelopes would be counted.  ECF No. 49, at 4.  A majority of the justices of that court suggested at the time that this envelope dating requirement might run afoul of federal voting rights law, and particularly the Materiality Provision, which prohibits states from denying the right to vote on the basis of an "error or omission [that] is not material in determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B).  *In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1074 n.5 (Pa. 2020) (opinion announcing judgment); *id.* at 1089 n.54 (Wecht, J., concurring and dissenting).

It is undisputed that all 257 of the ballots at issue were timely received by the County. ECF No. 49, at 5.  It is also undisputed that Plaintiffs are otherwise eligible and registered voters in Lehigh County. ECF No. 27 at ¶¶ 23-25. It is also undisputed that Plaintiffs' ballots do not raise any fraud concerns. ECF No. 27 at ¶ 26. Indeed, the Lehigh County Board of Elections ("the Board") initially decided unanimously to count Plaintiffs' ballots.  ECF No. 49, at 5.

Of the three Lehigh County judicial vacancies that were up for election in 2021, two candidates won by more than 257 votes, and their elections have been certified.  ECF No. 27 at ¶¶ 19-20. The difference between the third and fourth place candidates, however, is 71 votes. *See id.* After the Board decided that it would proceed to count the 257 mail ballots that did not include a handwritten date on the envelope, one of the candidates brought suit in state court, arguing that the ballots in undated envelopes should not be counted under state law. *Id.* at ¶¶ 34-35. At the end of more than two months of litigation, during which certification of the election

2

results for the third vacancy was suspended by operation of state law, the state courts ultimately agreed, holding that state law required the Board to set aside Plaintiffs' ballots. ECF No. 49, at 5; ECF No. 27-9.

On January 31, 2022, days after the state trial court's order not to count their ballots, Plaintiffs filed this federal court action, arguing, among other things, that the refusal to count their votes because of a failure to write a date on the envelope of their timely received mail ballots violates the Materiality Provision of the Civil Rights Act and their fundamental constitutional right to vote. ECF No. 49, at 5.

On March 16, 2022, this Court issued an opinion and order granting summary judgment to Defendants. With respect to the Materiality Provision, the Court held that there was no private right of action to enforce that provision in federal court, *i.e.*, that only the U.S. Attorney General may bring federal lawsuits to enforce the individual right to vote guaranteed by this provision in the Civil Rights Act. ECF No. 49, at 18-25.

Plaintiffs have noticed an appeal of the Court's decision. ECF No. 51.  Meanwhile, the Board has scheduled a meeting for Monday, March 21, 2022, for the purposes of certifying the last remaining election result without counting Plaintiffs ballots.[1]  Plaintiffs therefore seek emergency relief to maintain the status quo and protect their right to vote from permanent extinguishment during the pendency of their appeal.

---

[1] Attached hereto as Exhibit A is a true and correct copy of a March 17, 2022 email from the Board's counsel notifying the parties to this matter of the Board's planned meeting and attaching a copy of the public notice of the Board's March 21 meeting.

**III.     STATEMENT OF THE QUESTION INVOLVED**

Whether an injunction pending appeal of the Court's Opinion and Order should issue pursuant to Fed. R. Civ. P. 62 in order to preserve the status quo and prevent Plaintiffs' imminent, irreparable disenfranchisement?

**Suggested Answer:** Yes.

**IV.     SUMMARY OF ARGUMENT**

Plaintiffs meet all the factors needed for the Court to enter an injunction staying certification of the election pending appellate review.

On appeal, Plaintiffs are likely to succeed on the merits of their argument that a private right of action exists to enforce the Civil Rights Act's Materiality Provision, 52 U.S.C. § 10101(a)(2)(b).  The statute's text, structure, and legislative history demonstrate that Congress intended to create both a personal right and a private remedy to vindicate violations of voters' rights under Section 10101. That conclusion is consistent with, for example, the use of the term "party aggrieved" (which typically connotes a private right of action) in Section 10101 itself, with the statute's origins in Reconstruction Era civil rights laws that were always privately enforceable, and with statements from both Congress and the sitting Attorney General at the time the 1957 Civil Rights Act was passed acknowledging the history and continued expectation of private enforcement.  The Eleventh Circuit's comprehensive treatment of the issue recognized as much, *Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003), other well-reasoned decisions are in accord, and the Third Circuit ought to have the chance to weigh in before Plaintiffs lose their fundamental right to vote.

Plaintiffs are also likely to succeed on the merits of their substantive claim under the Materiality Provision.  A handwritten date on a mail ballot envelope is not "material to

4

determining whether" voters are "qualified under State law." 52 U.S.C. § 10101(a)(2)(b). The Board conceded as much in recent state court litigation (and indeed unanimously decided to count Plaintiffs' votes in the first instance). And the Pennsylvania Secretary of State has expressly concluded that the envelope dating requirement is not material.

The equities weigh strongly for the Plaintiffs. The harm that they will suffer absent relief is clear and irreparable: They will be disenfranchised as soon as Lehigh County certifies its election. Here, particularly in the unique circumstance where the election has not yet been certified, the public interest is best served by maintaining the status quo, resolving Plaintiffs' appeal on the merits, and ensuring that every ballot cast by eligible, qualified voters is counted.

## V.    ARGUMENT

Federal Rule of Civil Procedure 62(d) allows a court to grant temporary injunctive relief while an appeal is pending from a final judgment refusing to grant a requested injunction. *See also* Fed. R. App. P. 8(a). To determine whether emergency relief pending appeal is merited, the Court must assess whether: (1) appellants have demonstrated a likelihood of success on the merits; (2) appellants will be irreparably harmed absent an injunction; (3) the requested relief will substantially injure Defendants (*i.e.*, the balance of hardships); and (4) where the public interest lies. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987*); see also Republic of Philippines v. Westinghouse Elec. Corp.*, 949 F.2d 653, 658 (3d Cir. 1991). The first two factors are "the most critical." *E.g.*, *Nken v. Holder*, 556 U.S. 418, 434 (2009). In a challenge to governmental action, the third and fourth factors typically merge. *See Osorio-Martinez v. U.S. Att'y Gen.*, 893 F.3d 153, 178 (3d Cir. 2018).

In considering the case for emergency relief, the Third Circuit has "viewed favorably what is often referred to as the 'sliding-scale' approach." *E.g.*, *In re Revel AC, Inc.*, 802 F.3d

558, 569 (3d Cir. 2015). Under that approach, emergency relief pending appeal may be granted, for example, where a stay applicant shows that there are "serious questions going to the merits" and that the irreparable harm they face if the requested relief is denied "decidedly outweighs any potential harm" to the opposing party if the relief is granted. *Id.* at 570.

Here, an injunction pending appeal is needed to preserve the status quo and prevent the imminent and irreparable loss of Plaintiffs' fundamental right to vote. Plaintiffs are eligible and properly registered voters who will be disenfranchised as soon as the Board certifies its election. An injunction pending appeal would preserve Plaintiffs' ability to obtain effective relief. By contrast, the certification of Lehigh County's election, which the Board has noticed for Monday, March 21, would make effective relief impossible even if Plaintiffs prevail on appeal. Accordingly, an injunction is necessary to prevent the irreparable harm of disenfranchisement to Plaintiffs and 252 other similarly-situated voters.

**A. Plaintiffs Are Likely to Succeed on the Merits in Their Appeal**

*i. Plaintiffs are likely to succeed in appealing this Court's ruling regarding the existence of a private right of action to enforce 52 U.S.C. § 10101*

Plaintiffs have at least demonstrated that there are "serious questions going to the merits" with respect to whether a private right of action exists under the Civil Rights Act's Materiality Provision, 52 U.S.C. § 10101(a)(2)(b). *See In re Revel AC, Inc.*, 802 F.3d at 570. Indeed, the statutory text, context, legislative history, and the weight of the case law all support the conclusion that there is such a right of action, and that Plaintiffs are likely to succeed on appeal.

The Materiality Provision provides that it is unlawful to "deny the right of any individual to vote in any election because of an error or omission on any record or paper relating to any application, registration, or other act requisite to voting, if such error or omission is not material in determining whether such individual is qualified under State law to vote in such election." 52

6

U.S.C. § 10101(a)(2)(B). The purpose of the Materiality Provision is to prevent election officers from "requiring unnecessary information" that could result in disenfranchisement over "hyper-technical" errors. *See Condon v. Reno*, 913 F. Supp. 946, 949 (D.S.C. 1995).

In considering whether there is an implied private right of action with respect to a particular federal law, courts consider two factors. First, the court considers whether the statute's text and structure indicate that the legislature intended to create a personal right. *See Alexander v. Sandoval*, 532 U.S. 275, 286 (2001); *Wisniewski v. Rodale*, 510 F.3d 294, 301 (3d Cir. 2007). Second, the court considers the text, structure, and legislative history of the statute to determine whether the legislature intended to create a private remedy. *Sandoval*, 532 U.S. at 286; *Wisniewski*, 510 F.3d at 301; *accord Three Rivers Ctr. v. Hous. Auth. of the City of Pittsburgh*, 382 F.3d 412, 421 (3d Cir. 2004).

As to the first *Sandoval* factor, this Court agreed that Congress intended to create a personal, individual right with Section 10101's Materiality Provision. ECF No. 49, at 19, 24. That conclusion flows inexorably from the text of the Materiality Provision itself, which expressly refers to "the right of any individual to vote in any election." 52 U.S.C. § 10101(a)(2)(b). Such language "imparts an individual entitlement with an 'unmistakable focus on the benefitted class.'" *Grammer v. John J. Kane Reg'l Ctrs.-Glen Hazel*, 570 F.3d 520, 527 (3d Cir. 2009) (quoting *Sabree ex rel. Sabree v. Richman*, 367 F.3d 180, 187 (3d Cir. 2004)). As the Supreme Court has explained, "[o]nce a plaintiff demonstrates that a statute confers an individual right, the right is presumptively enforceable." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 284 (2002). That presumption in favor of private enforcement thus applies here with full force.

And as to the second *Sandoval* factor, Plaintiffs are likely to succeed on appeal in showing, based on the statutory text, context, legislative history, and case law, that Congress contemplated a private remedy for violations of the Materiality Provision.

*First*, the statutory text indicates that Congress intended a private right of action to enforce the provisions of subsection 10101(a). In addition to the expansive rights-creating language in the Materiality Provision itself, at least two other subsections of the statute discuss *who* may sue to enforce those rights. One, subsection 10101(c), provides that the Attorney General "may institute for the United States … a civil action or other proper proceeding for preventive relief" to enforce the rights set forth in § 10101(a). But the language of this subsection, which was enacted as part of the Civil Rights Act of 1957, is not exclusive. The Supreme Court has repeatedly held (as this Court acknowledged) that Congress may grant the Attorney General a right of action without indicating any intention to disallow private enforcement. *See, e.g.*, *Sandoval*, 532 U.S. at 279–80; *Morse v. Republican Party of Va.*, 517 U.S. 186 (1996); *see also Fitzgerald v. Barnstable Sch. Comm.*, 555 U.S. 246, 252–59 (2009); ECF No. 49, at 24. As explained below, that is precisely what Congress did here. *See Schwier v. Cox*, 340 F.3d 1284, 1296 (11th Cir. 2003) (so holding).

In addition to subsection 10101(c), the next subsection in the statute, 10101(d), confirms that Congress intended for individuals to continue enforcing the substantive rights set forth in Section 10101, as they had before the advent of the Attorney General's governmental right of action in the 1957 Act. Subsection 10101(d) provides that, "[t]he district courts of the United States shall have jurisdiction of proceedings instituted pursuant to this section and shall exercise the same without regard to whether *the party aggrieved* shall have exhausted any administrative or other remedies that may be provided by law." 52 U.S.C. § 10101(d) (emphasis added). The

8

text of this subsection thus contemplates that a "party aggrieved"—*i.e.*, a person whose voting rights have been violated—may "institute[]" "proceedings … pursuant to this section," *i.e.*, Section 10101. *See, e.g.*, *Texas Democratic Party v. Hughs*, 474 F. Supp. 3d 849, 859 (W.D. Tex. 2020) ("[t]he 'party aggrieved' is universally understood to mean the persons whose rights are being violated, not the Attorney General" (citing *Schwier*, 340 F.3d at 1296), *rev'd and remanded on other grounds*, 860 F. App'x 874 (5th Cir. 2021)).  Such "aggrieved parties" or "aggrieved persons" language strongly indicates a private right of action.  *See, e.g.*, *Bowers v. NCAA*, 346 F.3d 402, 426 (3d Cir. 2003) (discussing implied private right of action under the Rehabilitation Act, which refers to the rights of "any person aggrieved"); *see also, e.g.*, *Mitchell v. Cellone*, 389 F.3d 86, 90 (3d Cir. 2004) (discussing Fair Housing Act, which accords right of action to "[a]n aggrieved person").  The reference to administrative exhaustion, which would not ordinarily apply in a civil suit brought by the federal government, but frequently applies as a jurisdictional bar to individual plaintiffs, further demonstrates Congress' intent to maintain a private right of action here.  *Accord Schwier*, 340 F.3d at 1296.

       This Court's opinion did not discuss or mention subsection 10101(d) of the statute, even though this provision is discussed in *Schwier* and other cases cited in Plaintiffs' briefs.  *See* ECF No. 49, at 18-20; *see also* ECF No. 44, at 26-29.  Instead, the Court referred to subsections 10101(e) and (g), but appears to have overlooked the fact that those subsections apply only in the context of a particular form of relief (namely, intensive federal judicial monitoring of state election processes) that only the Attorney General may invoke, and thus by their own terms do not speak to the availability of a private right of action more generally.[2]  ECF No. 49, at 20.

---

[2] The Court in its Opinion and Order suggested that Sections 10101(e) and (g) indicate that the Attorney General is exclusively charged with enforcing Section 10101(a).  ECF No. 49, at 20.  However, both of those provisions deal with the use of "voting referees" and other forms of

Viewed as a whole, the text of Section 10101 indicates that Congress intended to maintain a private right of action here.

*Second*, statutory structure and context demonstrates that Congress intended for private enforcement and federal enforcement by the Attorney General to coexist. In particular, in structuring the statute now codified at Section 10101, Congress began by incorporating a key provision from the 1870 Enforcement Act, one of the original civil rights laws passed prior to the end of Reconstruction, as subsection (a) of the expanded statute. *See* Pub. L. 85–315, pt. IV, §131, Sept. 9, 1957, 71 Stat. 637. Those original civil rights laws, which included what is now 42 U.S.C. § 1983, were enforced by private parties from the start. *Schwier*, 340 F.3d at 1295 ("[F]rom the enactment of § 1983 in 1871 until 1957, plaintiffs could and did enforce the provisions of § 1971 [now codified as § 10101(a)(1)] under § 1983") (citing, inter alia, *Smith v. Allwright*, 321 U.S. 649, 658 (1944) (striking down white primary laws in private suit brought under the Enforcement Acts)). When Congress formulated the Civil Rights Act of 1957, it undoubtedly knew that the rights it was placing in subsection (a) (*i.e.*, the subsection that now contains the Materiality Provision) had long been privately enforceable. Congress *then* added the new Attorney General right of action in subsection 10101(c) as an additional means of enforcing those rights.

---

intensive federal monitoring to superintend a state's election process where a pattern or practice of violations has been shown. *See* 52 U.S.C. § 10101(e). Because the right to impose that sweeping form of relief *is* made exclusive to the Attorney General (and is not available to aggrieved parties generally), the statutory subsections concerning that form of relief are expressly restricted to actions brought by the Attorney General. See *id.* (allowing for the invocation of federal election monitors in any "proceeding instituted pursuant to subsection (c)"); 52 U.S.C. § 10101(g) (providing that a three-judge panel will be convened in any "proceeding instituted by the United States … under this section in which the Attorney General requests a finding of a pattern or practice of discrimination pursuant to subsection (e) of this section").

*Third*, the legislative history strongly corroborates this textual and contextual analysis. Congress's stated purpose with the 1957 Act was to "*supplement existing law*," and "to provide means of *further securing* and protecting the civil rights of persons within the jurisdiction of the United States." H.R. Rep. No. 85–291 (1957), reprinted in 1957 U.S.C.C.A.N. 1966, 1976 (emphasis added). Because one of the main innovations of the 1957 statute was the creation and empowerment of an Associate Attorney General for Civil Rights in the Civil Division of the Department of Justice, the legislative history discusses extensively the value of federal enforcement. But the legislative history also explicitly acknowledges that the "existing law" being "supplement[ed]" was a system of private enforcement by individuals. *See id.* at 1977 ("Section 1983 . . . has been used to enforce the rights, as legislatively declared in the existing law, as contained in section 1971 [now codified at 52 U.S.C. § 10101]."). This Court's suggestion that Congress "did not remark on the topic of private citizen suits," ECF No. 49, at 22, is simply not accurate.

The discussion in the legislative history regarding the jurisdictional provision in subsection 10101(d) further supports Congress's intent to retain private enforcement. The House Report explains that this subsection was designed to ensure that federal jurisdiction exists in civil rights cases "regardless of whether or not *the party thereto* shall have any administrative or other remedies provided by law." H.R. Rep. No. 85–291, at 1976. As with subsection 10101(d) itself, this "party thereto" language—and Congress's focus on administrative exhaustion requirements that typically apply to individuals—confirms that Attorney General enforcement was intended to supplement a longstanding private right of action, not displace it. *Accord Schwier*, 340 F.3d at 1296.

11

In its opinion, this Court also relied on a written statement in the legislative history from then-Attorney General Brownell that "[c]ivil remedies have not been available to the Attorney General in this field," ECF No. 49, at 22.  Those remarks about the enforcement powers *of the Attorney General* are of little relevance to the question whether private individuals are empowered to enforce the relevant provisions of the civil rights laws.  More importantly, and in any event, Attorney General Brownell actually testified in the hearings on the 1957 legislation on that topic, and could not have been clearer that, "[w]e are not taking away the right of the individual to start his own action ... Under the laws amended if this program passes, private people will retain the right they have now to sue in their own name." *See Civil Rights Act of 1957: Hearings on S. 83 Before the Subcomm. on Constitutional Rights of the Senate Comm. on the Judiciary*, 85th Cong. 73, 203, 1; 60–61, 67–73 (1957). This testimony, which the Court overlooked, sharply undermines this Court's conclusion here.

The legislative history in sum shows that Congress sought to supplement, not eliminate, existing private actions with federal civil enforcement. *Schwier*, 340 F.3d at 1295.  It would make no sense for Congress to take away an existing, longstanding, expressly acknowledged and highly effective private right of action to protect the right to vote as a means of "further securing" that right or "supplement[ing] existing law."  Indeed, that was the opposite of what Congress (and for that matter, the Attorney General) intended.

*Finally*, case law also supports private enforcement. The only federal appeals court to comprehensively address the private right of action issue is the Eleventh Circuit's decision in *Schwier*.  The *Schwier* court discussed the legislative history in detail and expressly concluded that Congress intended to maintain a pre-existing, longstanding private right of action. *See id.* at 1295–96. This Court, in its summary judgment decision, mistakenly concluded that *Schwier*

12

"only undertook half of the *Sandoval* analysis." *See* ECF No. 49, at 24. But *Schwier* was decided *after Sandoval*, the court expressly cited *Sandoval*, and it plainly applied both elements of the *Sandoval* test, determining that the Materiality Provision creates a private right, *and* that Congress, in light of the statutory text and the legislative history, intended the rights set forth in subsection § 10101(a) to be privately enforceable. *See Schwier*, 340 F.3d at 1295–97.[3] On appeal, Plaintiffs are likely to demonstrate that this Court misconstrued *Schwier*, and that the *Schwier* court's reasoning is correct.

Nor is *Schwier* alone. A number of other courts have addressed the issue and held that there is a private right of action to enforce the Materiality Provision. *See, e.g.*, *League of Women Voters of Ark. v. Thurston*, No. 5:20-CV-05174, 2021 WL 5312640, at *4 (W.D. Ark. Nov. 15, 2021); *Hughs*, 474 F. Supp. 3d at 859. Many others have adjudicated the merits of materiality claims brought by voters . *See, e.g.*, *Taylor v. Howe*, 225 F.3d 993, 996 (8th Cir. 2000); *Coal. for Educ. in Dist. One v. Bd. of Elections*, 495 F.2d 1090 (2d Cir. 1974); *Bell v. Southwell*, 376 F.2d 659 (5th Cir. 1967); *Reddix v. Lucky*, 252 F.2d 930, 934 (5th Cir. 1958); *Delegates to the Republican Nat'l Convention v. Republican Nat'l Comm.*, Case No. SACV 12-00927, 2012 WL 3239903, *5 n.3 (C.D. Cal. Aug. 7, 2012); *Common Cause/Ga. v. Billups*, 406 F. Supp. 2d 1326, 1371 (N.D. Ga. 2005). In contrast, the few courts that have held that there is no private right of action, like the Sixth Circuit, have done so with virtually no analysis. *See, e.g.*, *McKay v.*

---

[3] In *Schwier* the Eleventh Circuit *started* with the second *Sandoval* factor, analyzing the extensive history of private enforcement with respect to former 42 U.S.C. § 1971 and concluding that Congress in 1957 did not intend to "withdraw existing protection" by canceling such enforcement. 340 F.3d at 1295-1296. Having determined based on statutory text, context, and legislative history that Congress intended to maintain private enforcement of the rights in Section 10101, the court in *Schwier then* continued on to consider the first *Sandoval* factor (*i.e.*, the nature of the right contemplated by the Materiality Provision), concluding (as this Court did) that the Materiality Provision provides an individual, personal right. *Id.* at 1296–97.

*Thompson*, 226 F.3d 752, 756 (6th Cir. 2000) (stating, without elaboration, that "Section 1971 is enforceable by the Attorney General, not by private citizens."). And none has ever embraced the analysis that Defendants urged, and that the Court adopted, here.

Plaintiffs are likely to prevail on the merits of their appeal on the private enforceability of the Materiality Provision. At a minimum, Plaintiffs have demonstrated that there are substantial questions on that score, which is sufficient to support a grant of temporary relief pending appeal.

### ii. *Plaintiffs are likely to succeed on the merits of their materiality claim*[4]

The essential purpose of the Materiality Provision is to prevent states from "requiring unnecessary information," the omission of which negates a person's right to vote. *Schwier*, 340 F.3d at 1294; *see also Thurston*, 2021 WL 5312640, at *4 (Materiality Provision prohibits "those state election practices that increase the number of errors or omissions on papers or records related to voting and provide an excuse to disenfranchise otherwise qualified voters"). Courts have held that rejecting mail ballots because of the failure to provide unnecessary information violates the Materiality Provision. *See*, *e.g.*, *Martin v. Crittenden*, 347 F. Supp. 3d 1302, 1308–09 (N.D. Ga. 2018) (plaintiffs likely to succeed in demonstrating that rejection of mail-in ballots based on voters' failure to provide their year of birth violated Materiality Provision).[5]

---

[4] Plaintiffs are also appealing the Court's ruling on Count II of their Complaint for violation of Plaintiffs' fundamental right to vote under the First and Fourteenth Amendments. For the purposes of this Motion, however, Plaintiffs focus on the serious questions going to the merits of their claim under the Materiality Provision, which are more than sufficient to support the emergency relief requested.

[5] The Materiality Provision applies to any "application, registration, or other act requisite to voting." 52 U.S.C. § 10101(a)(2)(B). The statute directs that "vote" in this context means "all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election." 52 U.S.C. §§ 10101(a)(3)(A), 10101(e) (emphases added). Therefore, the statute "by definition includes not only the registration and eligibility to vote, but also the right to have that vote counted" and

14

Here, Plaintiffs are likely to succeed in demonstrating that the handwritten date on the envelope containing a mail ballot "is not material in determining whether such individual is qualified under State law to vote in such election," 52 U.S.C. § 10101(a)(2)(B); *see also In re Canvass of Absentee and Mail-In Ballots of Nov. 3, 2020 Gen. Election*, 241 A.3d 1058, 1074 n.5 (Pa. 2020) (opinion announcing judgment) (suggesting this to be the case); *id.* at 1089 n.54 (Wecht, J., concurring and dissenting) (similar). It is undisputed that Plaintiffs' registration status and qualifications to vote were already verified by the Board pursuant to its processes at the time Plaintiffs applied for a mail ballot. Joint Stip., ECF No. 27, ¶ 3. *Compare Martin*, 347 F. Supp. 3d. at 1309 (noting that "the qualifications of the absentee voters" were "not at issue because [county] elections officials have already confirmed such voters' eligibility through the absentee ballot application process"). There also is no dispute that the ballot envelopes were signed by the Plaintiffs, and no dispute that Plaintiffs' ballots were timely received. Joint Stip., ECF No. 27, ¶ 26. Whether a voter handwrote the date on their signed, timely-received mail ballot envelope has no material value in determining that voter's eligibility to cast a ballot. That was the position of the Board before Defendant-Intervenor brought a state court lawsuit against them challenging the counting of the ballots. *See* ECF No. 44-1, at 11. And it continues to be the position of the Pennsylvania Secretary of State. *See* ECF No. 40. Indeed, the County Election Board's own Chief Clerk testified in the state court case that he would count the mail ballots if a voter had put the wrong date on the ballot, *see* ECF No. 27-6 at 61:5 – 62:14. If counting the *wrong* date is acceptable, the envelope dating requirement cannot be material.

---

"prohibits officials from disqualifying votes for immaterial errors and omissions." *E.g.*, *Ford v. Tenn. Senate*, No. 06-2031-DV, 2006 WL 8435145, at *11 (W.D. Tenn. Feb. 1, 2006).

15

### B. Plaintiffs Will Lose Their Right to Vote Without Emergency Relief

Courts routinely deem a voter's loss of the opportunity to "fully exercise their voting and associational rights" to constitute irreparable harm. *Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 879 (3d Cir. 1997); *see also League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986). That is because "the right of suffrage is a fundamental matter in a free and democratic society." *Reynolds v. Sims*, 377 U.S. 533, 561–62 (1964). And once an election is certified, "there can be no do-over [or] redress," and an injury to Plaintiffs becomes both "real and completely irreparable . . . ." *League of Women Voters of N.C.*, 769 F.3d at 247.

Here, Plaintiffs' injury will be nothing short of disenfranchisement. The Board has noticed a meeting for Monday at 1:30 in order to certify the election. *See* Ex. A hereto. In the absence of an injunction pending appeal, the County will certify the election and Plaintiffs will likely lose any opportunity for appellate review—and any chance at having their votes counted. The harm Plaintiffs stand to suffer is clear and irreparable.

### C. The Public Interest Favors Emergency Relief Pending Appeal

The public interest strongly favors maintaining the status quo in this case while an appeal is pending. The disputed ballots have not been counted, and the results have not been certified for the single remaining race for judge in Lehigh County. Issuing an injunction pending appeal *before* the Lehigh County Board of Elections has certified the election will preserve rather than disrupt the current status quo, and advances the strong public interest in counting all legitimate votes.

The public interest "favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247-48 (citations and quotation marks omitted).  Indeed, in a recent non-precedential decision, the Third Circuit noted the strong value placed on counting every vote: "Democracy depends on counting all lawful votes promptly and finally, not setting them aside without weighty proof.  The public must have confidence that our Government honors and respects their votes."  *Donald J. Trump for President, Inc. v. Secretary of Pa.*, 830 F. App'x 377, 390–91 (3d Cir. 2020).  Here, absent an injunction pending appeal, the 257 ballots at issue in this case will be set aside even though all parties involved *agree* that the ballots were submitted by registered, eligible voters, were received on time, and otherwise complied with the rules for mail ballots—and even though there are strong arguments that federal law prohibits refusing to count those otherwise legitimate ballots for failure to comply with an immaterial envelope-dating requirement. *Cf. Council of Alt. Pol. Parties v. Hooks*, 121 F.3d 876, 884 (3d Cir. 1997) ("In the absence of legitimate countervailing concerns, the public interest clearly favors the protection of constitutional rights.").

Even if the Board had identified an interest in enforcing the requirement to write the date on the mail ballot envelope, it would not outweigh the harm of disenfranchisement that Plaintiffs and 252 similarly situated voters will suffer.  And whether the Board could identify such an interest is doubtful.  After all, the Board initially resolved to count Plaintiffs ballots and then defended that position throughout the state-court proceedings initiated by Defendant-Intervenor Ritter.  The Board has also maintained that even a clearly erroneous date suffices to count the ballot, *see* ECF No. 27-6 at 61:5 – 62:14.  And the Pennsylvania Department of State has opined, point blank, that the envelope-dating requirement "is not 'material' and cannot be used to disenfranchise any Pennsylvania voter."  ECF No. 40, at 7.  Whatever tenuous public interest

17

there might be in enforcing the immaterial envelope-dating requirement (if there is any) cannot justify rushing to finalize an election before all votes are properly counted.

Nor can a general desire for finality outweigh voters' fundamental right to have their ballots counted. To be sure, Plaintiffs are asking for relief that would entail some modest further delay in the certification of the election of one local judge in Lehigh County in order to maintain the status quo. But any inconvenience that might flow from that delay can be minimized through expedited appellate briefing. And any such inconvenience is outweighed by the overwhelming public interest in counting every vote.

## VI.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant emergency relief pursuant to Fed. R. Civ. P. 62(d) enjoining the certification of the Lehigh County election at issue in this action pending appellate review of the Court's Opinion (ECF No. 49) and Order (ECF No. 50).

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: March 18, 2022 | s/ Witold Walczak |
|  | Witold Walczak (No. 62976)<br>Richard Ting (No. 200438)<br>Connor Hayes (No. 330447)<br>ACLU OF PENNSYLVANIA<br>P.O. Box 23058<br>Pittsburgh, PA 15222<br>P: 412-681-7864<br>vwalczak@aclupa.org<br>rting@aclupa.org<br>chayes@aclupa.org |

18

Stephen A. Loney, Jr.  (No. 202535)
Marian K. Schneider (No. 50337)
ACLU OF PENNSYLVANIA
P.O. Box 60173
Philadelphia, PA 19102
P: 215-592-1513
sloney@aclupa.org
mschneider@aclupa.org

*Counsel for Plaintiffs*